**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
BINANCE HOLDINGS LIMITED,                                    :
                                                             :
                    Plaintiff                                :
                                                             :
            vs.                                              :       Case No.:  26-cv-1980
                                                             :
DOW JONES & COMPANY, INC. d/b/a THE :                                **COMPLAINT**
WALL STREET JOURNAL                                          :
                                                             :       JURY TRIAL DEMANDED
                    Defendant                                :
                                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

     Binance Holdings Limited ("Binance" or "Plaintiff"), as and for its Complaint against Dow Jones & Company, Inc. d/b/a The Wall Street Journal ("Dow Jones" or "Wall Street Journal"), alleges as follows:

## INTRODUCTION

    1.    Binance brings this action against the Wall Street Journal for publishing a false and defamatory article on February 23, 2026, which is the subject of this complaint (the "Article"). In the Article, the Wall Street Journal made numerous false and disparaging statements about Binance, and did so knowingly, recklessly, or negligently, and despite the fact that Binance provided factual corrections prior to publication, which the Wall Street Journal disregarded.

    2.    Binance is the world's largest cryptocurrency exchange by trading volume and users. In addition to holding licenses, registrations, and authorizations in more than 20 jurisdictions, Binance is the first cryptocurrency exchange to have secured full authorization under the Financial Services Regulatory Authority of the Abu Dhabi Global Market's regulatory framework. Binance has built one of the largest and most robust compliance programs in the digital asset industry, dedicating more than 1,500 individuals, nearly a quarter of its global workforce, to compliance, investigative, and risk functions. Binance invests

hundreds of millions of U.S. dollars in its compliance program, and a significant share of these resources is dedicated to maintaining a world-class compliance team.

3.    Despite this progress, the Wall Street Journal and its reporters have made a business of maligning both the cryptocurrency industry generally and Binance specifically, regardless of facts and reality. Indeed, this strategy appears tailored to generating sensationalist headlines designed to drive pageviews and the Wall Street Journal's bottom line. The Article is a case-in-point.

4.    Here, the Wall Street Journal ignored the strength of Binance's compliance program, disregarded specific facts provided by Binance, and instead chose to publish a false and misleading Article based on anonymous, unsupported sources. The Article begins with a false, defamatory and reckless headline, "Binance Fired Staff Who Flagged $1 Billion Moving to Sanctioned Iran Entities," and then launches into a narrative rife with bogus claims.

5.    Specifically, the Article makes factual allegations and implications that are false, defamatory, and reckless, including:

a.    The Wall Street Journal claims that Binance fired compliance personnel for investigating and identifying transactions with entities tied to Iran. **That is false**. The compliance personnel referenced in the Article were not terminated for any reporting or role in the investigations, and Binance's investigations continued unabated after the employees left Binance.

b.    The Wall Street Journal claims that Binance shut down this compliance investigation without taking any further action. **That is false**. Binance did not shut down the investigation; Binance offboarded the user accounts found to have engaged in suspicious activity and reported the suspicious activity soon after the conclusion of the investigation.

c.    The Wall Street Journal claims that Binance diminished its compliance with law enforcement requests. **That is false**. The compliance investigation started as a result of law enforcement requests seeking information about transactions, and Binance complied with those requests and cooperated with law enforcement, while also conducting an independent investigation that resulted in Binance offboarding user accounts it identified that were engaged in suspicious activity.

d.    The Wall Street Journal claims that Binance knowingly registered customers with false documentation and provided preferential treatment to those customers. **That is false**. Identity verification is mandatory for all customers.

6.    The Wall Street Journal contacted Binance at the eleventh hour seeking any comment Binance had on identified points and questions related to the Article, and refused to grant a good-faith extension for Binance to respond. Binance nevertheless worked with all haste to get factual corrections to the Wall Street Journal, but unfortunately, the Wall Street Journal then disregarded those corrections and refused an immediate request for correction. While it is incumbent upon a responsible publisher to seek to understand the true position prior to publication, it is apparent that the Wall Street Journal had already drafted the Article to conform to its own pre-existing agenda without regard to the fact that it contained false and defamatory statements. The Wall Street Journal was rushing to publish the Article as soon as possible regardless of the true facts, especially in light of a competitor—the New York Times—publishing an article on a similar topic that same day.

7.    Through this action, Binance seeks vindication of its reputation and recovery of damages resulting from the false and defamatory statements in the Article, which have only metastasized with multiple members of Congress adopting and repeating the Article's false statements as the basis for sending letters to Binance and other government officials demanding further inquiry. And those letters may very well be just the tip of the iceberg in terms of the

reputational, regulatory, and business ramifications of the Article and its baseless assertions. The Wall Street Journal must not be allowed to set aside journalistic standards and publish false, defamatory, and sensationalized narratives that sacrifice truth for profit.

## THE PARTIES

8.      **Binance Holdings Limited**[1] is a corporate entity incorporated under the laws of and headquartered in the Cayman Islands, and sits within the broader corporate structure of Binance.com, which is the world's largest cryptocurrency exchange by trading volume and users. With over 300 million registered users globally and more than $125 trillion in cumulative trading volume, Binance continues to lead the evolution of the digital asset ecosystem by building a secure, transparent, and fully compliant infrastructure.

9.      **Dow Jones & Co., Inc.** is a corporation organized under the laws of Delaware and headquartered at 1211 Avenue of the Americas, New York, New York 10036. Dow Jones operates and publishes the Wall Street Journal newspaper and publication, and published the Article in the Wall Street Journal on February 23, 2026. Reporters Patricia Kowsmann ("Kowsmann"), Angus Berwick ("Berwick"), and Ben Foldy ("Foldy,") were credited with writing the Article.

10.     The Wall Street Journal was founded in July 1889. On its website, the Wall Street Journal touts itself as "chronicling the rise of industries in America and around the world."

---

[1]     The Article refers generally to Binance. Based on the context of the Article, this appears to refer to Binance.com. As with any global financial institution, Binance.com is composed of a number of entities servicing various jurisdictions and functions. Within that corporate structure, Plaintiff Binance Holdings Ltd. is the entity that has served as the focus of U.S. regulatory and media scrutiny, including as the entity that entered into the 2023 resolutions with various agencies of the U.S. government. For the avoidance of doubt, Binance.com is operated by three entities regulated by Abu Dhabi Global Markets, as disclosed in the Terms of Use (https://www.binance.com/en/terms) and Privacy Notice (https://www.binance.com/en/privacy).

11. In its "News Mission," the Wall Street Journal tells its readers: "[t]rust in our news, information and authority is the currency we seek to earn with all we produce."

12. In its "Newsroom Standards & Ethics," the Wall Street Journal claims that it "strive[s] to be a model for ethical, fact-based, ambitious news reporting" and that "readers trust [it] because they see [the Wall Street Journal] as fair, accurate and impartial."

13. And the Wall Street Journal advertises its "No Surprises Journalism" as a commitment to "never pursue an agenda other than an unwavering commitment to the truth, which is why [the Wall Street Journal] strive [s]to attribute all disputable facts as precisely as possible to relevant parties."

14. Regrettably, these statements proved to merely be lip service, as the Wall Street Journal's treatment of Binance in the Article is wholly contradictory to the values set forth above.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because this is a civil action between a citizen of the Cayman Islands and a citizen of New York and Delaware, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

16. This Court has jurisdiction over Defendant Dow Jones pursuant to Civil Practice Law and Rules § 301 because Dow Jones is domiciled in New York, and therefore is subject to general jurisdiction in this Court.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events set forth in this Complaint occurred in this District. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b)(3) because Defendant Dow Jones is subject to personal jurisdiction in this District.

18. The claims herein are governed by the substantive law of the State of New York.

## FACTUAL ALLEGATIONS

*News Articles Unfairly Focus on Binance*

19.     Binance.com seeks to be the best cryptocurrency exchange for traders, offering deep liquidity, low fees, and a robust range of products. With strong security, global liquidity, and an easy-to-use interface, Binance remains the trusted choice for millions of crypto traders worldwide.

20.     However, Binance—like the cryptocurrency industry generally—has become a favorite target of the media and sensationalist journalism in recent years.

21.     Publications—like the Wall Street Journal—are undoubtedly aware that articles mentioning Binance, its founder Changpeng Zhao, and cryptocurrency generally, all increase the likelihood that readers will open and read those articles. This is particularly true for articles critical of Binance, where negative, sensational headlines serve as clickbait to drive engagement and increase advertising revenue.

22.     Negative press articles have focused on Binance's settlements with various U.S. government agencies in 2023 concerning Binance's compliance, KYC, and sanctions programs.

23.     Binance has dedicated significant resources and efforts to its compliance protocols and policies, especially since its 2023 settlements with U.S. government agencies.

24.     Binance has one of the largest and most robust compliance programs in the digital asset industry. Binance regularly partners with law enforcement investigators to help dismantle transnational criminal networks and claw back stolen user funds.

25.     Binance's compliance and law enforcement response functions are institutionalized to include: a dedicated Global Law Enforcement Response Team; a Financial Crimes Investigations unit focused on complex cross-border cases; a Sanctions and Counter-

Terrorist Financing investigations team; a Special Investigations team supporting high-risk and intelligence-led matters; and Blockchain analytics and compliance intelligence specialists.

26.     Binance supports these functions from other teams across the organization, including its Internal Audit, Legal & Regulatory Affairs, Compliance Governance (including escalation to the Criminal Conduct Committee), Risk & Transaction Monitoring teams and Technology and forensic data engineering teams.

27.     In total, more than 1,500 personnel (approximately 25% of Binance's global headcount) are dedicated to compliance, investigative, and risk functions.

28.     This dedication has paid off, as Binance's compliance efforts have been successful. In 2025 alone, Binance supported authorities in confiscating more than $131 million in funds linked to illicit activity, processed more than 71,000 law-enforcement requests worldwide, and delivered more than 160 training sessions to strengthen law enforcement's capacity to tackle crypto-related threats.

29.     Binance's success in its compliance regime has not, however, seen a corresponding decrease in media attacks against it. Indeed, Binance receives an outsized portion of media scrutiny, criticism, and defamation as compared to many of its competitors. The implication of that disproportionate media coverage is clear: the media, including the Wall Street Journal, sensationalizes stories and articles concerning Binance in order to drive up readership, without regard for the truth.

***The New York Times Article***

30.     On February 23, 2026 (but prior to the Article published the same day), the New York Times ("NYT") published an article entitled "Binance Employees Find $1.7 Billion in Crypto Was Sent to Iranian Entities." That article dealt with similar topics as the Article.

*The Wall Street Journal Contacts Binance, Purportedly Seeking Binance's Comments*

31.    On Friday, February 20, 2026, Angus Berwick from the Wall Street Journal wrote to Binance (copying Kowsmann), stating that the Wall Street Journal was "working on a story about internal investigations at Binance into its customers' transactions with a network funding Iran-backed terror groups, and the suspension and firing of employees who took part in the investigations." This inquiry implied, but did not explicitly state, that the Wall Street Journal had already decided the narrative and framing for the Article, which would be defamatory to Binance. In reality, the Wall Street Journal was merely checking a box by contacting the subject of the Article when it had no interest in materially adopting or including Binance's responses.

32.    Berwick stated that the Wall Street Journal's investigation "indicates that in October, after the investigators disclosed the role of a close Binance business partner in sending funds to the network, they were fired and the investigation was shut down."

33.    Berwick requested to speak to Binance regarding a list of 19 detailed points and queries, and eight additional questions, noting a deadline of Monday, February 23 by close-of-business (effectively less than one business day).

34.    Binance requested additional time to be able to consider and respond given the "long list of questions" the Wall Street Journal had put to it.

35.    On Friday, February 20, 2026, Berwick said he would "check[] on whether [the Wall Street Journal could] extend the time" to respond. But rather than responsibly and timely responding to Binance's request, and despite his assertion that he would "check," Mr. Berwick failed to provide any response until Monday, February 23, the day of the deadline itself.

36.    Only on Monday, February 23, 2026, did Berwick finally indicate that the Wall Street Journal would not reconsider its self-imposed deadline.

37.     Berwick refused to give any extension and instead asked Binance if the Wall Street Journal should simply consider a recent blog post published by Binance on similar topics to be Binance's response to the Wall Street Journal's questions. In other words, the Wall Street Journal sought to further rush to publish its Article by attempting to treat a Binance blog post as a substantive response to the Wall Street Journal's substantial points and questions, despite Binance's previous indications that it would respond directly to the Wall Street Journal.

38.     That same day, the Wall Street Journal revealed its true motivations. Instead of actually engaging with Binance, the Wall Street Journal prioritized filing quickly on the heels of the NYT so that it could maximize views of the Article. Berwick wrote to Binance indicating that he "saw the NYT piece," and "need[ed Binance's] comments as soon as possible" because the Wall Street Journal "plan[ned] to publish imminently." Berwick pushed for faster publication of the Article by stating that he could publish the Article immediately and could update it later "with any further comment from [Binance] later on." This appears to have been a disingenuous offer, given that no such update was published, and Binance's request to correct the Article post-publication was refused.

39.     At all relevant times, Berwick was acting within his scope of employment or other applicable contractual relationship with the Wall Street Journal, and therefore acting on behalf of and in furtherance of the business of the Wall Street Journal. All acts and omissions undertaken by Berwick set forth herein are therefore imputed to the Wall Street Journal.

40.     It is clear from Berwick's message that the Wall Street Journal had already drafted the Article to its own pre-existing agenda and was rushing to get the Article published as soon as possible, not to inform its readers of the true facts, but rather to compete for pageviews in light of a competitor's publication on a similar topic that day. In other words, the Wall Street Journal set aside its journalistic standards and the need for fair and accurate reporting for pure financial gain, to publish the Article as quickly as possible.

41.    Notwithstanding the unreasonable deadline imposed by the Wall Street Journal, Binance provided substantive responses to the 19 points and queries and eight additional questions that the Wall Street Journal had put to it by 2PM Eastern Standard Time, before the Article was published.

42.    Binance's responses were substantive and explicit, and set forth exactly why the Wall Street Journal's points and queries reflected an incorrect framing of the issues it intended to include in its Article. The responses also explained why facts, assertions, and implications contained in the Article were false, materially incomplete, or based on false information or a clear misunderstanding of the facts.

43.    The Wall Street Journal had every indication that the Article it intended to publish was based on false or incorrect information, and therefore would contain false assertions or implications of facts.

44.    The Wall Street Journal's failure to respond to Binance's request for an extension until the deadline arose and its decision to move that deadline up without a substantive response from Binance demonstrates its rush to publish the Article to keep up with a competitor, regardless of the truth. The Wall Street Journal's hollow offer to later correct or update the Article with further comments or facts from Binance epitomizes the Wall Street Journal's "shoot first, ask questions later" approach to the Article.

45.    And the Wall Street Journal's disregard for Binance's positions and responses in the published Article shows its disregard for facts that did not fit its preconceived narrative. Indeed, it appears the Wall Street Journal had already largely drafted the Article prior to checking the facts with the subject and intended to publish swiftly, without fully understanding and accounting for Binance's positions and responses. And following publication, the Wall Street Journal refused Binance's immediate request that the Wall Street Journal correct its Article.

46.    The Wall Street Journal's behavior, undertaken in an effort to race its competitor, is inconsistent with its ethical obligations and stated commitment to due diligence, to accuracy, and to providing an opportunity for full and fair comment pre-publication. It completely disregards the harm the Article's sensationalized headline and false accusations would and did cause Binance. And it reflects its reckless or intentional willingness to put commercial gain over the truth.

***The Wall Street Journal Publishes the Article Containing At Least 11 False and Defamatory Statements***

47.    On February 23, 2026, the Wall Street Journal published the Article with significant prominence online (at the top of its home page) and via print (on the front page of the publication), which, as expected, contained at least 11 false and defamatory statements.

***False Statement 1: The Wall Street Journal's Sensational Headline that Binance Fired Staff Who Flagged Iranian Transfers***

48.    The Article bears the sensational headline "Binance Fired Staff Who Flagged $1 Billion Moving to Sanctioned Iran Entities."

49.    This headline is a false and defamatory statement, because Binance did not unlawfully or unethically fire compliance team members in retaliation for their investigative findings and for circulating those findings.

50.    The Wall Street Journal knew that this accusation was false because Binance told the Wall Street Journal prior to publication that the employees departed after Binance uncovered breaches of company data protection and confidentiality policies, rather than because of the investigation:

> No one was terminated for conducting compliance reviews or raising concerns. Following an internal review, certain employees departed after breaches of company data protection and confidentiality policies were identified. These are serious violations that can result in termination. The actions taken were related to policy breaches, not the subject of any investigation.

51.     Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

52.     Following publication of the Article, Binance told the Wall Street Journal again that this statement is false, as "[n]o one was terminated for conducting compliance reviews or raising concerns."

53.     Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

***False Statement 2: The Wall Street Journal's Subheading Falsely Claims that Binance Dismantled the Probe and Suspended Investigators***

54.     The Article's subheading states "Weeks after Trump pardoned Binance's founder, the company dismantled [the] probe and suspended the investigators."

55.     This statement is false and defamatory, because (i) Binance did not unlawfully or unethically fire compliance team members in retaliation for their investigative findings and for circulating those findings; and (ii) Binance did not improperly or wrongly dismantle the underlying investigation after compliance team members circulated findings.

56.     As stated above (*supra* ¶ 50), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication.

57.     The Wall Street Journal also knew that statement was false because Binance informed it pre-publication that Binance's investigations continued after the other employees left Binance. Inexplicably, the Wall Street Journal failed to put this accusation to Binance prior to publication, and thus published it without knowing or caring whether it was true or not. It is false.

58.     Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

59.     As stated above (*supra* ¶ 52), following publication of the Article, Binance told the WSJ again that this statement was false.

60.    Following publication of the Article, Binance told the WSJ again that this statement was false because compliance personnel continued to work on the underlying investigation to ensure the investigation was completed thoroughly and appropriately.

61.    Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

### False Statement 3: The Wall Street Journal's Statement that Binance Fired Investigation Team Members in Retaliation for their Findings

62.    The Article states:

"[w]eeks after President Trump granted a pardon to convicted Binance founder Changpeng Zhao in October, executives at the crypto exchange dismantled a staff investigation into $1 billion that had recently moved through Binance to a network funding Iran-backed terror groups, according to company documents and people familiar with Binance's operations . . . Binance subsequently fired the investigators who had uncovered the transfers—and the network remained active."

63.    This statement is false and defamatory, because (i) Binance did not unlawfully or unethically fire compliance team members in retaliation for their investigative findings and for circulating those findings; (ii) Binance did not improperly or wrongly dismantle the underlying investigation after compliance team members circulated findings; and (iii) Binance took action regarding user accounts found to have engaged in suspicious activity.

64.    As set forth above (*supra* ¶¶ 50, 57), the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal so prior to publication.

65.    The Wall Street Journal also knew that the statement was false because Binance told it prior to publication that:

Binance identified the suspicious activity based on external law enforcement information combined with a thorough investigation. The accounts were offboarded. We cooperated and continue to cooperate with relevant law enforcement authorities. We took exactly the kind of decisive action that responsible platforms should take.

66.    Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

67.     As stated above (*supra* ¶¶ 52, 60), following publication of the Article, Binance told the Wall Street Journal again that this statement was false.

68.     Further, following publication of the Article, Binance told the Wall Street Journal that this statement was false:

> As detailed in the timeline we previously sent, as soon as Binance became aware of the potential Iran exposure, it investigated, escalated, and offboarded in line with company policies and procedures. This passage misleadingly attempts to assert that Binance allowed this transaction flow to occur with contemporaneous knowledge that the Entity A wallets were controlled by the IRGC. That is false.

69.     Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

***False Statement 4: The Wall Street Journal's False Claim that Binance Has Continued to Violate U.S. Sanctions and Money-Laundering Laws***

70.     The Article states:

> The episode echoed some of the same concerns that drew U.S. scrutiny in 2023, when prosecutors secured a plea deal with the world's largest crypto exchange and a prison sentence for Zhao. Binance admitted to breaking sanctions and anti-money-laundering laws—violations that turned it into a money-laundering hub for criminals, terrorists and Iranian-sanction evaders.

71.     This statement is false and defamatory, because (i) Binance has not continued to violate U.S. sanctions and money laundering laws; and (ii) Binance is not a "money-laundering hub for criminals, terrorists and Iranian-sanction evaders."

72.     The Wall Street Journal failed to put this accusation to Binance prior to publication, and thus published it without knowing or caring whether it was true or not. It is false.

73.     As set forth above (*supra* ¶ 65), the Wall Street Journal knew that these statements were false because Binance told it so prior to publication.

74.     The Wall Street Journal also knew that this statement was false and defamatory because Binance told it pre-publication that Binance has undertaken significant compliance efforts since 2023, setting forth clear facts as to the structure of Binance's compliance program

and the thousands of law enforcement requests it fields and the tens of millions of dollars of illicit funds confiscated with Binance's assistance.

75.    Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

76.    As stated above (*supra* ¶ 68), following publication of the Article, Binance told the Wall Street Journal again that this statement was false.

77.    Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

***False Statement 5: The Wall Street Journal Falsely Claims that Binance Has Not Improved its Compliance Program Since 2023***

78.    The Article states:

Documents, foreign law-enforcement officials and the people familiar with Binance's operations said the same conduct that broke the sanctions and anti-money-laundering laws has persisted at the exchange. And the law-enforcement officials said that, over the past year, Binance has started cooperating far less with their requests to obtain financial information about its hundreds of millions of users, such as by declining to provide customer details without a court order, or insisting requests are submitted via formal channels that can take months.

79.    This statement is false and defamatory, because (i) Binance has made material improvements to its compliance program since 2023; (ii) the conduct that was the subject of Binance's resolutions with the U.S. government agencies has not persisted at Binance; and (iii) Binance continues to fully cooperate with law enforcement.

80.    The Wall Street Journal knew, however, that their statement was false and defamatory because (a) it knew that the investigation focused on in the Article is actually a compliance success story resulting in the suspicious accounts being offboarded; and (b) as set forth above (*supra* ¶ 74), Binance set forth at length in its pre-publication communications to the Wall Street Journal the significant compliance efforts it has undertaken since 2023 and the breadth of Binance's compliance program.

81.    The Wall Street Journal also knew that this statement was false because, as set forth above (*supra* ¶ 65), Binance told it prior to publication that "Binance cooperates fully with law enforcement," explaining that in 2025 alone, Binance supported authorities in confiscating more than $131 million in funds linked to illicit activity, processed more than 71,000 law-enforcement requests worldwide, and delivered more than 160 training sessions to strengthen law enforcement's capacity to tackle crypto-related threats.

82.    Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

83.    Following publication of the Article, Binance told the Wall Street Journal again that this statement was false, as "Binance cooperated at all stages with law enforcement."

84.    Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

***False Statement 6: The Wall Street Journal States that Binance Onboarded Accounts Knowing that the Entities Financed Iran and Its Proxies***

85.    The Article states:

Internal reports submitted by Binance's financial-crime investigations team connected accounts registered to Chinese clients to digital wallets that U.S. and Israeli authorities said were used by Iran to finance its proxies. In total, $1.7 billion flowed over 2024 and 2025 from the accounts, which funded Iran-backed groups including Yemen's Houthi militants.

86.    This statement is false and defamatory, as it implies that Binance knew at the time of onboarding or at the time of the transactions that it was unlawfully and unethically facilitating the flow of cryptocurrency to Iranians and to terrorist groups in violation of its sanctions obligations.

87.    In reality, Binance identified the suspicious activity connected to Iran based on information from external law enforcement combined with a thorough investigation. Binance also cooperated with law enforcement and offboarded the accounts, consistent with applicable law and with maintaining a robust and healthy compliance function.

88.     As set forth above (*supra* ¶ 65), the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal so prior to publication.

89.     Nevertheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

90.     As stated above (*supra* ¶ 68), following publication of the Article, Binance told the Wall Street Journal again that this statement was false.

91.     Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

***False Statement 7: The Wall Street Journal Again Falsely States that Binance Suspended and Fired Its Investigators for Identifying the Suspicious Activity***

92.     The Article states "Investigators shared their findings with Binance's leadership, including Chief Executive Richard Teng and Chief Compliance Officer Noah Perlman, in October. The next month, Binance suspended the investigators and later fired them."

93.     This statement is false and defamatory because Binance did not suspend or fire team members in retaliation for their investigative findings and for circulating those findings.

94.     As stated above (*supra* ¶ 50), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication.

95.     Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

96.     As stated above (*supra* ¶ 52), following publication of the Article, Binance told the Wall Street Journal again that this statement was false.

97.     Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

***False Statement 8: The Wall Street Journal Falsely States that Binance Knowingly Accepted False Verification Documentation***

98.    The Article states:

In August, Binance's investigators submitted an internal report on the customer, a company called Hexa Whale Trading, registered in Hong Kong in 2024. Hexa had provided false documentation to open an account at Binance, which was flagged internally at the time, according to documents. Still, Binance allowed Hexa to open an account and gave it VIP client status, which reduces a user's trading fees.

99.    This statement is false and defamatory, because Binance did not, and does not, knowingly register customers with false documentation, let alone provide preferential treatment to some customers by allowing them to register with false documentation.

100.    The Wall Street Journal knew that this statement was false because the Wall Street Journal put that very statement to Binance prior to publication, and Binance responded by saying that it "does not knowingly onboard customers using incomplete/inaccurate documentation."

101.    Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

***False Statement 9: The Wall Street Journal Falsely States Binance Concealed or Shielded Customer Accounts from Investigations***

102.    The Article states "[u]nlike the majority of accounts held by customers, the suspicious account was labeled as 'internal' and access was tightly restricted. It required special approval from a Binance department called Internal Audit, whose leader reported to Teng, the CEO."

103.    This statement is false and defamatory, because Binance did not act unlawfully and unethically, or at the direction of Mr. Teng, by knowingly concealing or shielding any customer accounts from proper and thorough investigations.

104.    As stated above (*supra* ¶ 57), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication.

105.    The Wall Street Journal also knew that this statement was false because Binance told it prior to publication: "The account was not blocked from compliance oversight. It was placed on an Internal Audit restricted list for reasons unrelated to this investigation — a standard measure to preserve investigative integrity, not to bypass controls. When the compliance team required access, it was granted." Binance reiterated, that "[a]t no point was Compliance denied the access necessary to perform its investigative responsibilities and to suggest otherwise is false."

106.    Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

107.    Following publication of the Article, Binance told the Wall Street Journal again that this statement was false:

> As we noted in our prior response, no accounts associated with Blessed Trust were concealed from Compliance personnel or exempted from Binance's controls. Simply put, these designations had no material impact on the investigation, which again ultimately resulted in the offboarding of these accounts. Your reporting on this issue misleadingly asserts an attempt to conceal or protect these accounts.

108.    Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

***False Statement 10: The Wall Street Journal Falsely States that Binance Operated with Inadequate Compliance Standards and Did Not Address Suspicious Activity***

109.    The Article states:

> Months earlier, the account had been the subject of inquiries from the FBI, which didn't give a reason, and the Internal Revenue Service, which said the query was related to money laundering. The account also triggered 14 internal alerts of suspicious activity in 2025. Most were closed after an automated system found no illicit activity or they didn't meet escalation criteria, according to documents. Binance said the alerts were handled in accordance with standard compliance procedures.

110.    This statement is false and defamatory, because Binance did not act unlawfully and unethically by operating with inadequate compliance standards and ignoring or failing properly to address suspicious activity alerts.

111.    Binance cooperated with law enforcement, identified and investigated the relevant activity, and ultimately offboarded the subjects of the investigation.

112.    As stated above (*supra* ¶ 65), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication. The Wall Street Journal further knew that this statement was false because Binance told it prior to publication that "[a]ll customers are subject to risk-based KYC and verification controls."

113.    Binance further told the Wall Street Journal that "[a]ny suggestion that internal red flags were identified and deliberately disregarded is incorrect."

114.    Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

115.    As set forth above (*supra* ¶ 107), following publication of the Article, Binance told the Wall Street Journal again that this statement was false.

116.    Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

***False Statement 11: The Wall Street Journal Falsely States that Binance Prevented an Investigation into a Client's Suspicious Activity and Suspended and Fired Employees for Investigating a Client***

117.    The Article states:

On Sept. 24, one of the investigators contacted Blessed and asked about its relationship with digital wallets that were sending money to the Iranian illicit-financing network, according to documents.

Blessed told Binance the funds sent to Entity A originated from its clients that processed bitumen, an oil product used to pave roads, as well as others in the construction industry—both sectors that Binance knew participated in the illicit China-Iran oil trade, according to documents.

The investigators' findings on Blessed reached Binance's senior leadership, including Teng and Perlman, in October.

On Nov. 13, Binance suspended the main investigator on Blessed and a second person, the head of sanctions and counterterrorist financing investigations, and fired them in the following weeks.

Before leaving, the sanctions head submitted an internal report summarizing the investigators' findings. It couldn't be determined who received the report. On Nov. 24, other members of the investigations team told a Binance executive they would continue to investigate Blessed. Two days later, they were locked out of Binance's systems, suspended—and fired soon after.

118.    This statement is false and defamatory, because Binance did not continue operating an account funded by illicit activity nor did it fire compliance team members in retaliation for their investigations and findings.

119.    Binance appropriately investigated the suspicious activity, and escalated findings internally as part of a robust compliance program, which ultimately offboarded the clients.

120.    As stated above (*supra* ¶¶ 50, 57, 65, 105), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication.

121.    The Wall Street Journal also knew that the statement was false because Binance informed it pre-publication that:

Entity A is a cluster of unattributed addresses. It is not possible to determine the ownership of these addresses until offchain evidence surfaces. Between Entity A and the Binance client, there is no direct exposure. As mentioned in our blog, there are more than three hops between the Binance client, Blessed Trust and Sanctioned entity. Your statement is incorrect about direct exposure between Binance and Entity A.

122.    Binance also told the Wall Street Journal prior to publication that "Blessed Trust has been offboarded."

123.    Nonetheless, the Wall Street Journal ignored the truth and published this false and defamatory statement without further engagement with Binance.

124.    As stated above (*supra* ¶ 52, 68, 107), following publication of the Article, Binance told the Wall Street Journal again that this statement was false.

125.    Further, following publication of the Article, Binance reiterated its pre-publication refutation of this statement and further informed the Wall Street Journal that this "passage misleadingly attempts to assert that Binance allowed this transaction flow to occur with contemporaneous knowledge that the Entity A wallets were controlled by the IRGC. That is false."

126.    As stated above (*supra* ¶ 60), following publication of the Article, Binance told the Wall Street Journal again that this statement was false as compliance personnel continued to work on the underlying investigation to ensure the investigation was completed thoroughly and appropriately.

127.    Yet the Wall Street Journal has made no corrections to nor retracted any part of the Article.

### The Article's Statements Were Clearly Defamatory

128.    In addition to being false, each of the above statements in the Article was defamatory of Binance, as they falsely stated, implied, or otherwise suggested that Binance behaved unlawfully, improperly, and unethically, including by:

   a.    firing compliance team members in retaliation for circulating their investigative findings;

   b.    shuttering its investigation after compliance team members circulated findings;

   c.    not offboarding user accounts found to have engaged in suspicious activity;

   d.    continuing to violate U.S. sanctions and money laundering laws;

   e.    being, either intentionally or by failure to act, a money-laundering hub for wrongdoers;

   f.    not making any material improvements to its compliance program since 2023;

   g.    not cooperating fully with law enforcement;

   h.    knowingly registering customers with false documentation;

i.      knowingly concealing or shielding customer accounts from investigations;

j.      operating with inadequate compliance standards and ignoring or failing properly to address suspicious activity alerts; and

k.      knowingly operating an account funded by illicit activity.

129.    As set forth above, each of these defamatory statements in the Article is false.

***Binance Demands Corrections and Retraction***

130.    On February 24, 2026, the very next day after the Article was published, Binance wrote to Berwick concerning the Article. In particular, Binance demanded that Berwick and the Wall Street Journal "urgently address the following clarifications and corrections to [the Article], consistent with what [Binance] had informed [Berwick and the Wall Street Journal] prior to publication."

131.    Binance noted its disappointment that the Wall Street Journal "failed to represent" the information and truth that Binance had provided to it, which "render[ed] the [A]rticle inaccurate and defamatory."

132.    Berwick responded, indicating that he would get back to Binance. Berwick never responded, and neither he, nor Kowsmann or Foldy, made any correction or retraction to the Article, including to reflect any of the points that Binance submitted pre- or post-publication concerning the Article.

133.    Also on February 24, 2026, counsel for Binance sent a letter (the "Retraction Letter") to Emma Tucker, Editor-in-Chief of the Wall Street Journal, and Jason P. Conti, Executive Vice President and General Counsel for the Wall Street Journal.

134.    The Retraction Letter specifically stated that the "Article contains false information and it should be corrected immediately and the defamatory imputations retracted, to ensure that [the Wall Street Journal's] significant readership does not continue to be misled."

135.    The Retraction Letter set forth the clear guidelines for responsible journalism, including that "it is incumbent upon a responsible reporter and publisher to put to the subject of any article those matters which it intends to publish in good time prior to publication, to provide the subject with an opportunity to respond and thus to enable the publisher to understand the subject's true position."

136.    The Retraction Letter noted that, in contravention of those guidelines and principles, the Article did not reflect the true factual position as provided in the answers that Binance provided to the Wall Street Journal pre-publication. That failure, therefore, gave "rise to the inaccurate and damaging [A]rticle published, which falsely asserts to readers that Binance engaged in illegal conduct by breaching Iranian sanctions, shutting down investigation into this alleged conduct, and firing employees in retaliation for participating in that investigation in order to suppress the disclosure of wrongdoing."

137.    The Retraction Letter set forth, in no uncertain terms, that the "Article is false, seriously misleading to [the Wall Street Journal's] readers, and defamatory of [Binance, which] has written to [the Wall Street Journal] directly seeking correction of the major matters of significant concern." The Retraction Letter also demanded that, in order to "act responsibly," the Wall Street Journal must "remove [the] Article pending [a] correction, thus potentially avoiding the need for any further action."

138.    On February 25, 2026, Ava Lubell, counsel to Dow Jones, responded to the Retraction Letter, stating that "[w]e have reviewed the matters raised by [Binance] and no correction or clarification is warranted."

139.    To date, the Wall Street Journal has not removed, altered, corrected, or amended the Article in any material way, and the Article, replete with these false and defamatory statements, remains available online.

***The Wall Street Journal's State of Mind***

140.    The statements in the Article concern the internal affairs of Binance, and Binance did not seek to make those matters public or otherwise invite the media into those issues.

141.    The Wall Street Journal acted under no privilege in publishing the statements in the Article and, to the extent there was any privilege available, it was abused by the Wall Street Journal. This is because it engaged in a sham "investigation" into the facts set forth in the Article, waiting until the last minute to verify details of the story with Binance and then, after Binance provided evidence rebutting the Wall Street Journal's pre-conceived narrative, it made statements it knew, or was reckless as to knowing, or should have known were false and without further engaging Binance to understand the true facts.

142.    In addition, the Wall Street Journal had a particular bias and motivation for publishing the Article defaming Binance, given the financial payoff to publications for articles critical of Binance, where negative sensational headlines serve as clickbait to drive engagement and increase advertising revenue. The Wall Street Journal also had a particular bias and motivation for publishing the Article in a rush, without regard to the truth or falsity of its reporting, due to its desire to publish the Article close in time to a competitor's publication on a similar topic.

143.    Accordingly, the Wall Street Journal published its statements with actual malice as it knew its statements in the Article were false or, at minimum, were reckless as to their falsity, as evidenced by Berwick pressing to publish as quickly as possible and the Wall Street Journal's refusal to include pre-publication answers that Binance provided to them for inclusion in the Article.

144.    That behavior demonstrates actual malice and recklessness, in addition to ordinary negligence, in publishing the false statements in the Article.

***The Article and Its Numerous False Statements Have Harmed Binance***

145.    As intended by the Wall Street Journal, the Article was published to, and therefore seen and read by, the millions of readers of the Wall Street Journal.

146.    The Wall Street Journal's statements have directly caused harm to Binance, which has suffered serious and substantial damages as a result of the clearly false and defamatory statements published in the Article.

147.    The Wall Street Journal's statements have also severely diminished Binance's reputation generally in the industry.

148.    In addition, Binance incurred legal fees and costs in its efforts to request the Wall Street Journal to take down its defamatory Article prior to filing suit.

149.    These harms continue unabated as the Article has not been corrected or retracted, and therefore the damage to Binance and its reputation remains ongoing.

150.    For example, on February 24, 2026, Senator Blumenthal issued a Letter to Binance, posted on the Senator's website that repeats many of the False Statements in the Article.[2] Senator Blumenthal's accompanying press release states that he has "Open[ed an] Inquiry After New Reporting Reveals Binance Allowed $1.7 Billion in Money Laundering to Iran Proxies." That letter also requested that Binance respond to various document requests premised on the Article's false reporting.

151.    Additionally, on February 27, 2026, a group of Democratic Senators sent a letter to the Attorney General and Secretary of the Treasury demanding they open investigations into Binance based on the Article's—as is clear herein, false—reporting.

---

[2]    Available    at    https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-opens-inquiry-after-new-reporting-reveals-binance-allowed-17-billion-in-money-laundering-to-iran-proxies-and-russias-shadow-fleet.

152.    The false statements in the Article were defamatory *per se*, presumptively causing reputational injury to Binance in an amount in excess of $75,000.00 in an amount to be proven at trial.

## CAUSE OF ACTION

### Defamation

153.    Binance realleges and incorporates herein by reference each foregoing paragraph of this Complaint as if set forth in full herein.

154.    Dow Jones said, caused to be said, or implied, statements of fact concerning Binance which are false, which are damaging to its reputation, and which have caused and were calculated to cause Binance harm.

155.    Specifically, in the Article, Dow Jones said, caused to be said, or implied, the statements and meanings set forth in Paragraphs 47 to 125.

156.    Each of these statements is false, and Dow Jones published these statements knowing these statements were false, entertaining serious doubts about their accuracy, or acting with a high degree of awareness of the statements' probable falsity, which amounts to, at least, actual malice.

157.    Dow Jones made or caused these statements to be made or implied to third parties, including to millions of readers of the Article in the Wall Street Journal in print or online.

158.    These statements are defamatory, and defamed Binance *per se*.

159.    Dow Jones planned and made their defamatory statements with hatred, ill will, spite, a fraudulent or evil motive, or such a conscious and deliberate disregard of the interests of Binance that the conduct was willful or wanton, thereby entitling Binance to an award of punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Binance respectfully requests:

**A.** Compensatory, general, and specific damages in an amount to be proven at trial;

**B.** Punitive damages in an amount to be determined at trial;

**C.** Pre- and post-judgment interest;

**D.** Reasonable attorneys' fees; and

**E.** Such other and further relief as this Court may deem appropriate and equitable.

## **JURY DEMAND**

Binance demands a trial by jury of all claims triable to a jury in this action.

Dated: March 11, 2026

WITHERS BERGMAN LLP

By: _____
        Christopher N. LaVigne
        Amber Melville-Brown (*pro hac vice* forthcoming)
        Alexander C. Haden
        430 Park Avenue
        New York, NY 10022
        (212) 848-9000
        Christopher.LaVigne@withersworldwide.com
        Amber.Melville-Brown@withersworldwide.com
        Alex.Haden@withersworldwide.com