**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BINANCE HOLDINGS LIMITED,                          :

                        Plaintiff                          :

                  vs.                          :     Case No.:  1:26-cv-1980

                                :

DOW JONES & COMPANY, INC. d/b/a THE :   **AMENDED COMPLAINT**
WALL STREET JOURNAL                          :

                                :     JURY TRIAL DEMANDED

                Defendant                          :

                                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Binance Holdings Limited ("Binance" or "Plaintiff"), as and for its Amended Complaint against Dow Jones & Company, Inc. d/b/a The Wall Street Journal ("Dow Jones" or "Wall Street Journal"), alleges as follows:

## INTRODUCTION

1.      Binance brings this action against the Wall Street Journal for publishing three false and defamatory articles on February 23, 2026 (the "February 23 Article"), March 11, 2026 (the "March 11 Article"), and May 21, 2026 (the "May 21 Article") (collectively, the "Articles"), all of which are the subjects of this Amended Complaint. In the Articles, the Wall Street Journal made numerous false and defamatory statements about Binance, and did so knowing the statements to be false, or with knowing or reckless disregard for the truth.

2.      Binance is the world's largest cryptocurrency exchange by trading volume and users. In addition to holding licenses, registrations, and authorizations in more than 20 jurisdictions, Binance is the first cryptocurrency exchange to have secured full authorization under the Financial Services Regulatory Authority of the Abu Dhabi Global Market's regulatory framework. Binance has built one of the largest and most robust compliance programs in the digital

1

asset industry, dedicating more than 1,500 individuals, nearly a quarter of its global workforce, to compliance, investigative, and risk functions. Binance invests hundreds of millions of U.S. dollars in its compliance program, and a significant share of these resources is dedicated to maintaining a world-class compliance team.

3.      Despite this progress, the Wall Street Journal and its reporters, in particular reporter Angus Berwick, who has disparaged Binance outside of his reporting, have made a business of maligning both the cryptocurrency industry generally and Binance specifically, regardless of facts and reality. Berwick's animus against Binance appears to have contributed to the Wall Street Journal's strategy of generating sensationalist headlines designed to drive pageviews and the Wall Street Journal's bottom line at Binance's expense—and at the expense of the truth. The Articles are a case-in-point.

4.      Here, the Wall Street Journal engaged in a clear pattern: fashion a preconceived narrative against Binance for publication based, in material part, on anonymous sources; ambush Binance with eleventh-hour, facially slanted accusations, purporting to request responses; disregard Binance's requests for more time to respond; admit disinterest in Binance's actual responses and express desire to publish immediately regardless of Binance's responses; deliberately disregard the specific factual rebuttals that Binance provides; and publish unchanged a preconceived narrative with false and misleading statements that the Wall Street Journal knew or should have known were false.

5.      Specifically, the Articles make factual allegations and implications that the Wall Street Journal knows, or should have known or had reason to suspect, are false and defamatory. Before publishing each Article, the Wall Street Journal approached Binance with myriad questions slanted toward a preconceived agenda against Binance and demanded answers within an

2

unreasonable timeframe. Nevertheless, Binance communicated to the Wall Street Journal prior to publication of the Articles that the accusations were false. These responses were not mere self-serving denials. They were much more than that—Binance substantiated the assertions of falsity with specific and verifiable contradictory facts and explanations concerning, *inter alia*, Binance's compliance program and efforts, the departure of certain employees, and cooperation with law enforcement. The Wall Street Journal therefore had a high degree of awareness of the probable falsity of the assertions in all three Articles.

6.      Yet the Wall Street Journal deliberately chose not to meaningfully engage or further investigate, and proceeded knowingly to publish the false assertions. The Wall Street Journal, if it were truly interested in investigating its accusations, easily could have followed up and asked Binance questions about, or sought to verify, any of the specific information in Binance's responses and rebuttals. But in this case, the Wall Street Journal *admitted* it was not interested in actually investigating its claims or Binance's responses. Instead, for example, it informed Binance that it intended to publish the February 23 Article "imminently," even ahead of its own earlier-imposed deadline, because a competitor—the New York Times—published an article on a similar topic that same day. It justified its rush to publish regardless of Binance's responses by falsely stating that the Wall Street Journal could publish first and update the Article later with any further information from Binance. This was a hollow promise. Indeed, when Binance followed up with the Wall Street Journal after publication of the February 23 Article and sought clarification or retraction of that Article's many false statements, the Wall Street Journal refused.

7.      The Wall Street Journal's accusations and later republication of those accusations, notwithstanding Binance's rebuttals, confirm that the Wall Street Journal had already drafted the Articles to conform to its own pre-existing agenda and would have published them regardless of

Binance's response. Again, in this case, the Wall Street Journal said the quiet part out loud and explicitly admitted that it did not care about getting answers to its questions or engaging in a true investigation, instead prioritizing quick publication of its already baked narrative. The Wall Street Journal has exhibited a pattern of ambushing Binance with a constant barrage of questions under unrealistic and unwarranted time pressure, all designed to give the appearance of an investigation without truly engaging with the subject of its press. Before publishing the March 11 Article, the Wall Street Journal contacted Binance less than 48 hours before publication and again sent a list of loaded questions for Binance's comment, but when Binance responded with a spokesperson's immediate availability to discuss its responses, the Wall Street Journal asked to speak with the spokesperson the next day and said again that it "cannot guarantee the story won't run before then."

8.      As a result of the Wall Street Journal's rush to publish and conscious choice not to properly investigate its accusations while disregarding the true facts Binance provided, the Wall Street Journal published the Articles, which assert false and defamatory statements against Binance:

a.      The Wall Street Journal claims that Binance fired compliance personnel for investigating and identifying transactions with entities tied to Iran. **That is false**. The compliance personnel referenced in the Article were not terminated for any reporting or role in the investigations, and Binance's investigations continued unabated after the employees left Binance.

b.      The Wall Street Journal claims, based on anonymous sources, that Binance shut down this compliance investigation without taking any further action. **That is false**. Binance did not shut down the investigation; Binance offboarded the user accounts

4

found to have engaged in suspicious activity and reported the suspicious activity soon after the conclusion of the investigation.

c.  The Wall Street Journal claims, based on anonymous sources, that Binance diminished its compliance with law enforcement requests. **That is false**. The compliance investigation started as a result of law enforcement requests seeking information about transactions, and Binance complied with those requests and cooperated with law enforcement, while also conducting an independent investigation that resulted in Binance offboarding user accounts it identified that were engaged in suspicious activity.

d.  The Wall Street Journal claims that Binance knowingly registered customers with false documentation and provided preferential treatment to those customers. **That is false**. Identity verification is mandatory for all customers.

e.  The Wall Street Journal claims, based on anonymous sources, that Binance knowingly allowed Iran to move millions of dollars to fund its regime through May 2026. **That is false**. Binance did not knowingly permit transactions with sanctioned individuals and took appropriate measures to locate and investigate any sanctioned users or users with a potential nexus to sanctioned individuals on its platform and apply restrictions, including but not limited to freezing their accounts or offboarding them.

f.  The Wall Street Journal claims that transactions connected to Iranian users occurred on Binance.com, yet Binance knowingly failed to offboard the users connected to those transactions despite repeated red flags and internal alerts concerning the applicable wallets at issue. **That is false**. Binance did not ignore repeated red flags

5

or internal alerts; it handled alerts in accordance with standard compliance procedures, investigated the relevant activity, and took appropriate compliance action.

g.    The Wall Street Journal claims, based on anonymous sources, that Binance allowed an account to remain active for 15 months despite multiple internal flags. **That is false**. The account at issue was identified, investigated, offboarded, and reported to law enforcement.

h.    The Wall Street Journal claims that, based on anonymous sources, Binance declined to participate in a joint investigation into funds linked to Iran's central bank. **That is false**. Binance did not refuse to collaborate or cooperate in sanctions-related investigative efforts, but rather collaborated and continues to collaborate with those intelligence-sharing efforts to this day.

i.    The Wall Street Journal claims that, based on anonymous sources, Binance sought to loosen anti-money-laundering controls for high-risk clients and was reluctant to remove Russian users despite prior commitments to do so. **That is false**. Binance did not loosen anti-money-laundering controls. Instead, in line with its licensing obligations in certain markets, Binance removed a monetary threshold so that it could *expand* Enhanced Due Diligence coverage to *more* users. Binance also conducted *further* Enhanced Due Diligence on Russian legacy users and, where necessary, restricted accounts and offboarded users.

9.    Following publication of each of the Articles, Binance provided further factual corrections and rebuttals to the Wall Street Journal so that it could correct its false and defamatory statements. However, the Wall Street Journal refused to correct or retract its false and defamatory

statements. Indeed, after each Article, rather than pause, investigate further, or correct the record, the Wall Street Journal doubled down, repeating, amplifying, and refusing to correct the same falsehoods and publishing additional falsehoods in successive Articles.

10.     The *modus operandi* of the Wall Street Journal is made clear through its three Articles, setting forth a pattern of biased reporting. This pattern demonstrates actual malice; the WSJ has pursued a clear agenda against Binance while deliberately disregarding the truth.

11.     Through this action, Binance seeks vindication of its reputation and recovery of damages resulting from the false and defamatory statements in the Articles, which have only metastasized since the February 23 Article, with multiple members of Congress adopting and repeating false statements in that Article (and repeated in subsequent Articles) as the basis for sending letters to Binance and other government officials demanding further inquiry. And those letters may very well be just the tip of the iceberg in terms of the reputational, regulatory, and business ramifications of the Articles and their baseless assertions. The Wall Street Journal must not be allowed to set aside journalistic standards and knowingly or with reckless disregard publish false, defamatory, and sensationalized narratives that sacrifice truth for profit.

## THE PARTIES

12.     **Binance Holdings Limited**[1] is a corporate entity incorporated under the laws of and headquartered in the Cayman Islands, and sits within the broader corporate structure of

---

[1]    The Articles refer generally to Binance. Based on the context of the Articles, this appears to refer to Binance.com. As with any global financial institution, Binance.com is composed of a number of entities servicing various jurisdictions and functions. Within that corporate structure, Plaintiff Binance Holdings Limited is the entity that has served as the focus of U.S. regulatory and media scrutiny, including as the entity that entered into the 2023 resolutions with various agencies of the U.S. government. For the avoidance of doubt, Binance.com is operated by three entities regulated by the Abu Dhabi Global Market, as disclosed in the Terms of Use (https://www.binance.com/en/terms) and Privacy Notice (https://www.binance.com/en/privacy).

Binance.com, which is the world's largest cryptocurrency exchange by trading volume and users. With over 300 million registered users globally and more than $125 trillion in cumulative trading volume, Binance continues to lead the evolution of the digital asset ecosystem by building a secure, transparent, and fully compliant infrastructure.

13.    **Dow Jones & Company, Inc.** is a corporation organized under the laws of Delaware and headquartered at 1211 Avenue of the Americas, New York, New York 10036. Dow Jones operates and publishes the Wall Street Journal newspaper and publication, and published the Articles in the Wall Street Journal on February 23, 2026, March 11, 2026, and May 21, 2026. Reporters Patricia Kowsmann ("Kowsmann"), Angus Berwick ("Berwick"), and Ben Foldy ("Foldy") were credited with writing the Articles.

14.    The Wall Street Journal was founded in July 1889. On its website, the Wall Street Journal touts itself as "chronicling the rise of industries in America and around the world."

15.    In its "News Mission," the Wall Street Journal tells its readers: "[t]rust in our news, information and authority is the currency we seek to earn with all we produce."

16.    In its "Newsroom Standards & Ethics," the Wall Street Journal claims that it "strive[s] to be a model for ethical, fact-based, ambitious news reporting" and that "readers trust [it] because they see [the Wall Street Journal] as fair, accurate and impartial."

17.    And the Wall Street Journal advertises its "No Surprises Journalism" as a commitment to "never pursue an agenda other than an unwavering commitment to the truth, which is why [the Wall Street Journal] strive[s] to attribute all disputable facts as precisely as possible to relevant parties."

18.    Regrettably, these statements proved to merely be lip service, as the Wall Street Journal's treatment of Binance in the Articles wholly contradicts the values set forth above.

**JURISDICTION AND VENUE**

19.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because this is a civil action between a citizen of the Cayman Islands and a citizen of New York and Delaware, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

20.     This Court has jurisdiction over Defendant Dow Jones pursuant to Civil Practice Law and Rules § 301 because Dow Jones is domiciled in New York, and therefore is subject to general jurisdiction in this Court.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events set forth in this Complaint occurred in this District. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b)(3) because Defendant Dow Jones is subject to personal jurisdiction in this District.

22.     The claims herein are governed by the substantive law of the State of New York.

**FACTUAL ALLEGATIONS**

*News Articles Unfairly Focus on Binance*

23.     Binance.com seeks to be the best cryptocurrency exchange for traders, offering deep liquidity, low fees, and a robust range of products. With strong security, global liquidity, and an easy-to-use interface, Binance remains the trusted choice for millions of crypto traders worldwide.

24.     However, Binance—like the cryptocurrency industry generally—has become a favorite target of the media and sensationalist journalism in recent years.

25.     Publications—like the Wall Street Journal—are undoubtedly aware that articles mentioning Binance, its founder Changpeng Zhao, and cryptocurrency generally, all increase the likelihood that readers will open and read those articles. This is particularly true for articles critical

9

of Binance, where negative, sensational headlines serve as clickbait to drive engagement and increase advertising revenue.

26. Negative press articles have focused on Binance's settlements with various U.S. government agencies in 2023 concerning Binance's compliance, know-your-customer ("KYC"), and sanctions programs.

27. Binance has dedicated significant resources and efforts to its compliance protocols and policies, especially since its 2023 settlements with U.S. government agencies.

28. Binance has one of the largest and most robust compliance programs in the digital asset industry. Binance regularly partners with law enforcement investigators to help dismantle transnational criminal networks and claw back stolen user funds.

29. Binance's compliance and law enforcement response functions are institutionalized to include: a dedicated Global Law Enforcement Response Team; a Financial Crimes Investigations unit focused on complex cross-border cases; a Sanctions and Counter-Terrorist Financing investigations team; a Special Investigations team supporting high-risk and intelligence-led matters; and Blockchain analytics and compliance intelligence specialists.

30. Binance supports these functions from other teams across the organization, including its Internal Audit, Legal & Regulatory Affairs, Compliance Governance (including escalation to the Criminal Conduct Committee), Risk & Transaction Monitoring teams and Technology and forensic data engineering teams.

31. In total, more than 1,500 personnel (approximately 25% of Binance's global headcount) are dedicated to compliance, investigative, and risk functions.

32. This dedication has paid off, as Binance's compliance efforts have been successful. In 2025 alone, Binance supported authorities in confiscating more than $131 million in funds

linked to illicit activity, processed more than 71,000 law-enforcement requests worldwide, and delivered more than 160 training sessions to strengthen law enforcement's capacity to tackle crypto-related threats.

33.    Binance's success in its compliance regime has not, however, seen a corresponding decrease in media attacks against it. Indeed, Binance receives an outsized portion of media scrutiny, criticism, and defamation as compared to many of its competitors. The reason for that disproportionate media coverage is clear: the media, including the Wall Street Journal, sensationalizes stories and articles concerning Binance in order to drive up readership, without regard for the truth.

### *The New York Times Article*

34.    Before the Wall Street Journal published the February 23 Article, the New York Times ("NYT") published an article that same day entitled "Binance Employees Find $1.7 Billion in Crypto Was Sent to Iranian Entities." That article dealt with topics similar to those in the February 23 Article.

### *The Wall Street Journal Contacts Binance, Purportedly Seeking Binance's Comments for the February 23 Article*

35.    On Friday, February 20, 2026, Angus Berwick from the Wall Street Journal wrote to Binance (copying his colleague, Patricia Kowsmann), stating that the Wall Street Journal was "working on a story about internal investigations at Binance into its customers' transactions with a network funding Iran-backed terror groups, and the suspension and firing of employees who took part in the investigations." This inquiry implied that the Wall Street Journal had already decided the narrative and framing for the February 23 Article, which would be defamatory to Binance. In reality, the Wall Street Journal was merely checking a box when it had no interest in materially adopting or including Binance's responses and thus no interest in publishing the truth.

11

36.     Berwick stated that the Wall Street Journal's investigation "indicates that in October, after the investigators disclosed the role of a close Binance business partner in sending funds to the network, they were fired and the investigation was shut down."

37.     Berwick requested to speak to Binance regarding a list of 19 detailed points and queries, and eight additional questions, containing multiple assertions for comment or further questions in subparts, and imposed a deadline of Monday, February 23 by close-of-business (effectively less than one business day).

38.     Binance requested additional time to consider and respond given the "long list of questions" the Wall Street Journal had presented to it.

39.     On Friday, February 20, 2026, Berwick said he would "check[] on whether [the Wall Street Journal could] extend the time" to respond. But rather than responsibly and timely responding to Binance's request, and despite his assertion that he would "check," Mr. Berwick did not provide any response until Monday, February 23, the day of the deadline itself.

40.     Instead, Kowsmann responded on Saturday, February 21, 2026, that the Wall Street Journal would not reconsider its self-imposed deadline, without further explanation.

41.     When Berwick responded on Monday, February 23, 2026, he asked Binance if the Wall Street Journal should simply consider a recent blog post published by Binance on similar topics to be Binance's response to the Wall Street Journal's questions. In other words, the Wall Street Journal sought to rush to publish its February 23 Article by attempting to treat a Binance blog post as a substantive response to the Wall Street Journal's sprawling points and questions, despite Binance's previous indications that it would respond directly to the Wall Street Journal. The Wall Street Journal knew that it did not have Binance's full responses to the issues it raised,

yet published its allegations knowingly or recklessly disregarding the truth to support its preconceived agenda.

42.     That same day, the Wall Street Journal revealed its true motivations. Instead of actually engaging with Binance, the Wall Street Journal prioritized filing quickly on the heels of the NYT so that it could maximize views of the February 23 Article. Berwick wrote to Binance indicating that he "saw the NYT piece," and "need[ed Binance's] comments as soon as possible" because the Wall Street Journal "plan[ned] to publish imminently." Berwick further stated that he could publish the February 23 Article immediately—i.e. without Binance's responses to his questions—and could update it "with any further comment from [Binance] later on." This was a disingenuous offer, given that no such update was published, and Binance's requests to correct the February 23 Article post-publication were ignored and ultimately outright refused.

43.     At all relevant times, Berwick was acting within his scope of employment or other applicable contractual relationship with the Wall Street Journal, and therefore acting on behalf of and in furtherance of the business of the Wall Street Journal. All acts and omissions undertaken by Berwick set forth herein are therefore imputed to the Wall Street Journal.

44.     It is clear from Berwick's message that the Wall Street Journal had already drafted the February 23 Article to its own pre-existing agenda and was rushing to get the February 23 Article published as soon as possible, not to inform its readers of the true facts, but to compete for pageviews in light of a competitor's publication on a similar topic that day. In other words, the Wall Street Journal set aside its journalistic standards and the need for fair and accurate reporting to publish the February 23 Article as quickly as possible, for pure financial gain.

45.     Notwithstanding the unreasonable deadline imposed by the Wall Street Journal, Binance provided substantive responses to the 19 points and queries and eight additional questions

that the Wall Street Journal had presented to it by 2PM Eastern Time, before the February 23 Article was published.

46.    Binance's responses were substantive and explicit, and set forth specific and verifiable facts explaining why the Wall Street Journal's points and queries reflected an incorrect framing of the issues it intended to include in its February 23 Article. The responses also explained why facts, assertions, and implications contained in the February 23 Article were false, materially incomplete, or based on false information or a clear misunderstanding of the facts.

47.    The Wall Street Journal had every indication that the February 23 Article it intended to publish was based on false or incorrect information, and therefore would contain false assertions or implications of fact.

48.    The Wall Street Journal's failure to respond to Binance's request for an extension until the deadline arose and its decision to try to publish without a substantive response from Binance, and before its own imposed deadline, demonstrates its rush to publish the February 23 Article to keep up with a competitor, regardless of the truth. The Wall Street Journal's hollow offer to later correct or update the February 23 Article with further comments or facts from Binance epitomizes the Wall Street Journal's "shoot first, ask questions later" approach to the February 23 Article.

49.    Indeed, the February 23 Article was published less than two hours after Binance submitted its substantive responses and rebuttals. The Wall Street Journal did not follow up regarding those responses. And it failed to accurately account for Binance's positions and responses in the published February 23 Article, even after receiving detailed, factual rebuttals to its pregnant questions. Accordingly, the Wall Street Journal was on notice of the truth but nonetheless demonstrated its reckless disregard for facts that did not fit its preconceived narrative.

14

Indeed, it appears the Wall Street Journal had already largely drafted the February 23 Article prior to purporting to check the facts with the subject and intended to publish swiftly, without fully understanding and accounting for Binance's positions and responses and knowingly or recklessly disregarding the truth. And following publication, the Wall Street Journal refused Binance's immediate request that the Wall Street Journal correct its February 23 Article.

50.    The Wall Street Journal's behavior, undertaken in an admitted effort to keep up with its competitor, is inconsistent with its ethical obligations and stated commitments to due diligence, accuracy, and providing an opportunity for full and fair comment pre-publication. It completely disregards the harm the February 23 Article's sensationalized headline and false accusations would and did cause Binance. And it reflects its reckless or intentional willingness to ignore the truth and to put commercial gain over the truth.

***The Wall Street Journal Publishes the February 23 Article Containing At Least 11 False and Defamatory Statements***

51.    On February 23, 2026, the Wall Street Journal published the February 23 Article with significant prominence online (at the top of its home page) and via print (on the front page of the publication), which, as expected, contained at least 11 false and defamatory statements. The Wall Street Journal knew that these statements were false not only because Binance told the Wall Street Journal so, but also because Binance explained the true position prior to publication. Accordingly, the Wall Street Journal published these allegations knowingly or recklessly disregarding the truth.

***False Statement 1: The Wall Street Journal's Sensational Headline that Binance Fired Staff Who Flagged Iranian Transfers***

52.    The February 23 Article bears the sensational headline "Binance Fired Staff Who Flagged $1 Billion Moving to Sanctioned Iran Entities."

15

53.    This headline is a false and defamatory statement, because Binance did not unlawfully or unethically fire compliance team members in retaliation for their investigative findings and for circulating those findings.

54.    The Wall Street Journal knew that this accusation was false because Binance explained to the Wall Street Journal prior to publication that the employees departed after Binance uncovered breaches of company data protection and confidentiality policies, rather than because of the investigation:

> No one was terminated for conducting compliance reviews or raising concerns. Following an internal review, certain employees departed after breaches of company data protection and confidentiality policies were identified. These are serious violations that can result in termination. The actions taken were related to policy breaches, not the subject of any investigation.

55.    Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

56.    Following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement is false, as "[n]o one was terminated for conducting compliance reviews or raising concerns."

57.    Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

*False Statement 2: The Wall Street Journal's Subheading Falsely Claims that Binance Dismantled the Probe and Suspended Investigators*

58.    The February 23 Article's subheading states "Weeks after Trump pardoned Binance's founder, the company dismantled [the] probe and suspended the investigators."

59.    This statement is false and defamatory, because (i) Binance did not unlawfully or unethically fire compliance team members in retaliation for their investigative findings and for

circulating those findings; and (ii) Binance did not improperly or wrongfully dismantle the underlying investigation after compliance team members circulated findings.

60. As stated above (*supra* ¶ 54), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication.

61. The Wall Street Journal also knew that statement was false because Binance informed it pre-publication that Binance's investigations continued after the other employees left Binance. Inexplicably, the Wall Street Journal failed to present this accusation to Binance prior to publication, and thus published it without knowing or caring whether it was true or not. It is false.

62. Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

63. As stated above (*supra* ¶ 56), following publication of the February 23 Article, Binance told the WSJ again that this statement was false.

64. Following publication of the February 23 Article, Binance told the WSJ again that this statement was false because compliance personnel continued to work on the underlying investigation to ensure the investigation was completed thoroughly and appropriately.

65. Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

*False Statement 3: The Wall Street Journal's Statement that Binance Fired Investigation Team Members in Retaliation for their Findings*

66. The February 23 Article states:

Weeks after President Trump granted a pardon to convicted Binance founder Changpeng Zhao in October, executives at the crypto exchange dismantled a staff investigation into $1 billion that had recently moved through Binance to a network funding Iran-backed terror groups, according to company documents and people familiar with Binance's operations. . . . Binance subsequently fired the investigators who had uncovered the transfers—and the network remained active.

17

67.     This statement is false and defamatory, because (i) Binance did not unlawfully or unethically fire compliance team members in retaliation for their investigative findings and for circulating those findings; (ii) Binance did not improperly or wrongfully dismantle the underlying investigation after compliance team members circulated findings; and (iii) Binance took action regarding user accounts found to have engaged in suspicious activity.

68.     As set forth above (*supra* ¶¶ 54, 60), the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal so prior to publication.

69.     The Wall Street Journal also knew that the statement was false because Binance told it prior to publication that:

> Binance identified the suspicious activity based on external law enforcement information combined with a thorough investigation. The accounts were offboarded. We cooperated and continue to cooperate with relevant law enforcement authorities. We took exactly the kind of decisive action that responsible platforms should take.

70.     The Wall Street Journal also knew that this statement lacked any reliable basis because the February 23 Article itself attributed it only to purported "company documents" and unnamed "people familiar with Binance's operations." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

71.     The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

72.     As stated above (*supra* ¶¶ 56, 63), following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement was false.

18

73.    Further, following publication of the February 23 Article, Binance told the Wall Street Journal that this statement was false:

As detailed in the timeline we previously sent, as soon as Binance became aware of the potential Iran exposure, it investigated, escalated, and offboarded in line with company policies and procedures. This passage misleadingly attempts to assert that Binance allowed this transaction flow to occur with contemporaneous knowledge that the Entity A wallets were controlled by the IRGC. That is false.

74.    Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

### False Statement 4: The Wall Street Journal's False Claim that Binance Has Continued to Violate U.S. Sanctions and Money-Laundering Laws

75.    The February 23 Article states:

The episode echoed some of the same concerns that drew U.S. scrutiny in 2023, when prosecutors secured a plea deal with the world's largest crypto exchange and a prison sentence for Zhao. Binance admitted to breaking sanctions and anti-money-laundering laws—violations that turned it into a money-laundering hub for criminals, terrorists and Iranian-sanction evaders.

76.    This statement is false and defamatory, because (i) Binance has not continued to violate U.S. sanctions and money laundering laws; and (ii) Binance is not a "money-laundering hub for criminals, terrorists and Iranian-sanction evaders."

77.    The Wall Street Journal failed to present this accusation to Binance prior to publication, and thus published it without knowing or caring whether it was true or not. It is false.

78.    As set forth above (*supra* ¶ 69), the Wall Street Journal knew that these statements were false because Binance told it so prior to publication.

79.    The Wall Street Journal also knew that this statement was false and defamatory because Binance told it pre-publication that Binance has undertaken significant compliance efforts since 2023, setting forth clear facts as to the structure of Binance's compliance program and the

19

thousands of law enforcement requests it fields and the tens of millions of dollars of illicit funds confiscated with Binance's assistance.

80.    Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

81.    As stated above (*supra* ¶ 73), following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement was false.

82.    Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

**False Statement 5: The Wall Street Journal Falsely Claims that Binance Has Not Improved its Compliance Program Since 2023**

83.    The February 23 Article states:

Documents, foreign law-enforcement officials and the people familiar with Binance's operations said the same conduct that broke the sanctions and anti-money-laundering laws has persisted at the exchange. And the law-enforcement officials said that, over the past year, Binance has started cooperating far less with their requests to obtain financial information about its hundreds of millions of users, such as by declining to provide customer details without a court order, or insisting requests are submitted via formal channels that can take months.

84.    This statement is false and defamatory, because (i) Binance has made material improvements to its compliance program since 2023; (ii) the conduct that was the subject of Binance's resolutions with the U.S. government agencies has not persisted at Binance; and (iii) Binance continues to fully cooperate with law enforcement.

85.    The Wall Street Journal knew that its statement was false and defamatory because (a) it knew that the investigation focused on in the February 23 Article is actually a compliance success story resulting in the suspicious accounts being offboarded; and (b) Binance set forth at length in its pre-publication communications to the Wall Street Journal the significant compliance

efforts it has undertaken since 2023 and the breadth of Binance's compliance program (*see supra* ¶ 79).

86.    The Wall Street Journal also knew that this statement was false because, as set forth above (*supra* ¶ 69), Binance told it prior to publication that "Binance cooperates fully with law enforcement," explaining that in 2025 alone, Binance supported authorities in confiscating more than $131 million in funds linked to illicit activity, processed more than 71,000 law-enforcement requests worldwide, and delivered more than 160 training sessions to strengthen law enforcement's capacity to tackle crypto-related threats.

87.    The Wall Street Journal also knew that this statement lacked any reliable basis because the February 23 Article itself attributed it only to purported "documents" and unnamed "foreign law-enforcement officials" and "people familiar with Binance's operations." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

88.    The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

89.    Following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement was false, as "Binance cooperated at all stages with law enforcement."

90.    Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

***False Statement 6: The Wall Street Journal States that Binance Onboarded Accounts Knowing that the Entities Financed Iran and Its Proxies***

91.    The February 23 Article states:

Internal reports submitted by Binance's financial-crime investigations team connected accounts registered to Chinese clients to digital wallets that U.S. and Israeli authorities said were used by Iran to finance its proxies. In total, $1.7 billion flowed over 2024 and 2025 from the accounts, which funded Iran-backed groups including Yemen's Houthi militants.

92.    This statement is false and defamatory, as it implies that Binance knew at the time of onboarding or at the time of the transactions that it was unlawfully and unethically facilitating the flow of cryptocurrency to Iranians and terrorist groups in violation of its sanctions obligations.

93.    In reality, Binance identified the suspicious activity connected to Iran based on information from external law enforcement combined with a thorough investigation. Binance also cooperated with law enforcement and offboarded the accounts, consistent with applicable law and maintaining a robust and healthy compliance function.

94.    As set forth above (*supra* ¶ 69), the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal so prior to publication.

95.    The Wall Street Journal also knew that this statement lacked any reliable basis because the February 23 Article itself attributed it only to purported "internal reports." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

96.    The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

97.    As stated above (*supra* ¶ 73), following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement was false.

22

98.    Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

***False Statement 7: The Wall Street Journal Again Falsely States that Binance Suspended and Fired Its Investigators for Identifying the Suspicious Activity***

99.    The February 23 Article states "Investigators shared their findings with Binance's leadership, including Chief Executive Richard Teng and Chief Compliance Officer Noah Perlman, in October. The next month, Binance suspended the investigators and later fired them."

100.    This statement is false and defamatory because Binance did not suspend or fire team members in retaliation for their investigative findings and for circulating those findings.

101.    As stated above (*supra* ¶ 54), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication.

102.    Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

103.    As stated above (*supra* ¶ 56), following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement was false.

104.    Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

***False Statement 8: The Wall Street Journal Falsely States that Binance Knowingly Accepted False Verification Documentation***

105.    The February 23 Article states:

In August, Binance's investigators submitted an internal report on the customer, a company called Hexa Whale Trading, registered in Hong Kong in 2024. Hexa had provided false documentation to open an account at Binance, which was flagged internally at the time, according to documents. Still, Binance allowed Hexa to open an account and gave it VIP client status, which reduces a user's trading fees.

106.    This statement is false and defamatory, because Binance did not, and does not, knowingly register customers with false documentation, let alone provide preferential treatment to some customers by allowing them to register with false documentation.

107.    The Wall Street Journal knew that this statement was false because the Wall Street Journal presented that very statement to Binance prior to publication, and Binance responded by saying that it "does not knowingly onboard customers using incomplete/inaccurate documentation."

108.    Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

***False Statement 9: The Wall Street Journal Falsely States Binance Concealed or Shielded Customer Accounts from Investigations***

109.    The February 23 Article states "[u]nlike the majority of accounts held by customers, the suspicious account was labeled as 'internal' and access was tightly restricted. It required special approval from a Binance department called Internal Audit, whose leader reported to Teng, the CEO."

110.    This statement is false and defamatory, because Binance did not act unlawfully and unethically, or at the direction of Mr. Teng, by knowingly concealing or shielding any customer accounts from proper and thorough investigations.

111.    As stated above (*supra* ¶ 61), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication.

112.    The Wall Street Journal also knew that this statement was false because Binance told it prior to publication: "The account was not blocked from compliance oversight. It was placed on an Internal Audit restricted list for reasons unrelated to this investigation — a standard measure

24

to preserve investigative integrity, not to bypass controls. When the compliance team required access, it was granted." Binance reiterated, that "[a]t no point was Compliance denied the access necessary to perform its investigative responsibilities and to suggest otherwise is false."

113.    Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

114.    Following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement was false:

> As we noted in our prior response, no accounts associated with Blessed Trust were concealed from Compliance personnel or exempted from Binance's controls. Simply put, these designations had no material impact on the investigation, which again ultimately resulted in the offboarding of these accounts. Your reporting on this issue misleadingly asserts an attempt to conceal or protect these accounts.

115.    Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

### False Statement 10: The Wall Street Journal Falsely States that Binance Operated with Inadequate Compliance Standards and Did Not Address Suspicious Activity

116.    The February 23 Article states:

> Months earlier, the account had been the subject of inquiries from the FBI, which didn't give a reason, and the Internal Revenue Service, which said the query was related to money laundering. The account also triggered 14 internal alerts of suspicious activity in 2025. Most were closed after an automated system found no illicit activity or they didn't meet escalation criteria, according to documents. Binance said the alerts were handled in accordance with standard compliance procedures.

117.    This statement is false and defamatory, because Binance did not act unlawfully and unethically by operating with inadequate compliance standards and ignoring or failing properly to address suspicious activity alerts.

25

118. Binance cooperated with law enforcement, identified and investigated the relevant activity, and ultimately offboarded the subjects of the investigation.

119. As stated above (*supra* ¶ 69), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication. The Wall Street Journal further knew that this statement was false because Binance told it prior to publication that "[a]ll customers are subject to risk-based KYC and verification controls."

120. Binance further told the Wall Street Journal that "[a]ny suggestion that internal red flags were identified and deliberately disregarded is incorrect."

121. Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

122. As set forth above (*supra* ¶ 114), following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement was false.

123. Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

***False Statement 11: The Wall Street Journal Falsely States that Binance Prevented an Investigation into a Client's Suspicious Activity and Suspended and Fired Employees for Investigating a Client***

124. The February 23 Article states:

On Sept. 24, one of the investigators contacted Blessed and asked about its relationship with digital wallets that were sending money to the Iranian illicit-financing network, according to documents.

Blessed told Binance the funds sent to Entity A originated from its clients that processed bitumen, an oil product used to pave roads, as well as others in the construction industry—both sectors that Binance knew participated in the illicit China-Iran oil trade, according to documents.

The investigators' findings on Blessed reached Binance's senior leadership, including Teng and Perlman, in October.

On Nov. 13, Binance suspended the main investigator on Blessed and a second person, the head of sanctions and counterterrorist financing investigations, and fired them in the following weeks.

Before leaving, the sanctions head submitted an internal report summarizing the investigators' findings. It couldn't be determined who received the report. On Nov. 24, other members of the investigations team told a Binance executive they would continue to investigate Blessed. Two days later, they were locked out of Binance's systems, suspended—and fired soon after.

125.    This statement is false and defamatory, because Binance did not continue operating an account funded by illicit activity nor did it fire compliance team members in retaliation for their investigations and findings.

126.    Binance appropriately investigated the suspicious activity, and escalated findings internally as part of a robust compliance program, which ultimately offboarded the clients.

127.    As stated above (*supra* ¶¶ 54, 61, 69, 112), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication.

128.    The Wall Street Journal also knew that the statement was false because Binance informed it pre-publication that:

Entity A is a cluster of unattributed addresses. It is not possible to determine the ownership of these addresses until offchain evidence surfaces. Between Entity A and the Binance client, there is no direct exposure. As mentioned in our blog, there are more than three hops between the Binance client, Blessed Trust and Sanctioned entity. Your statement is incorrect about direct exposure between Binance and Entity A.

129.    Binance also told the Wall Street Journal prior to publication that "Blessed Trust has been offboarded."

130.    The Wall Street Journal also knew that this statement lacked any reliable basis because the February 23 Article itself attributed it only to purported "documents." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

27

131.    The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

132.    As stated above (*supra* ¶¶ 56, 73, 114), following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement was false.

133.    Further, following publication of the February 23 Article, Binance reiterated its pre-publication refutation of this statement and further informed the Wall Street Journal that this "passage misleadingly attempts to assert that Binance allowed this transaction flow to occur with contemporaneous knowledge that the Entity A wallets were controlled by the IRGC. That is false."

134.    As stated above (*supra* ¶ 64), following publication of the February 23 Article, Binance told the Wall Street Journal again that this statement was false as compliance personnel continued to work on the underlying investigation to ensure the investigation was completed thoroughly and appropriately.

135.    Yet the Wall Street Journal neither corrected nor retracted any part of the February 23 Article.

***The February 23 Article's Statements Were Clearly Defamatory***

136.    In addition to being false, each of the above statements in the February 23 Article was defamatory of Binance, as they falsely stated, implied, or otherwise suggested that Binance behaved unlawfully, improperly, and unethically, including by:

    a.    firing compliance team members in retaliation for circulating their investigative findings;

    b.    shuttering its investigation after compliance team members circulated findings;

    c.    not offboarding user accounts found to have engaged in suspicious activity;

    d.    continuing to violate U.S. sanctions and money laundering laws;

e.    being, either intentionally or by failing to act, a money-laundering hub for wrongdoers;

f.    not making any material improvements to its compliance program since 2023;

g.    not cooperating fully with law enforcement;

h.    knowingly registering customers with false documentation;

i.    knowingly concealing or shielding customer accounts from investigations;

j.    operating with inadequate compliance standards and ignoring or failing properly to address suspicious activity alerts; and

k.    knowingly operating an account funded by illicit activity.

***Binance Demands Corrections and Retraction of the February 23 Article***

137.    On February 24, 2026, the day after the February 23 Article was published, Binance wrote to Berwick concerning the February 23 Article. In particular, Binance demanded that Berwick and the Wall Street Journal "urgently address the following clarifications and corrections to [the February 23 Article], consistent with what [Binance] had informed [Berwick and the Wall Street Journal] prior to publication."

138.    Binance noted its disappointment that the Wall Street Journal "failed to represent" the information and truth that Binance had provided to it, which "render[ed] the [February 23 A]rticle inaccurate and defamatory."

139.    Berwick responded, indicating that he would get back to Binance. Berwick never responded, and neither he, nor Kowsmann, nor their co-author Foldy, made any correction or retraction to the February 23 Article, including to reflect any of the points that Binance submitted pre- or post-publication concerning the February 23 Article.

29

140.    Also on February 24, 2026, counsel for Binance sent a letter (the "Retraction Letter") to Emma Tucker, Editor-in-Chief of the Wall Street Journal, and Jason P. Conti, Executive Vice President and General Counsel for the Wall Street Journal.

141.    The Retraction Letter specifically stated that the "[February 23] Article contains false information and it should be corrected immediately and the defamatory imputations retracted, to ensure that [the Wall Street Journal's] significant readership does not continue to be misled."

142.    The Retraction Letter set forth the clear guidelines for responsible journalism, including that "it is incumbent upon a responsible reporter and publisher to put to the subject of any article those matters which it intends to publish in good time prior to publication, to provide the subject with an opportunity to respond and thus to enable the publisher to understand the subject's true position."

143.    The Retraction Letter noted that, in contravention of those guidelines and principles, the February 23 Article did not reflect the true factual position as provided in the answers that Binance provided to the Wall Street Journal pre-publication. That failure, therefore, gave "rise to the inaccurate and damaging [February 23 A]rticle published, which falsely asserts to readers that Binance engaged in illegal conduct by breaching Iranian sanctions, shutting down investigation into this alleged conduct, and firing employees in retaliation for participating in that investigation in order to suppress the disclosure of wrongdoing."

144.    The Retraction Letter set forth, in no uncertain terms, that the "[February 23] Article is false, seriously misleading to [the Wall Street Journal's] readers, and defamatory of [Binance, which] has written to [the Wall Street Journal] directly seeking correction of the major matters of significant concern." The Retraction Letter also demanded that, in order to "act

30

responsibly," the Wall Street Journal must "remove [the] [February 23] Article pending [a] correction, thus potentially avoiding the need for any further action."

145.    On February 25, 2026, Ava Lubell, counsel to Dow Jones, responded to the Retraction Letter, stating that "[w]e have reviewed the matters raised by [Binance] and no correction or clarification is warranted."

146.    To date, the Wall Street Journal has not removed, altered, corrected, or amended the February 23 Article in any material way, and the February 23 Article, replete with these false and defamatory statements, remains available online.

**The Wall Street Journal Contacts Binance Again, Purportedly Seeking Comments for the March 11 Article**

147.    On March 9, 2026, Berwick again contacted Binance concerning an upcoming article that would follow up on the February 23 Article, submitting six bullets concerning purported "reporting" about Binance's internal investigation into Iran-related transactions.

148.    Yet again, Berwick demanded responses and comments thereto within less than one day, with no reason given for such "urgency," because none existed.

149.    Berwick's "reporting" again consisted of facially slanted accusations, making clear that another article containing false and defamatory statements was forthcoming. For example, Berwick asserted:

- "[T]he Justice Department is investigating whether Iranians used Binance to evade U.S. sanctions, after Binance fired and suspended its investigators who discovered the transfers, and that Justice Department officials have contacted people with knowledge of the transactions to seek interviews and gather evidence."

31

- "We previously reported that Blessed Trust was the primary channel for the crypto moving to the Iranian network, with Blessed transferring more than $1 billion to the network either from its own Binance account, or through other Binance account holders."

150. Again, Berwick's email made clear that the Wall Street Journal's preconceived agenda had already been formed, and that it would publish that agenda regardless of what Binance provided.

151. Nevertheless, the following day, Binance responded to Berwick with its factual rebuttal of the points in his March 9 email. Specifically, Binance stated that it "categorically did not directly transact with any sanctioned entities," that it "unequivocally did not terminate any employees for escalating compliance concerns," and that Binance uncovered a "sophisticated, multi-jurisdictional pattern of financial activity" that resulted in some funds "arriv[ing] in wallets with links to IRGC." Binance further noted that the "IRGC connections were only identified and sanctioned after Binance began investigating and taking action in lock step with law enforcement to shut down this network." Binance also pointed the Wall Street Journal to a recent blog post by Binance setting forth further information about the true facts about the investigation into these transactions.

152. Based on those responses, the Wall Street Journal again had every indication that the March 11 Article it intended to publish was based on false or incorrect information, and therefore would contain false assertions or implications of facts.

153. Additionally, Berwick again revealed the Wall Street Journal's disregard for the truth. On March 10, in an effort to prompt the Wall Street Journal to take Binance's responses and rebuttals seriously, Binance offered to have a spokesperson immediately available to speak with

Berwick. Berwick responded asking for a call on March 11, the day of publication, and stated that "I can't guarantee the story won't run before then." In other words, Berwick put off an interview with a key member of Binance's team and proceeded to publish the March 11 Article without further investigation or discussion with Binance.

154. And the Wall Street Journal's failure to accurately account for Binance's positions and responses in the published March 11 Article, even after receiving notice of the truth, shows its reckless disregard for facts that did not fit its preconceived narrative. Indeed, it appears the Wall Street Journal had already largely drafted the March 11 Article prior to purporting to check the facts with the subject and intended to publish swiftly, without fully understanding and accounting for Binance's positions and responses and thus published these allegations knowingly or recklessly disregarding the truth.

***The Wall Street Journal Publishes the March 11 Article Repeating Its False and Defamatory Statements***

155. On March 11, 2026, the Wall Street Journal published the March 11 Article, again authored by Berwick and Kowsmann, continuing the Wall Street Journal's knowingly false and sensationalized reporting about Binance. Rather than correct the false narrative advanced in the February 23 Article, the March 11 Article repeated and amplified knowingly false and defamatory allegations about Binance, including by portraying Binance as improperly facilitating sanctions evasion and operating with deficient compliance controls. Those portrayals were false.

156. The March 11 Article directly linked readers to the earlier February 23 Article and repeated the same false and defamatory allegations about Binance. By then, as set forth above, Binance had already repeatedly put the Wall Street Journal on notice that those accusations were false, yet the Wall Street Journal knowingly persisted in republishing and amplifying them without ever investigating or engaging with Binance's repeated factual responses and despite that the Wall

Street Journal knowingly or recklessly disregarded the truth contradicting these continued publications.

***False Statement 12: The Wall Street Journal Falsely States that Binance Dismantled an Internal Investigation***

157. The March 11 Article states:

The probe follows the crypto exchange's dismantling of an internal investigation into more than $1 billion that flowed through the platform to a network funding Iran-backed terror groups, according to company documents and people familiar with the matter.

158. The statement is false and defamatory because Binance did not dismantle any internal investigations.

159. As set forth above (*supra* ¶ 61), the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal so prior to publication of the February 23 Article.

160. Further, the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal again, prior to the March 11 Article, that Binance "unequivocally did not terminate any employees for escalating compliance concerns."

161. The Wall Street Journal also knew that this statement lacked any reliable basis because the March 11 Article itself attributed it only to purported "company documents" and unnamed "people familiar with the matter." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

162. The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

163. Following publication, Binance told the Wall Street Journal again that this statement was false.

34

164.    Yet the Wall Street Journal neither corrected nor retracted any part of the March 11 Article.

***False Statement 13: The Wall Street Journal Falsely Implies that Binance Was Again (and Correctly) in the "Legal Spotlight" for Criminal Misconduct***

165.    The March 11 Article states:

The inquiry puts the world's largest crypto exchange back in the legal spotlight after its founder Changpeng Zhao, known as CZ, received a pardon from President Trump in October. Binance pleaded guilty in 2023 to violating U.S. anti-money-laundering and sanctions laws, paying a $4.3 billion fine and agreeing to operate under U.S. oversight. Zhao pleaded guilty to a related charge and spent four months in jail.

166.    These statements are false and defamatory because, read together, they falsely portray Binance as guilty of further criminal wrongdoing since 2023. The March 11 Article deliberately weaponized references to Binance's 2023 plea, the $4.3 billion fine, Zhao's guilty plea, and Zhao's jail sentence to assert, falsely, that Binance has not taken its compliance efforts seriously since its compliance program previously drew U.S. regulatory and law enforcement scrutiny.

167.    As stated above (*supra* ¶¶ 69, 73, 86), the Wall Street Journal knew that the statement was false because Binance told the Wall Street Journal so prior to publication of the February 23 Article.

168.    The Wall Street Journal further knew that these statements were false because Binance told the Wall Street Journal prior to the March 11 Article that Binance did not directly transact with any sanctioned entities, and that Binance worked with law enforcement to shut down a complex network involving the IRGC once that network was identified. Binance also previously detailed for the Wall Street Journal its recent compliance efforts and work with international law enforcement agencies to combat illicit use of cryptocurrency. Instead of engaging with these facts, the Wall Street Journal ignored them.

169. The March 11 Article further states "[t]he Wall Street Journal couldn't determine whether the Justice Department is investigating Binance itself for potential misconduct, or solely the customers on its platform," clearly evidencing in its own words that it did not have sufficient information to make this serious assertion, yet it proceeded nonetheless to publish it, despite not identifying any concrete source supporting the suggestion that Binance was under investigation.

170. Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published these false and defamatory statements and implications without further engagement with Binance.

171. And the Wall Street Journal neither corrected nor retracted any part of the March 11 Article.

***False Statement 14: The Wall Street Journal Falsely States that Binance Suspended the Employees Investigating the Transactions After They Flagged Transfers Linked to Iran***

172. The March 11 Article states:

Binance suspended the employees investigating the transactions last November, not long after they flagged $1.7 billion moving from Chinese clients into digital wallets used by Iran to finance its proxies, including Yemen's Houthi militants, the Journal reported last month, citing internal reports submitted by the employees.

173. This statement is false and defamatory, because (i) Binance did not suspend employees in retaliation for investigating transactions or for flagging suspicious activity; and (ii) Binance did not suspend employees because they purportedly identified $1.7 billion moving from Chinese clients into wallets used by Iran to finance its proxies.

174. As set forth above (*supra* ¶¶ 54, 56), the Wall Street Journal knew that this statement was false because Binance explained to the Wall Street Journal prior to publication of the February 23 Article that no one was terminated for conducting compliance reviews or raising concerns. Further, the Wall Street Journal knew that this statement was false because Binance told

36

the Wall Street Journal again, prior to the March 11 Article, that Binance "unequivocally did not terminate any employees for escalating compliance concerns."

175. Binance provided the Wall Street Journal with a clear, verifiable explanation of the true reasons for these terminations, which the Wall Street Journal deliberately chose to ignore.

176. The Wall Street Journal also knew that this statement lacked any reliable basis because the March 11 Article itself attributed it only to purported "internal reports." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

177. The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

178. Following publication, Binance told the Wall Street Journal again that this statement was false.

179. Yet the Wall Street Journal neither corrected nor retracted any part of the March 11 Article.

***The March 11 Article's Statements Were Clearly Defamatory***

180. In addition to being false, each of the above statements in the March 11 Article was defamatory of Binance, as they falsely stated, implied, or otherwise suggested that Binance behaved unlawfully, improperly, and unethically, including by:

   a.   firing compliance team members in retaliation for circulating their investigative findings;

   b.   shuttering its investigation after compliance team members circulated findings; and

   c.   returning to the "legal spotlight" for renewed criminal or regulatory wrongdoing.

181.    And, as the March 11 Article re-published the false and defamatory statements in the February 23 Article, the March 11 Article was defamatory of Binance for the same reasons set forth above (*supra* ¶ 136).

### *Binance Demands Corrections and Retraction of the March 11 Article*

182.    Immediately after the March 11 Article was published, Binance wrote to the Wall Street Journal concerning this article's false and defamatory statements. In particular, Binance demanded the March 11 Article "be corrected immediately, and the defamatory imputations retracted."

183.    Binance noted that the Wall Street Journal "ha[d] been repeatedly informed of the true facts concerning the investigation, and other issues raised in [the March 11] Article and [the February 23 Article], yet, knowing them to be false, [the Wall Street Journal] persist[ed] in false and defamatory statements that mislead" the publication's readers and cause harm to Binance. Binance "again call[ed] upon [the Wall Street Journal] to act responsibly by retracting and correcting the false statements" that it made and repeated.

184.    The Wall Street Journal did not correct or retract the March 11 Article. Instead, despite Binance's repeated notice of the falsity of its statements, the Wall Street Journal continued its pattern of republishing and expanding the same knowingly false narrative about Binance in the weeks that followed.

185.    To date, the Wall Street Journal has not removed, altered, corrected, or amended the March 11 Article in any material way, and the March 11 Article, replete with these false and defamatory statements, remains available online.

### *Binance Files Suit Against the Wall Street Journal for the February 23 Article*

186.    On March 11, 2026, Binance instituted this suit against the Wall Street Journal for the false and defamatory statements made in the February 23 Article. At the time of filing, Binance

was not yet aware the March 11 Article was going to be published nor the specific false and defamatory statements the Wall Street Journal made therein.

187. Nevertheless, and despite receiving notice of this action and the wrongdoing Binance set forth in the initial complaint in this action, the Wall Street Journal continued its course of conduct by engaging in a repeated pattern of rushed, agenda-driven reporting about Binance; posing slanted, last-minute allegations while denying reasonable time for response; disregarding Binance's factual rebuttals; and publishing anyway.

***The Wall Street Journal Again Superficially Seeks Binance's Comment for Its May 21 Article***

188. On Tuesday, May 12, 2026, Berwick wrote to Binance, stating that the Wall Street Journal was "reporting an article that looks at how Binance's platform was used as a vital financial channel for the Iranian Revolutionary Guard Corps in the years preceding the current U.S.-Iran war." Although framed as a request for comment, the inquiry again made clear that the Wall Street Journal had already decided the accusations that it intended to make.

189. Berwick stated that the Wall Street Journal's investigation showed that "around $3 billion has moved through Binance to networks that were financing the IRGC, and a key mover of these funds was the sanctioned Iranian financier Babak Zanjani."

190. Berwick further stated that the Wall Street Journal "hope[d] to engage with Binance on this reporting and welcome[d] any perspective the company can offer on the points outlined below."

191. Once again, Berwick sent Binance a lengthy list of 31 detailed points and queries, not counting subparts, but again imposed an unreasonably, and unjustified, short deadline, demanding a response by Thursday, May 14, 2026 (less than two days' time).

192. Binance was again forced to request additional time to respond to this voluminous set of questions.

193.    On May 14, 2026, Berwick added another question to the already significant set of inquiries.

194.    On May 18, 2026, after working around the clock to review and answer the Wall Street Journal's numerous questions, Binance provided a lengthy and detailed response and rebuttal.

195.    On May 19, 2026, Berwick sought responses to fourteen additional sprawling questions and demanded that Binance respond within 24 hours, which was—yet again—a patently unreasonable timeframe. Berwick also stated that he would "consider [Binance's] answers to be on the record" and if Binance wanted the Wall Street Journal to consider Binance's responses then Binance had to "put those statements on the record." This response further demonstrated that the Wall Street Journal was not engaged in a good-faith effort to test its reporting against the facts, but was instead determined to publish on its own schedule while dictating the terms on which Binance's rebuttal would be considered, if at all.

196.    The Wall Street Journal's outright refusal to consider relevant background information was entirely unreasonable and evidences an utter disregard for the truth. It is incumbent on a responsible publisher to consider all relevant information provided to it in order to properly and professionally inform its readers. In the case of the Wall Street Journal's recent reporting on Binance, which had already forced Binance to file a legal complaint over prior false and defamatory accusations, such consideration was all the more imperative. The Wall Street Journal's insistence on disregarding highly relevant information because it had not been presented on terms of its unilateral choosing is clear evidence that the Wall Street Journal did not care about the truth, but rather remained bent on advancing its preordained accusations.

197.    Once again Binance was required to seek additional time to review and respond, particularly given the upcoming holiday weekend.

198.    On May 21, 2026, Binance provided substantive responses to the 14 additional follow-up inquiries and clarifications that the Wall Street Journal had layered onto its requests.

199.    Binance's responses were detailed and explicit and explained precisely why the Wall Street Journal's questions reflected an incorrect characterization of the issues it intended to include in its forthcoming article. The responses further explained why the facts, assertions, and implications contained in the forthcoming article were false, materially incomplete, and reflected a clear misunderstanding of the facts. Once again, the provision of these denials, and the provision of the supporting information meant that the Wall Street Journal published these allegations knowingly or recklessly disregarding the truth.

***The Wall Street Journal Publishes the May 21 Article as Part of Its Continuing False and Defamatory Reporting on Binance***

200.    On May 21, 2026, the Wall Street Journal published the May 21 Article with significant prominence online and via print, making numerous false and defamatory statements. The May 21 Article continued the Wall Street Journal's knowingly false and defamatory reporting concerning Binance, repeating prior falsehoods and adding new fabrications as part of its ongoing pattern of purposefully disregarding the truth in order to advance its preconceived narrative against Binance.

***False Statement 15: The Wall Street Journal's Headline Falsely Suggests that Binance Continued to Knowingly Facilitate Billions of Dollars in Transactions for Iran***

201.    The May 21 Article bears the inflammatory headline "Iran Moved Billions Through Binance to Fund Regime—Continuing Into This Month."

202.    This statement is false and defamatory because it implies that Binance knowingly allowed or failed to stop Iran from transacting on Binance.com and that it should have known Iran was transacting on Binance.com leading up to and prior to May 2026.

203.    This headline further is false and defamatory, because (i) Binance did not knowingly permit transactions with individuals or digital wallets that were sanctioned; and (ii) Binance took appropriate action once any such individuals or digital wallets became sanctioned, contrary to the headline's suggestion of continuing misconduct through May 2026.

204.    As set forth above (*supra* ¶¶ 69, 73, 168), the Wall Street Journal knew that this headline was false because Binance told it so prior to publication of the February 23 and March 11 Articles.

205.    The Wall Street Journal further knew that this headline was false because Binance provided clear supporting explanations to the Wall Street Journal, prior to publication of the May 21 Article, that Binance had not permitted transactions with sanctioned individuals and had taken appropriate investigative measures. Binance confirmed that "any transactions with designated individuals occurred prior to their wallet attribution as sanctioned individuals. Once they were designated or relevant wallets were attributed as linked to designated individuals, [Binance] investigated, restricted the accounts, offboarded them and reported them to law enforcement."

206.    Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory headline without further engagement with Binance.

207.    Following publication of the May 21 Article, Binance told the Wall Street Journal again that its reporting was false because it conflated and attributed wider blockchain and network-level activity solely to activity on the Binance platform; failed to distinguish relevant account

42

metrics to overstate fund amounts moving through the Binance platform; did not fairly report that the referenced account activity connected to later-sanctioned users predated any designation or reliable attribution of the account as sanctioned; and purposefully minimized Binance's compliance response once that designation or attribution became clear.

208.    Yet the Wall Street Journal neither corrected nor retracted any part of the May 21 Article.

***False Statement 16: The Wall Street Journal's False Subheading that Transactions on Binance.com Occurred Despite Repeated Red Flags***

209.    The May 21 Article's subheading states "[t]ransactions on world's largest crypto exchange took place despite repeated red flags."

210.    This statement is false and defamatory, because (i) Binance did not ignore repeated red flags concerning sanctioned individuals or digital wallets; and (ii) Binance took appropriate investigative and compliance action in response to relevant risk indicators.

211.    As set forth above (*supra* ¶¶ 69, 73, 168), the Wall Street Journal knew that this statement was false because prior to the February 23 and March 11 Articles, Binance had already informed it that Binance did not disregard internal alerts, and that it has provided clear supporting confirmation that it handled alerts in accordance with standard compliance procedures, and ultimately investigated and offboarded the relevant accounts.

212.    Further, the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal again, prior to the May 21 Article, that Binance did not permit any transactions from sanctioned entities to go through its platform. More specifically, Binance told the Wall Street Journal that any such transactions predated attribution of the relevant wallets to sanctioned individuals and that, once those wallets were identified, Binance investigated, restricted the accounts, offboarded them, and reported them to law enforcement.

213.    Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

214.    Following publication of the May 21 Article, Binance further told the Wall Street Journal that its reporting was false because it conflated and attributed wider blockchain and network-level activity solely to activity on the Binance platform; failed to distinguish relevant account metrics to overstate fund amounts moving through the Binance platform; did not fairly report that the referenced account activity connected to later-sanctioned users predated any designation or reliable attribution of the account as sanctioned; and purposefully minimized Binance's compliance response once that designation or attribution became clear.

215.    Yet the Wall Street Journal neither corrected nor retracted any part of the May 21 Article.

### False Statement 17: The Wall Street Journal Falsely States that "At [the] Core" of A Secret Payment Network "Was Binance"

216.    The May 21 Article states "[a]s Iran braced for conflict with the U.S., a key regime financier built a secret payment network to keep money flowing to its military forces. At its core was Binance."

217.    This statement is false and defamatory, because (i) Binance was not at the core of any secret payment network used to keep money flowing to Iran's military forces; and (ii) Binance did not serve as a central platform for such activity.

218.    As set forth above (*supra* ¶¶ 69, 73, 168), the Wall Street Journal knew that this statement was false because prior to the February 23 and March 11 Articles, Binance had already informed it that Binance did not permit transactions with sanctioned individuals or digital wallets, that it took appropriate action once relevant sanctions designations became clear, and that it

44

objected that the Wall Street Journal's reporting falsely characterized Binance as central to a sanctioned individual's operations.

219. Further, as set forth above (*supra* ¶ 212), the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal again, prior to the May 21 Article, that Binance did not permit transactions by sanctioned entities, and that "[w]here appropriate, Binance reports relevant matters to law enforcement and other competent authorities in accordance with applicable legal and regulatory obligations."

220. The Wall Street Journal sensationally portrayed Binance as the center of a covert regime-financing network, and did so knowing that it had no reliable basis to make the accusation because it failed to identify concrete, verifiable facts showing that Binance itself knowingly played such a role, contrary to its ongoing efforts to police its platform and address suspicious activity.

221. Nonetheless, the Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

222. Following publication of the May 21 Article, Binance told the Wall Street Journal again that this reporting was false because it falsely characterized Binance as central to a sanctioned individual's operations and purposefully minimized Binance's compliance response once the relevant accounts were designated as sanctioned.

223. Yet the Wall Street Journal neither corrected nor retracted any part of the May 21 Article.

***False Statement 18: The Wall Street Journal Falsely States that Binance Was a "Financial Artery" for the IRGC***

224. The May 21 Article states "[t]he vast sums show how Binance has been used as a financial artery for the IRGC, the powerful political, military and economic force that dominates

Iran, according to the Binance compliance reports, foreign law-enforcement officials and the nonpublic documents."

225.    This statement is false and defamatory, because (i) Binance was not a financial artery for the IRGC; and (ii) Binance did not facilitate the movement of funds for the IRGC.

226.    As set forth above (*supra* ¶¶ 69, 73, 168), the Wall Street Journal knew that this statement was false because prior to the February 23 and March 11 Articles, Binance had already clearly informed it that Binance did not permit transactions with sanctioned individuals or digital wallets, that it took appropriate action once relevant sanctions designations became clear, and that it has a zero-tolerance policy for illicit activity on its platform.

227.    Further, as set forth above (*supra* ¶ 212), the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal again, prior to the May 21 Article, that Binance did not permit transactions by sanctioned entities.

228.    Further, the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal again, prior to the May 21 Article, that claiming Binance acts as a primary gateway for Iranian crypto funds simply does not reflect current reality and is false. Binance explained that it does not permit transactions by sanctioned entities, has zero tolerance for illicit activity on its platform, and investigates, restricts, offboards, and reports accounts once relevant wallets are identified as linked to sanctioned individuals.

229.    The Wall Street Journal also knew that this statement lacked any reliable basis because the May 21 Article itself attributed it only to purported "Binance compliance reports," "foreign law-enforcement officials," and "nonpublic documents." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

230.    The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

231.    Following publication of the May 21 Article, Binance told the Wall Street Journal again that this reporting was false because it conflated and attributed wider blockchain and network-level activity solely to activity on the Binance platform; failed to distinguish relevant account metrics to overstate fund amounts moving through the Binance platform; did not fairly report that the referenced account activity connected to later-sanctioned users predated any designation or reliable attribution of the account as sanctioned; and purposefully minimized Binance's compliance response once that designation or attribution became clear.

232.    Yet the Wall Street Journal neither corrected nor retracted any part of the May 21 Article.

*False Statement 19: The Wall Street Journal Falsely States that an Account Associated with an Iranian Anti-Sanctions Operator Remained Active for 15 Months Despite Multiple Internal Flags*

233.    The May 21 Article states "[e]ven after multiple internal flags on the activity, the main account [associated with an Iranian anti-sanctions operator] continued to operate over a period of at least 15 months and was open as of January, according to the Binance reports."

234.    This statement is false and defamatory, because (i) Binance did not knowingly or improperly allow the account to continue operating despite internal flags; and (ii) Binance took appropriate investigative and compliance action in response to relevant risk indicators and did not ignore or disregard internal alerts.

235.    As set forth above (*supra* ¶¶ 69, 73, 168), the Wall Street Journal knew that this statement was false because prior to the February 23 and March 11 Articles, Binance had already

informed it that Binance did not disregard internal alerts, that it handled alerts in accordance with standard compliance procedures, and that it investigated the relevant activity.

236. Further, the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal again, prior to the May 21 Article, that the account at issue had been identified, investigated, offboarded, and reported to law enforcement.

237. The Wall Street Journal misleadingly asserted to its readers that Binance knowingly tolerated improper activity simply because the account remained open for a period of time, while minimizing the fact that Binance investigated the activity, took compliance action, and responded once sanction designations became clear.

238. The Wall Street Journal also knew that this statement lacked any reliable basis because the May 21 Article itself attributed it only to purported "Binance reports." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

239. The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

240. Following publication of the May 21 Article, Binance told the Wall Street Journal again that this reporting was false because it falsely characterized Binance as central to a sanctioned individual's operations and purposefully minimized Binance's compliance response once the relevant accounts were designated as sanctioned.

241. Yet the Wall Street Journal neither corrected nor retracted any part of the May 21 Article.

***False Statement 20: The Wall Street Journal Falsely Stated that Binance Investigators Concluded $1.7 Billion Moved Through Binance to an Iranian Network and that Binance Forced Out Investigators Who Raised Concerns***

242.    The May 21 Article states:

These funds are on top of the roughly $1.7 billion that Binance investigators concluded moved through Binance to that same Iranian network, as previously reported by The Wall Street Journal in February. The Binance compliance reports said the Iranian actors moved funds using sophisticated techniques in an effort to evade detection. Binance forced out several internal investigators who raised concerns about accounts associated with a Binance business partner that they concluded moved around $1.2 billion of that amount through the platform in 2024 and '25, according to the Journal's article.

243.    This statement is false and defamatory because it repackages and republishes the same false accusations advanced in the February 23 Article—namely, that Binance knowingly facilitated Iran-linked illicit activity through its platform, forced out investigators for raising concerns, and improperly allowed accounts associated with a Binance business partner to be used for that activity.

244.    As set forth above (*supra* ¶¶ 54, 56, 69, 73, 112, 114, 168), the Wall Street Journal knew that this statement was false because prior to the February 23 and March 11 Articles, Binance had already informed it that no one was terminated for conducting compliance reviews or raising concerns, and it clearly explained that the relevant accounts were investigated and offboarded, and that the account designation issues did not conceal the accounts from compliance personnel or bypass Binance's controls.

245.    Further, the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal again, prior to the May 21 Article, that "Binance unequivocally did not terminate any employees for escalating compliance concerns."

246.    The Wall Street Journal also knew that this statement lacked any reliable basis because it repackaged and compounded the Wall Street Journal's earlier false reporting, while

49

relying on purported "Binance investigators" and "Binance compliance reports." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

247.    The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

248.    Following publication of the May 21 Article, Binance told the Wall Street Journal again that this reporting was false because it conflated and attributed wider blockchain and network-level activity solely to activity on the Binance platform; failed to distinguish relevant account metrics to overstate fund amounts moving through the Binance platform; did not fairly report that the referenced account activity connected to later-sanctioned users predated any designation or reliable attribution of the account as sanctioned; and purposefully minimized Binance's compliance response once that designation or attribution became clear.

249.    Yet the Wall Street Journal neither corrected nor retracted any part of the May 21 Article.

*False Statement 21: The Wall Street Journal Falsely Stated that Binance Declined to Participate in a Joint Investigation into Funds Linked to Iran's Central Bank*

250.    The May 21 Article states:

Another blockchain data firm, TRM Labs, which works with U.S. authorities and exchanges, including Binance, to trace crypto transactions, also identified transactions linking Iran's central bank to Binance accounts but couldn't trace any further movement, according to a nonpublic document and a person familiar with the matter. TRM approached Binance executives this January and asked if they would jointly investigate the funds and share findings with the U.S. to support sanctions, the sources said. The companies, including TRM's head of policy, Ari Redbord, and Binance's chief compliance officer, Noah Perlman, discussed it, but Binance declined to participate, the document and the person said.

251.   This statement is false and defamatory because Binance did not decline to participate in a sanctions-related investigation and was not indifferent to illicit activity or unwilling to cooperate with law enforcement.

252.   As set forth above (*supra* ¶¶ 69, 73, 168), the Wall Street Journal knew that this statement was false because prior to the February 23 and March 11 Articles, Binance had already informed it that Binance did not permit transactions with sanctioned individuals or digital wallets, explaining that it took appropriate action once relevant sanctions designations became clear, and that it works closely with law enforcement authorities around the world to detect, prevent, and combat financial crime.

253.   Further, the Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal again, prior to the May 21 Article, that Binance never declined to collaborate with TRM, and in fact does collaborate with TRM today.

254.   The Wall Street Journal also knew that this statement lacked any reliable basis because the May 21 Article itself attributed it only to a purported "nonpublic document" and an unnamed "person familiar with the matter." The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

255.   The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

256.   Following publication of the May 21 Article, Binance also told the Wall Street Journal that this reporting was false because it falsely portrayed Binance as refusing to collaborate with TRM, when Binance did no such thing and in fact continues to work actively with TRM on anti-money-laundering and crime-prevention initiatives.

51

257.    Yet the Wall Street Journal neither corrected nor retracted any part of the May 21 Article.

**False Statement 22: The Wall Street Journal Falsely Stated that Binance Sought to Loosen Anti-Money Laundering Controls and Was Reluctant to Remove Russian Clients**

258.    The May 21 Article states:

After the plea deal, some Binance compliance directors also grew alarmed by company leaders' requests to loosen anti-money-laundering controls for high-risk clients, and also what they viewed as a reluctance to remove Russian clients, despite a previous commitment to exit the sanctioned country, the former compliance employees said.

259.    This statement is false and defamatory because Binance did not loosen anti-money-laundering controls for high-risk clients and was not reluctant to remove Russian clients.

260.    The Wall Street Journal knew that this statement was false because Binance told the Wall Street Journal, prior to the May 21 Article, that there was no basis to claim any compliance directors had escalated alarm in this instance. Binance further explained that it had previously used a monetary threshold for Enhanced Due Diligence, but later removed that threshold in line with its licensing obligations in the Abu Dhabi Global Market so that it could *expand* Enhanced Due Diligence screening to *more* users—not reduce anti-money-laundering controls.

261.    The Wall Street Journal further knew that this statement was false because Binance told it that, because Russia was under ADGM supervision, Binance conducted further Enhanced Due Diligence on Russia legacy users and took measures including restricting accounts and offboarding users as necessary. In other words, *the truth was the opposite of what the Wall Street Journal claimed*: Binance *further restricted* Russian users through its Enhanced Due Diligence process.

262.    The Wall Street Journal also knew that this statement lacked any reliable basis because the May 21 Article itself attributed it only to unnamed "former compliance employees."

The Wall Street Journal chose to elevate these vague and unverifiable sources over Binance's specific and verifiable factual contrary explanation.

263.    The Wall Street Journal knowingly or recklessly disregarded this notice of the truth and instead published this false and defamatory statement without further engagement with Binance.

264.    Following publication of the May 21 Article, Binance also told the Wall Street Journal that this reporting was false because it purposefully minimized Binance's compliance response to designation of sanctioned users or entities.

265.    Yet the Wall Street Journal neither corrected nor retracted any part of the May 21 Article.

***The May 21 Article's Statements Were Clearly Defamatory***

266.    In addition to being false, each of the above statements in the May 21 Article was defamatory of Binance, as they falsely stated, implied, or otherwise suggested that Binance behaved unlawfully, improperly, and unethically, including by:

a.    continuing to facilitate transactions involving sanctioned individuals or digital wallets;

b.    ignoring repeated red flags and internal alerts concerning suspicious activity;

c.    serving as a central platform for Iran-linked illicit financial activity;

d.    acting as a financial artery for the IRGC;

e.    allowing Iran-linked funds to continue flowing through Binance after Binance's 2023 plea;

f.    failing to take appropriate investigative and compliance action in response to suspicious activity;

g.    wrongfully forcing out investigators who raised compliance concerns;

53

h.      improperly allowing accounts associated with a Binance business partner to be used for Iran-linked illicit activity;

i.      knowingly or negligently permitting accounts to remain active despite repeated internal flags;

j.      wrongfully refusing to cooperate in sanctions-related investigative efforts; and

k.      loosening anti-money-laundering controls for high-risk clients and being reluctant to remove Russian users despite prior commitments.

267.    As set forth above, each of these defamatory statements in the May 21 Article is false, and each was published by the Wall Street Journal with actual malice, as the Wall Street Journal published these allegations knowingly or recklessly disregarding the truth to suit its own agenda.

***Binance Demands Corrections and Retraction of the May 21 Article***

268.    On May 22, 2026, counsel for Binance wrote to the Wall Street Journal concerning the May 21 Article's false information and defamatory implications. Binance stated that the May 21 Article continued to make false and defamatory assertions concerning Binance—including repetitions of prior falsehoods and new fabrications—as part of the Wall Street Journal's continuing pattern of purposefully disregarding the truth in order to press its preconceived agenda against Binance.

269.    Binance also identified a list of examples of falsities and inaccuracies in the article and explained that it distorted, or omitted entirely, the true facts Binance had provided before publication.

270.    Binance further reminded the Wall Street Journal of its stated ethical obligation to "remain fair, accurate, and impartial," and demanded that the Wall Street Journal immediately

54

correct the false statements and remove the May 21 Article pending those corrections in order to limit the continuing harm caused by the article's false and defamatory assertions.

271.    But in light of the Wall Street Journal's clear pattern of reckless and irresponsible conduct toward Binance, reflecting its partiality against Binance and disregard for the truth, the Wall Street Journal refused to correct or retract the May 21 Article, which remains available online and continues to cause harm.

**The Wall Street Journal's State of Mind**

272.    The statements in the Articles concern the internal affairs of Binance, and Binance did not seek to make those matters public or otherwise invite the media into those issues.

273.    The Wall Street Journal acted under no privilege in publishing the statements in the Articles and, to the extent there was any privilege available, it was abused by the Wall Street Journal. This is because it engaged in sham "investigations" into the facts set forth in the Articles, waiting until the last minute to verify details of the story with Binance and then, after Binance provided specific and credible rebuttals to the Wall Street Journal's preconceived narrative, it published these allegations knowingly or recklessly disregarding the truth, without further engaging Binance to understand the true facts.

274.    The Wall Street Journal's state of mind is further demonstrated by its repetition and amplification of the same false narrative after Binance had already put it on notice of the falsity of its reporting. After publication of the February 23 Article, Binance reasonably demanded corrections and retraction, set forth detailed factual refutations, and then when required to do so in the face of refusal from the Wall Street Journal filed this defamation action. Yet instead of correcting its reporting, the Wall Street Journal republished and expanded the same accusations in the March 11 and May 21 Articles, while continuing to ignore Binance's repeated factual

corrections. That repetition, after explicit notice of defamatory falsity, further evidences actual malice, recklessness, and deliberate disregard for the truth.

275. Berwick—the author of all three Articles at issue here—reports prolifically on the cryptocurrency industry and has repeatedly reported on Binance specifically dozens of times—often from a censorious perspective; other reporters at the Wall Street Journal have similarly written articles denouncing Binance dozens of times.

276. Berwick's agenda against Binance, irrespective of truth, is evidenced by his expressions of personal hostility toward Binance outside the reporting process, including that he seeks to avoid talking to Binance employees because he considers them all to be criminals. That statement reflects personal bias and animus toward Binance that caused him to act in reckless disregard for the truth in pursuit of a false narrative that would harm Binance's reputation.

277. In addition, the Wall Street Journal had a particular bias and motivation for publishing the Articles defaming Binance, given the financial payoff to publishers for articles critical of Binance, where negative sensational headlines serve as clickbait to drive engagement and increase advertising revenue. That motive was apparent from the Wall Street Journal's admission that it was rushing to publish the February 23 Article on the heels of a competitor's article on the same topic. The Wall Street Journal's actual malice toward Binance is further evidenced by Berwick's statement before the March 11 Article that he would be willing to speak with a Binance representative but would proceed with publishing regardless, and his statements in advance of the May 21 Article that he would not consider any of the specific facts and responses from Binance unless they were on the record.

278. The Wall Street Journal's actual malice is further demonstrated by its deliberate distortion of the underlying facts. As alleged above, the Wall Street Journal repeatedly ignored,

omitted or minimized Binance's investigative steps, offboarding decisions, compliance actions, and cooperation with law enforcement, while framing the same facts in a manner calculated to make Binance appear more culpable than it was and knowing the truth to be otherwise. In particular, the Wall Street Journal continued to portray Binance as contributing to sanctions evasion, terrorism financing, and post-plea compliance failures even after Binance had specifically explained why those characterizations were false or materially misleading.

279. Accordingly, the Wall Street Journal published its statements with actual malice as it knowingly or recklessly disregarded the truth when it published the Articles.

***The Articles and Their Numerous False Statements Have Harmed Binance***

280. As intended by the Wall Street Journal, the Articles were published to, and therefore seen and read by, the millions of readers of the Wall Street Journal.

281. The Wall Street Journal's statements have directly caused harm to Binance, which has suffered serious and substantial damages as a result of the clearly false and defamatory statements published in the Articles.

282. The Wall Street Journal's statements have also severely diminished Binance's reputation generally in the industry.

283. In addition, Binance incurred legal fees and costs in its efforts to request the Wall Street Journal to take down its defamatory Articles prior to filing suit.

284. These harms continue unabated as the Articles have not been corrected or retracted, and therefore the damage to Binance and its reputation remains ongoing.

285. For example, on February 24, 2026, Senator Blumenthal issued a Letter to Binance, posted on the Senator's website that repeats many of the False Statements in the February 23

Article.[2] Senator Blumenthal's accompanying press release states that he has "Open[ed an] Inquiry After New Reporting Reveals Binance Allowed $1.7 Billion in Money Laundering to Iran Proxies." That letter also requested that Binance respond to various document requests premised on the February 23 Article's false reporting.

286.    In connection with that inquiry, Senator Blumenthal adopted the Wall Street Journal's narrative, and publicly stated that "[t]he scale of the newly-revealed illicit transfers—uncaught until nearly two billion dollars flowed to sanctioned entities—and the unexplained firing of internal investigators call into question Binance's compliance with American sanctions and banking laws," expressly citing the Wall Street Journal's reporting. Senator Blumenthal further characterized Binance's public response as "evasive" and said it did "little to ease my concerns." These statements illustrate the concrete reputational and regulatory harm caused by the Wall Street Journal's false reporting.

287.    Additionally, on February 27, 2026, a group of Democratic Senators sent a letter to the Attorney General and Secretary of the Treasury demanding they open investigations into Binance based on the February 23 Article's false reporting.

288.    The false statements in the Articles were defamatory *per se*, presumptively causing reputational injury to Binance in an amount in excess of $75,000.00 in an amount to be proven at trial.

---

[2]    Available at https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-opens-inquiry-after-new-reporting-reveals-binance-allowed-17-billion-in-money-laundering-to-iran-proxies-and-russias-shadow-fleet.

## CAUSE OF ACTION

### Defamation

289.    Binance realleges and incorporates herein by reference each foregoing paragraph of this Complaint as if set forth in full herein.

290.    Dow Jones said, caused to be said, or implied, statements of fact concerning Binance which are false, which are damaging to its reputation, and which have caused and were calculated to cause Binance harm.

291.    Specifically, in the Articles, Dow Jones said, caused to be said, or implied, the statements and meanings set forth in Paragraphs 52 to 136, 157 to 181, and 201-267.

292.    Each of these statements is false, and Dow Jones published these statements knowingly or recklessly disregarding the truth, which amounts to actual malice.

293.    Dow Jones made or caused these statements to be made or implied to third parties, including to millions of readers of the Articles in the Wall Street Journal in print or online.

294.    These statements are defamatory, and defamed Binance *per se*.

295.    Dow Jones planned and made its defamatory statements with hatred, ill will, spite, a fraudulent or evil motive, or such a conscious and deliberate disregard of the interests of Binance that the conduct was willful or wanton, thereby entitling Binance to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Binance respectfully requests:

A.    Compensatory, general, and specific damages in an amount to be proven at trial;

B.    Punitive damages in an amount to be determined at trial;

C.    Pre- and post-judgment interest;

D.    Reasonable attorneys' fees; and

E.    Such other and further relief as this Court may deem appropriate and equitable.

## JURY DEMAND

296.    Binance demands a trial by jury of all claims triable to a jury in this action.

Dated: June 8, 2026


WITHERS BERGMAN LLP


By: _____
        Christopher N. LaVigne
        Amber Melville-Brown (*pro hac vice*)
        Alexander C. Haden
        430 Park Avenue
        New York, NY 10022
        (212) 848-9800
        Christopher.LaVigne@withersworldwide.com
        Amber.Melville-Brown@withersworldwide.com
        Alex.Haden@withersworldwide.com