UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

BINANCE HOLDINGS LIMITED,

                Plaintiff,

          vs.

DOW JONES & COMPANY, INC. d/b/a THE
WALL STREET JOURNAL,

                Defendant.

      Case No: 1:26-cv-1980

---------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT DOW JONES & COMPANY, INC.'S MOTION TO DISMISS
## <u>THE FIRST AMENDED COMPLAINT</u>

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger
Amanda B. Levine
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
(212) 489-8230
katebolger@dwt.com
amandalevine@dwt.com

Azeezat Adeleke (*pro hac vice*)
1301 K Street NW Suite 500 East
Washington, D.C. 20001
Telephone: (202) 973-4237
azeezatadeleke@dwt.com

*Attorneys for Defendant Dow Jones &
Company, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 2

    A.   The Parties ................................................................................................................... 2

    B.   The Challenged Reporting ......................................................................................... 2

        1.   The February Article ............................................................................................. 3

        2.   The March Article ................................................................................................. 5

        3.   The May Article ................................................................................................... 6

    C.   This Litigation............................................................................................................ 7

ARGUMENT ............................................................................................................................ 8

    I.   BINANCE FAILS TO STATE A DEFAMATION CLAIM............................................ 9

        A.   Binance Fails to Plead Actual Malice ....................................................................... 9

            1.   Actual Malice Is the Relevant Fault Standard .......................................... 9

            2.   Binance Does Not Carry Its Burden of Pleading Actual Malice .............................. 11

                a.   *Binance's Pre-Publication Denials Do Not Support Actual Malice* .................... 13

                b.   *Reliance on Confidential Sources Does Not Constitute Actual Malice* ................ 16

                c.   *The Articles' Timing Does Not Support a Finding of Actual Malice* .................... 18

                d.   *Binance's Post-Publication Denials Are Irrelevant to Actual Malice*.................. 21

                e.   *Binance's Allegations of Ill Will Are Irrelevant to Actual Malice*........................ 22

                f.   *Even Collectively, Binance's Allegations Fail to Plead Actual Malice*................ 22

        B.   Binance Does Not and Cannot Plead The Other Elements of Its Defamation Claim... 23

            1.   Binance Has Not Established That The Articles Are False ..................................... 23

            2.   Binance's Vague References to "Implication" Do Not Salvage Its Claim............... 29

            3.   Statements 1, 2, 15, and 16 Are Fair Indexes of the Articles ................................. 31

            4.   Statements 4 and 13 Lack a Defamatory Meaning ................................................. 33

    II.   THE *JOURNAL* IS ENTITLED TO ATTORNEYS' FEES AND COSTS...................... 35

CONCLUSION........................................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1st Amend. Praetorian v. N.Y. Times Co.*,
2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) ..............................................................12, 22, 34

*Aboutaam v. Dow Jones & Co.*,
2019 WL 1359772 (Sup. Ct. N.Y. Cty. Mar. 26, 2019),
*aff'd*, 180 A.D.3d 573 (1st Dep't 2020)..............................................................................23, 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................................8, 9

*Biro v. Conde Nast*,
2014 WL 4851901 (S.D.N.Y. Sept. 30, 2014).........................................................................3

*Biro v. Conde Nast*,
883 F. Supp. 2d 441 (S.D.N.Y. 2012).............................................................................28, 30

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015) ..................... *passim*

*Bloom v. A360 Media LLC*,
735 F. Supp. 3d 466 (S.D.N.Y. 2024).............................................................................12, 21

*Bobulinski v. Tarlov*,
758 F. Supp. 3d 166 (S.D.N.Y. 2024).............................................................................12, 35

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)................................................................................................................21

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) ..............................................................................................................30

*Brimelow v. N.Y. Times Co.*,
2021 WL 4901969 (2d Cir. Oct. 21, 2021)..........................................................12, 14, 21, 23

*Button v. N.Y. Times Co.*,
2025 WL 2643674 (S.D.N.Y. Sept. 15, 2025),
*appeal filed*, 25-2634 (2d Cir. Oct. 22, 2025).......................................................................35

*BYD Co. Ltd. v. VICE Media LLC*,
531 F. Supp. 3d 810 (S.D.N.Y. 2021),
*aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022) ..............................................................12, 31

*Cabello-Rondon v. Dow Jones & Co., Inc.*,
2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017),
*aff'd*, 720 F. App'x 87 (2d Cir. 2018)................................................................................ *passim*

*Celle v. Filipino Reporter Enters., Inc.*,
209 F.3d 163 (2d Cir. 2000)............................................................................................11

*Church of Scientology Int'l v. Behar*,
238 F.3d 168 (2d Cir. 2001)......................................................................................11, 33

*Church of Scientology Int'l v. Daniels*,
992 F.2d 1329 (4th Cir. 1993) ........................................................................................19

*Cohn v. Nat'l Broad. Co.*,
50 N.Y.2d 885 (1980) .....................................................................................................33

*Coliniatis v. Dimas*,
965 F. Supp. 511 (S.D.N.Y. 1997) .............................................................................14, 19

*Consortium for Indep. Journalism, Inc. v. United States*,
2025 WL 919504 (S.D.N.Y. Mar. 26, 2025),
*appeal dismissed*, Case No. 25-1376 (2d Cir. July 21, 2025)...................................................12

*Contemp. Mission, Inc. v. N.Y. Times Co.*,
842 F.2d 612 (2d Cir. 1988)........................................................................................12, 14

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
551 F. Supp. 3d 320 (S.D.N.Y. 2021),
*aff'd sub nom.,* 2022 WL 1013982 (2d Cir. Apr. 5, 2022) ...................................................4, 9

*Dfinity Found. v. N.Y. Times Co.*,
702 F. Supp. 3d 167 (S.D.N.Y. 2023),
*aff'd*, 2024 WL 3565762 (2d Cir. July 29, 2024) ...................................................................9

*Dillon v. City of N.Y.*,
261 A.D.2d 34 (1st Dep't 1999) ......................................................................................23

*Edwards v. Nat'l Audubon Soc., Inc.*,
556 F.2d 113 (2d Cir. 1977)............................................................................................14

*Garrison v. Louisiana*,
379 U.S. 64 (1964)..........................................................................................................12

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974).....................................................................................................10, 11

iii

*Golan v. Daily News, L.P.*,
　77 Misc. 3d 258 (Sup. Ct. N.Y. Cty. 2022),
　*aff'd*, 214 A.D.3d 558 (1st Dep't 2023)..............................................................10, 31

*Grifols, S.A. v. Yu*,
　2026 WL 836657 (S.D.N.Y. Mar. 26, 2026) ..................................................................35

*Harte-Hanks Comms. v. Connaughton*,
　491 U.S. 657 (1989)........................................................................................................21

*Heilbut v. Cassave Sciences, Inc.*,
　778 F. Supp. 3d 551 (S.D.N.Y. 2025)............................................................................35

*Herbert v. Lando*,
　781 F.2d 298 (2d Cir. 1986)...........................................................................................21

*Huggins v. Moore*,
　94 N.Y.2d 296 (1999) .....................................................................................................10

*InkMango, Inc. v. Warren*,
　84 Misc. 3d 1227(A) (Sup. Ct. N.Y. Cty. 2024),
　*aff'd*, 243 A.D.3d 476 (1st Dep't 2025)........................................................................10

*Jacob v. Lorenz*,
　626 F. Supp. 3d 672 (S.D.N.Y. 2022)................................................................. *passim*

*Jankovic v. Int'l Crisis Grp.*,
　72 F. Supp. 3d 284 (D.D.C. 2014),
　*aff'd*, 822 F.3d 576 (D.C. Cir. 2016) .............................................................................20

*Jewell v. NYP Holdings, Inc.*,
　23 F. Supp. 2d 348 (S.D.N.Y. 1998)..............................................................................29

*Kerik v. Tacopina*,
　64 F. Supp. 3d 542 (S.D.N.Y. 2014)..............................................................................12

*Kesner v. Buhl*,
　590 F. Supp. 3d 680 (S.D.N.Y. 2022),
　*aff'd sub nom.*, 2023 WL 4072929 (2d Cir. June 20, 2023) .....................10, 28, 35

*Kesner v. Dow Jones & Co., Inc.*,
　515 F. Supp. 3d 149 (S.D.N.Y. 2021)................................................................. *passim*

*Lemelson v. Bloomberg L.P.*,
　903 F.3d 19 (1st Cir. 2018).............................................................................................14

*Lindberg v. Dow Jones & Co.*,
　2021 WL 5450617 (S.D.N.Y. 2021)...............................................................................15

iv

*Lindell v. Mail Media Inc.*,
    575 F. Supp. 3d 479 (S.D.N.Y. 2021)..................................................................................33

*Lively v. Wayfarer Studios LLC*,
    786 F. Supp. 3d 695 (S.D.N.Y. 2025)................................................................................3, 12

*Love v. William Morrow & Co.*,
    193 A.D.2d 586 (2d Dep't 1993) ........................................................................................23

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991)........................................................................................................12, 24

*McDougal v. Fox News Network, LLC*,
    489 F. Supp. 3d 174 (S.D.N.Y. 2020)..............................................................................12, 22

*McInnes v. S. Poverty L. Ctr., Inc.*,
    811 F. Supp. 3d 1319 (M.D. Ala. 2025) .............................................................................14

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt.*,
    2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018)......................................................................12

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)......................................................................................................10, 12

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007)..................................................................................................8

*Prince v. Intercept*,
    2023 WL 4492413 (S.D.N.Y. July 12, 2023) ......................................................12, 14, 18, 22

*Prince v. Intercept*,
    634 F. Supp. 3d 114 (S.D.N.Y. 2022)........................................................................4, 14, 21

*Pritchard v. Herald Co.*,
    120 A.D.2d 956 (4th Dep't 1986) ........................................................................................33

*Reeves v. Assoc. Newspapers Ltd.*,
    232 A.D.3d 10 (1st Dep't 2024) ..........................................................................................10

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
    42 N.Y.2d 369 (1977) ..........................................................................................................30

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)..............................................................................................................12

*Stepanov v. Dow Jones & Co., Inc.*
    120 A.D.3d 28 (1st Dep't 2014) ..........................................................................................30

*Sweeney v. Prisoners' Legal Services, Inc.*,
   84 N.Y.2d 791 (1995) ........................................................................................................18

*Tah v. Global Witness Publishing, Inc.*,
   413 F. Supp. 3d 1 (D.D.C. 2019) .....................................................................................20

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
   864 F.3d 236 (2d Cir. 2017)..............................................................................................24

*Test Masters Educ. Servs. v. NYP Holdings, Inc.*,
   603 F. Supp. 2d 584 (S.D.N.Y. 2009)................................................................................31

**Statutes**

N.Y. Civ. Rights Law §§ 70-a *et seq* .......................................................................................1, 35

N.Y. Civ. Rights Law §§ 76-a *et seq* .......................................................................................1, 10

N.Y. Civ. Rights Law § 74 ...........................................................................................................33

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)..........................................................................................................1, 8, 35

Defendant Dow Jones & Company, Inc., which publishes *The Wall Street Journal* ("Dow Jones" or the "*Journal*") respectfully submits this memorandum of law in support of its motion pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing the First Amended Complaint ("FAC") of Plaintiff Binance Holdings Ltd. ("Binance") and awarding the *Journal* its attorneys' fees and costs under New York's SLAPP statute, N.Y. Civ. Rights Law §§ 70-a, 76-a.

## **PRELIMINARY STATEMENT**

This baseless defamation action is brought by Binance, the company that operates the world's largest cryptocurrency exchange. For years, Binance has been at the forefront of public discourse, including because the company pled guilty to violating anti-money laundering and sanctions laws, while its founder and former CEO pled guilty to failing to maintain an effective anti-money laundering program. In keeping with its role as the preeminent American news outlet covering business and finance, the *Journal* has frequently reported on Binance, including the government scrutiny it has received. These topics are, for obvious reasons, newsworthy.

On February 23, 2026, the *Journal* published an article reporting on a Binance internal investigation that found over $1 billion had flowed through Binance's platform to entities linked to Iran-backed terror groups. The article reported that Binance subsequently fired the investigators who made these findings but also ultimately offboarded the offending accounts from its platform. The article included a lengthy response from Binance denying that it fired the investigators for raising compliance concerns and asserting that it complied with its legal and reporting obligations. On March 11, the *Journal* published an additional article, reporting that multiple U.S. government entities had launched investigations into Iran's use of Binance to evade sanctions.

That same day, Binance sued the *Journal* for defamation stemming from the February 23 article, and the *Journal* subsequently moved to dismiss. Undeterred by Binance's attempt to use legal threats to suppress further reporting, the *Journal* subsequently published another article about

Binance on May 21, which reported that additional funds flowed through Binance to Iran.

The FAC now challenges as defamatory statements from each of these articles. But rather than curing the legal deficiencies the *Journal* identified in its earlier motion to dismiss, the FAC only expands upon them. Most notably, as the *Journal* previously explained, the actual malice fault standard applies here, which requires Binance to plead that the *Journal* published the challenged articles with subjective knowledge of their falsity. Binance attempts to meet this difficult pleading standard by making various claims about the *Journal*'s supposed failure to credit Binance's denials, its alleged anti-Binance bias, its "rush" to publish, and its reliance on "unverified, anonymous sources." Not only are Binance's allegations disproven by the very record incorporated by reference into the FAC, but none of these allegations—even collectively—suffices to plead actual malice as a matter of law. Nor has Binance plausibly alleged that each of the challenged statements is materially false and defamatory—required elements of a defamation claim. Ultimately, while Binance may wish that the *Journal*'s coverage portrayed the company in a more positive light, its editorial disagreement with the *Journal*'s truthful reporting cannot sustain a defamation action. Because the FAC is meritless, it should be dismissed with prejudice, and the *Journal* should be awarded its attorneys' fees under New York's anti-SLAPP law.

## STATEMENT OF FACTS

### A.    The Parties

Plaintiff Binance is the corporate entity that operates Binance.com, "the world's largest cryptocurrency exchange by trading volume and users." FAC ¶ 12. Binance has over 300 million registered users and over $125 trillion in cumulative trading volume. *Id.*

Defendant Dow Jones publishes the *Journal*. *Id.* ¶ 13.

### B.    The Challenged Reporting

Beginning in February 2026, the *Journal* published a series of articles on its website and

in print reporting on findings from internal Binance investigations into Iran-linked transactions facilitated through the Binance platform. *See* FAC ¶¶ 51, 155, 201.

       1.     <u>The February Article</u>

The *Journal* published the first article, *Binance Fired Staff Who Flagged $1 Billion Moving to Sanctioned Iran Entities*, on February 23, 2026. FAC ¶¶ 51-52; Declaration of Katherine M. Bolger ("Bolger Decl.") Ex. 2 (the "February Article").[1]

On February 20, *Journal* reporter Angus Berwick sent Binance a detailed list of questions, requesting that Binance respond by Monday, February 23. FAC ¶¶ 35-37; Bolger Decl. Ex. 9 at 11-14.[2] In the interim, on Sunday, February 22, Binance published a blog post about its investigation into Iranian transactions that seemingly responded to the *Journal*'s questions. *See* Bolger Decl. Ex. 7 at 6. Binance also provided on-the-record comments to the *New York Times* for a separate article, which went live on February 23. *See* Bolger Decl. Ex. 6 at 2-4, 6-8. Binance then responded to Berwick's questions by 2:00 pm ET. *See* FAC ¶ 45; Bolger Decl. Ex. 9 at 2.

The February Article reported that, in 2023, Binance pled guilty to breaking sanctions and anti-money laundering laws, paying a record $4.3 billion fine and entering a U.S. monitorship. Bolger Decl. Ex. 2 at 2. It further explained how Binance's founder and then-CEO, Changpeng Zhao, also pled guilty to failing to maintain an effective anti-money laundering program, was sentenced to four months in prison, and was later pardoned by President Trump. *Id.* at 2-3.

The February Article then reported that, weeks after President Trump pardoned Zhao, Binance executives fired a team of investigators who had flagged $1.7 billion in transactions that

---

[1] The Court can consider the articles on this motion because they are both central to and incorporated by reference into the FAC. *See Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 714 (S.D.N.Y. 2025); *Biro v. Conde Nast*, 2014 WL 4851901, at *4 (S.D.N.Y. Sept. 30, 2014).

[2] The Court may consider the email correspondence in deciding this motion because it is incorporated by reference into the FAC. *See* FAC ¶¶ 35-50. The same is true of Binance's pre-publication email correspondence with the *Journal* prior to publication of the March and May Articles, *see id.* ¶¶ 147-154 ¶¶ 188-99.

moved through Binance to a network funding Iran-backed terror groups, including the Islamic Revolutionary Guard Corps (IRGC). *Id.* at 2-3, 10. Relying on "documents, foreign law enforcement officials, and people familiar with Binance's operations," *id.* at 3, the February Article explained that much of this money flowed through the accounts of two Hong Kong-based entities—Blessed Trust, which transferred over $1 billion to Iranian-linked digital wallets, *see id.* at 8, and Hexa Whale Trading, which transferred $500 million to such digital wallets, *see id.* at 7. It reported that Binance ultimately offboarded both entities from the Binance platform. *Id.* at 7-8.

The February Article also quoted foreign law enforcement officials who explained that, after the plea deal, Binance became "far more cooperative with their requests for help." *Id.* at 6. But, over the past year, they claimed that Binance had "started cooperating far less with [officials'] requests to obtain financial information," and this latest incident "echoed some of the same concerns that drew U.S. scrutiny [to Binance] in 2023." *Id.* at 2-3.

The February Article also referenced earlier reporting on the same topic, including a February 13 article in *Fortune* magazine, entitled "Exclusive: Binance fires top investigators who claim to have uncovered evidence of Iranian sanctions violations," Bolger Decl. Ex. 5, and a February 23 *New York Times* Article, "Binance Employees Find $1.7 Billion in Crypto Was Sent to Iranian Entities," Bolger Decl. Ex. 6.[3] The *Fortune* article reported that Binance appeared to be "reneging on its promise" to enter a "new phase of 'regulatory maturity'" after it fired members of its compliance team who "uncovered evidence that entities tied to Iran had received more than $1

---

[3] On a motion to dismiss, courts may take judicial notice of newspaper articles not for the truth of the matters asserted therein but for the fact they were published and what they said. *See Prince v. Intercept*, 634 F. Supp. 3d 114, 136 n.24 (S.D.N.Y. 2022) (taking judicial notice "of the existence of articles written by and about Plaintiff for purposes of establishing when the articles were published and what was reported, not for the truth of the matter asserted"); *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 324, n.2 (S.D.N.Y. 2021) ("The Court may take judicial notice of court filings and other matters of public record, including newspaper articles and media interviews, without converting a motion to dismiss into a motion for summary judgment."), *aff'd sub nom. Daleiden v. Planned Parenthood Fed'n of Am.*, 2022 WL 1013982 (2d Cir. Apr. 5, 2022). Accordingly, the court can take judicial notice of both the *Fortune* and *New York Times* articles.

billion through the exchange." *Id.* at 1-2. The *New York Times* article likewise reported that Binance internal investigators discovered that "about $1.7 billion had flowed from two Binance accounts to Iranian entities with links to terrorist groups," and "[w]ithin weeks, Binance fired or suspended at least four employees involved in the investigation." Bolger Decl. Ex. 6 at 2.[4]

The *Journal*'s February Article heavily incorporated Binance's comments in its sub-headline and at least eight times throughout its body text—including the comments that Binance shared with Berwick on the day of publication. *Compare* Bolger Decl. Ex. 2, *with* Ex. 9 at 2-9.

On February 24, after the February Article was published, Binance again contacted Berwick, claiming the Article was inaccurate and requesting corrections to it. FAC ¶¶ 137-38. The *Journal* has not altered or retracted the February Article. *Id.* ¶ 146.

### 2.    The March Article

The *Journal* published the second article, *Justice Department Probes Iran's Use of Binance to Evade Sanctions*, on March 11, 2026. FAC ¶ 155; Bolger Decl. Ex. 3 (the "March Article").

On March 9, prior to publication, Berwick again contacted Binance, requesting answers to six key questions. FAC ¶¶ 147, 149. On March 10, Binance provided responses and also directed Berwick to its blog, where it had uploaded a new post. *Id.* ¶ 151; *see* Bolger Decl. Ex. 10 at 2.

The March Article reported that the Department of Justice (DOJ) had launched an inquiry into Iran-linked entities' use of Binance to evade sanctions. Bolger Decl. Ex. 3 at 1-2. The Article explained that this investigation put Binance "back in the legal spotlight" after Zhao's pardon. *Id.* at 1-2. The Article explained that the *Journal* "couldn't determine whether the Justice Department [was] investigating Binance itself for potential misconduct, or solely the customers on its

---

[4] In addition, because the FAC itself discusses the *New York Times* article, *see* FAC ¶¶ 34, 42, it is incorporated by reference into the FAC and can be considered by this Court. *See* n.1, *supra*.

platform." *Id.* at 2.  It also reported that the Treasury Department and a Senator had opened their own inquiries into the transactions. *Id.* at 2, 4.

The March Article included a statement from a Binance spokesperson that the exchange "categorically did not directly transact with sanctioned entities," the company "uncovered a sophisticated, multi-jurisdictional pattern of financial activity," and the Iranian connections were "only identified and sanctioned after Binance began investigating." *Id.* at 3. It also repeated Binance's statement that its investigators were not terminated for escalating compliance concerns, they left based on "individual circumstances," and the internal investigation "continued and led to the Blessed Trust account being shut down." *Id*. After publication, Binance again demanded that the *Journal* retract its reporting. FAC ¶¶ 184-185. The *Journal* did not do so. FAC ¶ 185.

3.    The May Article

The *Journal* published the third article, *Iran Moved Billions Through Binance to Fund Regime—Continuing Into This Month*, on May 21, 2026. FAC ¶ 200; Bolger Decl. Ex. 4 (the "May Article").

On May 12, Berwick emailed Binance a list of 31 detailed questions and asked for a response by May 14. FAC ¶¶ 188-191; Bolger Decl. Ex. 11 at 16-19. Binance requested additional time to respond, and the *Journal* agreed. *See* Bolger Decl. Ex. 11 at 13. On May 18, Binance responded, FAC ¶ 194, Berwick sent follow-up questions, and Binance responded on May 21, FAC ¶ 198; *see also* Bolger Decl. Ex. 11 at 2-14. While Binance claims its answers were "lengthy and detailed," FAC ¶ 194, only a few brief statements, reflecting only a small portion of its specific responses to Berwick's questions, were "on the record."  *See* Bolger Decl. Ex. 11 at 2-14.

The May Article reported that internal Binance documents showed that Babak Zanjani, an Iranian financier, had made $850 million in transactions on Binance's platform over two years as part of a money-laundering network to finance the Iranian military. *See* Bolger Decl. Ex. 4 at 1, 3.

6

The Article noted that the Zanjani account was in operation for at least 15 months, through January 2026, even though the account triggered multiple internal flags. *Id.* at 2, 10. The Article also reported that while Zanjani had previously been sanctioned by the U.S. government, he was not on the sanctions list during that 15-month period. *Id.* at 6.

The May Article explained how the funds transacted through the Zanjani account were part of "billions in crypto transactions that have flowed through Binance to networks financing [the IRGC]," which showed "how Binance has been used as a financial artery for the IRGC." *Id.* at 2. It then summarized the *Journal*'s prior reporting on Binance, including how Binance had "forced out several internal investigators who raised concerns" about Iran-linked transactions. *Id.* at 4. The Article also reported that other Binance staff claimed they departed the company amid concerns about "company leaders' requests to loosen anti-money laundering controls for high-risk clients" and "what they viewed as a reluctance to remove Russian clients, despite a previous commitment to exit the sanctioned country." *Id.* at 8. Finally, the Article reported that TRM Labs, a blockchain data firm that works with the U.S. government, approached Binance and proposed that the two companies jointly investigate the Iran-linked accounts and share their findings about those accounts with the U.S. government. *Id.* at 12. Binance declined to participate in that effort. *Id.*

The May Article relied on a variety of sources, including foreign law enforcement officials, a foreign law enforcement agency, Binance's internal compliance reports, former Binance compliance employees, and other confidential sources with direct knowledge of the events in question. *Id.* at 2, 4, 8, 12. The *Journal* also quoted the on-the-record portions of Binance's response throughout the Article. Following publication, Binance once again demanded retraction and correction, which the *Journal* declined. FAC ¶¶ 268-271.

## C.    This Litigation

Binance filed this lawsuit on March 11, 2026, bringing a claim for defamation based on 11

7

purportedly false statements in the February Article. ECF No. 1. The *Journal* moved to dismiss on May 18. ECF No. 16. On June 8, Binance filed the FAC, again bringing a single claim for defamation but now alleging 22 purportedly false statements across the February, March, and May Articles. ECF No. 20. Those statements are set forth in a chart annexed to the Bolger Declaration as Exhibit 1. This Motion to Dismiss follows.

## ARGUMENT

Binance's FAC only crystallizes that this case should be dismissed. The FAC's central contention is that the *Journal* knowingly falsified the Articles by rushing to publish negative information about Binance and myopically refusing to credit Binance's denials of any wrongdoing. But even a cursory look at the challenged Articles undercuts those claims. The Articles are rigorously reported and detailed, and they incorporate Binance's comments throughout. And the FAC itself establishes that Binance either conceded or did not challenge the truth of the facts in the Articles that give rise to the alleged defamatory sting for which it seeks to recover. In other words, what seems to trouble Binance is not that the Articles included allegedly false facts about it, but that the Articles reported truthful facts in a manner Binance does not like. But Binance's bluster cannot transform its dissatisfaction into a defamation claim. The FAC should be dismissed.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court need not credit a complaint's conclusory legal allegations or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557); *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (giving "no effect to legal

8

conclusions couched as factual allegations"). Where the pleaded facts do not "plausibly give rise to an entitlement to relief," dismissal is appropriate. *Iqbal,* 556 U.S. at 679.

"Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Ctr. for Med. Progress*, 551 F. Supp. 3d at 325-26 (quoting *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013)). "[I]n defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Dfinity Found. v. N.Y. Times Co.*, 702 F. Supp. 3d 167, 173 (S.D.N.Y. 2023), *aff'd*, 2024 WL 3565762 (2d Cir. July 29, 2024). Because Binance has not pled a defamation claim, this lawsuit should be dismissed with prejudice.

## I.        BINANCE FAILS TO STATE A DEFAMATION CLAIM

The parties agree that New York substantive law governs this dispute. FAC ¶ 22. In order to plead defamation under New York law, a plaintiff must show the challenged statements were: (1) "of and concerning" the plaintiff; (2) likely to be understood as defamatory by the ordinary person; (3) false; and (4) published with the requisite degree of fault. *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 276 (S.D.N.Y. 2013) (quoting *Karedes v. Ackerley Grp.*, 423 F.3d 107, 113 (2d Cir. 2005)), *aff'd*, 807 F.3d 541 (2d Cir. 2015).  Binance does not—and cannot—plausibly plead these elements and, accordingly, its FAC should be dismissed.

### A.        Binance Fails to Plead Actual Malice

#### 1.        Actual Malice Is the Relevant Fault Standard

To sustain its defamation claim, Binance must plausibly allege that the *Journal* acted with actual malice for either of two reasons. *First*, under New York's anti-SLAPP law, when an action is based upon a "communication in . . . a public forum in connection with an issue of public

interest," N.Y. Civ. Rights Law § 76-a(1)(a)(1), a plaintiff must "establish[] by clear and convincing evidence" that the challenged statements were "made with knowledge of [their] falsity or with reckless disregard of whether [they] w[ere] false"—*i.e.*, actual malice. *Id.* §§ 76-a(1)(a)(1)-(2). Here, a "news media website," is a "quintessential public forum." *Reeves v. Assoc. Newspapers Ltd.*, 232 A.D.3d 10, 19 (1st Dep't 2024); *see also Golan v. Daily News, L.P.*, 77 Misc. 3d 258, 263-64 (Sup. Ct. N.Y. Cty. 2022), *aff'd*, 214 A.D.3d 558 (1st Dep't 2023). And the challenged Articles unquestionably concern matters of public interest. *See* N.Y. Civil Rights Law § 76-a(1)(d) ("[P]ublic interest" should be "construed broadly" to mean "any subject other than a purely private matter."); *Huggins v. Moore*, 94 N.Y.2d 296, 303 (1999) ("Absent clear abuse, the courts will not second-guess editorial decisions."). Here, the Articles discuss the business activities of the self-described "world's largest cryptocurrency exchange," FAC ¶ 2, and involve transactions related to a country with which the United States is at war. There is no question they involve matters of public interest. *See, e.g.*, *Kesner v. Buhl*, 590 F. Supp. 3d 680, 693 (S.D.N.Y. 2022) (Engelmayer, J.) (activities subject to investigation by SEC constituted matters of public interest), *aff'd sub nom. Kesner v. Dow Jones & Co.*, 2023 WL 4072929 (2d Cir. June 20, 2023); *InkMango, Inc. v. Warren*, 84 Misc. 3d 1227(A), at *2 (Sup. Ct. N.Y. Cty. 2024) (company's funding and investment activities were matters of public interest), *aff'd*, 243 A.D.3d 476 (1st Dep't 2025).[5] Binance must, therefore, plead that the *Journal* published each of the Articles with actual malice.

*Second*, Binance must plead actual malice because it is a public figure. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974).

---

[5] Binance's assertion that the Articles "concern the internal affairs of Binance" and that "Binance did not seek to make those matters public or otherwise invite the media into those issues," FAC ¶ 272, defies credulity. Binance published a blog post on its public-facing website—before the February 23 Article was even published—to put forth its own narrative about the strength of its compliance program. *See* Bolger Decl. Ex. 7. Binance later published a second blog post with a similar aim. *See* Bolger Decl. Ex. 8.

The U.S. Supreme Court has delineated two types of public figure defamation plaintiffs: general purpose public figures, who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," *Gertz,* 418 U.S. at 345, and limited purpose public figures, who "voluntarily inject" themselves or are "drawn into a particular public controversy," thereby becoming "a public figure for a limited range of issues," *id.* at 351. "Where the question whether a plaintiff is a public figure can be determined upon the pleadings alone, the Court may deem a plaintiff a public figure at the motion to dismiss stage." *Biro*, 963 F. Supp. 2d at 270.

There is no question that Binance is a public figure. On a motion to dismiss, courts look to a plaintiff's own "candid admissions" regarding its status, including in the complaint. *Id.* at 274-75 (deeming plaintiff a public figure based only on complaint's allegations); *see also Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 177 (2d Cir. 2000). And here, Binance admits that it is "the world's largest cryptocurrency exchange by trading volume and users," FAC ¶ 2, with over 300 million registered users globally, *id.* ¶ 12 (alleging that Binance "lead[s] the evolution of the digital asset ecosystem"). Binance further acknowledges that it is a "favorite target of the media," *id.* ¶ 24, and receives "an outsized portion of media scrutiny," *id.* ¶ 33. This is particularly so after Binance and its CEO pled guilty to violating U.S. anti-money laundering laws, *see id.* ¶ 166, and Binance was forced to pay one of the largest corporate penalties in history, *see* Bolger Decl. Ex. 2 at 2. Given its prominence in the cryptocurrency world, its high-profile plea deal, and its frequent media attention, Binance is a public figure as a matter of law.

2.    Binance Does Not Carry Its Burden of Pleading Actual Malice

Binance was thus required to plausibly allege in non-conclusory terms that the *Journal* published the Articles with actual malice. "Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001). Instead, a statement is published with actual malice when the

11

defendant acted with "knowledge that the statements were false or with reckless disregard as to their falsity." *Biro*, 807 F.3d at 544; *see Sullivan*, 376 U.S. at 279-80 (1964). "[R]eckless disregard" in this context does not mean mere negligence or even gross negligence. *Masson v. New Yorker Mag.*, *Inc.*, 501 U.S. 496, 510 (1991). Indeed, it is not an objective standard at all. Rather, it means that the defendant must have actually "entertained serious doubts as to the truth of his [statement]," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or had a "high degree of awareness of [its] probable falsity[,]" *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). This is measured by what the defendant *actually* believed and not by what a "reasonably prudent man would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731.

The Second Circuit has emphasized that "the actual malice standard imposes on a plaintiff 'a heavy burden of proof . . . that is designed to assure to the freedoms of speech and press that breathing space essential to their fruitful exercise.'" *Brimelow v. N.Y. Times Co.*, 2021 WL 4901969, at *2 (2d Cir. Oct. 21, 2021) (quoting *Contemp. Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988)). Further, "in the era of *Iqbal* and *Twombly*, pleading actual malice is a more onerous task as well." *Biro*, 963 F. Supp. 2d at 278. As a result, courts in the Second Circuit routinely grant motions to dismiss for failure to plead actual malice.[6] Because Binance fails to meet this pleading burden, the FAC should be dismissed.

---

[6] *See, e.g.*, *see Brimelow*, 2021 WL 4901969, at *3; *Lively*, 786 F. Supp. 3d at 779-81; *1st Amend. Praetorian v. N.Y. Times Co.*, 2025 WL 949575, at *10 (S.D.N.Y. Mar. 28, 2025); *Consortium for Indep. Journalism, Inc. v. United States*, 2025 WL 919504, at *20 (S.D.N.Y. Mar. 26, 2025), *appeal dismissed*, Case No. 25-1376 (2d Cir. July 21, 2025); *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 179-80 (S.D.N.Y. 2024); *Bloom v. A360 Media LLC*, 735 F. Supp. 3d 466, 474-75 (S.D.N.Y. 2024); *Prince v. Intercept*, 2023 WL 4492413, at *11-12 (S.D.N.Y. July 12, 2023); *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 692-94 (S.D.N.Y. 2022); *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 827 (S.D.N.Y. 2021), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022); *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 187-88 (S.D.N.Y. 2020); *Cabello-Rondon v. Dow Jones & Co., Inc.*, 2017 WL 3531551, at *7 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87 (2d Cir. 2018); *Contemp. Mission*, 665 F. Supp. at 270; *MiMedx Grp., Inc. v. Sparrow Fund Mgmt.*, 2018 WL 4735717, at *12 (S.D.N.Y. Sept. 29, 2018); *Biro*, 963 F. Supp. 2d at 278, *aff'd*, 807 F.3d 541; *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 573 (S.D.N.Y. 2014).

a.    *Binance's Pre-Publication Denials Do Not Support Actual Malice*

Binance's primary actual malice allegation—unchanged from the original complaint—is that the *Journal* knew its reporting was false because Binance purports to have denied the reported facts to the *Journal* prior to publication. *See, e.g.*, FAC ¶¶ 5, 51, 167, 174, 204-05.

Initially, Binance has overstated the content of its "denials," many of which are not denials at all. Consider, for example, the May Article. The *Journal* reported, "[S]ome Binance compliance directors also grew alarmed by company leaders' requests to loosen anti-money-laundering controls for high-risk clients, and also what they viewed as a reluctance to remove Russian clients, despite a previous commitment to exit the sanctioned country[.]" Bolger Decl. Ex. 4 at 8. Binance claims it denied these statements in its pre-publication comments. FAC ¶¶ 260-61. But, in actuality, Binance *admitted* that far from exiting the Russian market as promised, it instead restricted some Russian users via enhanced due diligence. *See* Bolger Decl. Ex. 11 at 11. Binance's pre-publication statement thus confirmed, rather than undermined, the *Journal*'s reporting.

More than that, Binance's so-called "denials" of the claims in the May Article (after this lawsuit was commenced) were not meaningful efforts to engage with the *Journal*; they were gamesmanship. While Binance gave a general on-the-record statement, the vast majority of the information provided to the *Journal* was "on background." *See* Bolger Decl. Ex. 11 at 2-14. As the FAC admits, Berwick pressed Binance to put *more* statements on the record, so they could be attributed to Binance, FAC ¶ 195, but Binance rejected this attempt at transparency. Binance was not providing meaningful denials—it was posturing for this litigation. The Court should not permit Binance to have it both ways: Binance did not want the *Journal* to publish its statements; it cannot now fault the *Journal* for not doing so.

Regardless, actual malice "cannot be predicated on mere denials, however vehement" because "such denials are so commonplace in the world of polemical charge and countercharge

13

that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 121 (2d Cir. 1977). Or, as one court in this District put succinctly: "Emphatic denials are part of the landscape of journalism, and a decision to print a story in the face of such a denial, particularly where, as here, it comes from an interested protagonist, does not establish clear and convincing evidence of malice." *Coliniatis v. Dimas*, 965 F. Supp. 511, 519 (S.D.N.Y. 1997). "To hold otherwise would empower public figures to silence opposing speech, not based on the veracity of the speech in the mind of the speaker but based solely on the subject's denial of its veracity." *McInnes v. S. Poverty L. Ctr., Inc.*, 811 F. Supp. 3d 1319, 1333 (M.D. Ala. 2025). Courts therefore routinely grant motions to dismiss when plaintiffs rely on their denials to support actual malice. *See Brimelow*, 2021 WL 4901969, at *3 ("[I]t is well settled that denials without more do not support a plausible claim of actual malice."); *Prince*, 2023 WL 4492413, at *11 ("[D]enials without more are insufficient to support a plausible claim of actual malice."); *Contemp. Mission, Inc.*, 665 F. Supp. at 270 ("Publication in the face of a denial by plaintiffs of a statement's truth does not demonstrate actual malice.").

This case exemplifies the reason for this rule. Binance has received extensive scrutiny from the U.S. government and the media for its past violations of sanctions laws. *See* FAC ¶¶ 165-66; Bolger Decl. Ex. 2 at 2. When it comes to news coverage concerning potential further sanctions violations, Binance is the textbook definition of an "interested protagonist." *See Colinatis*, 965 F. Supp. at 519. Particularly with this background, Binance's allegation that the *Journal* published the Articles despite its self-interested denials does not establish actual malice.

In addition, reporting Binance's denials "undercut[s] any inference of actual malice." *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018); *see also Prince*, 634 F. Supp. 3d at 141 (finding plaintiff failed to plead actual malice and noting "the Article reported Plaintiff's

14

denial of the allegations"); *Lindberg v. Dow Jones & Co.*, 2021 WL 5450617, at \*6 (S.D.N.Y. 2021) ("The *Journal's* inclusion of [a statement from plaintiff's spokesperson] cuts against the allegedly defamatory implication of the [] [a]rticle, allowing readers to decide for themselves what to conclude from the [article], [thus] making any allegation of actual malice less plausible."); *Cabello-Rondon*, 2017 WL 3531551, at \*10 (where article includes plaintiff's denials, "the article cannot be said to evince an intent to deliberately avoid learning or portraying the truth").

Here, the *Journal* extensively acknowledged and quoted Binance's denials throughout each Article. In the February Article, for example, a reader would only have to make it to the sub-headline—displayed right after the headline—to see Binance's perspective: "Weeks after Trump pardoned Binance's founder, the company dismantled probe and suspended the investigators; Binance denied inquiry ended or staff fired for concerns." Bolger Decl. Ex. 2 at 1.  Binance's further denials were noted throughout the February Article, including:

- "A Binance spokeswoman said the investigators weren't 'suspended or terminated for raising compliance concerns,' but instead left 'based on individual circumstances.' The investigation continued, she said, and resulted in the entities identified being removed from Binance's platform." *Id.* at 2.

- "Binance said it was confident it complied with legal and reporting obligations and didn't knowingly permit sanctionable activity." *Id.* at 5.

- "The [Binance] spokeswoman said the investigation didn't establish that any Binance user transacted directly with a sanctioned entity, instead transmitting funds over several steps. She also said [the CEO] didn't reject a proposal to request more information from users, and added that Binance cooperates with law enforcement and regulators." *Id.*

- In response to the statement that the internal investigation found evidence that Binance employees were involved in Blessed Trust's operations: "Binance said none of its employees logged into Blessed's account, and the claim relied on 'incorrect investigation records,' adding that, 'Any suggestion that Blessed Trust was operated, directed, or controlled by Binance is false.'" *Id.* at 9.

Likewise, the March Article quoted denials from Binance, including:

- "A Binance spokesman said the exchange 'categorically did not directly transact with any sanctioned entities.' He said that the company 'uncovered a sophisticated, multi-

jurisdictional pattern of financial activity' and that the Iranian connections were 'only identified and sanctioned after Binance began investigating and taking action in lock step with law enforcement to shut down this network.'" Bolger Decl. Ex. 3 at 3.

- "Binance said that it didn't terminate any investigators for escalating compliance concerns and that they left on individual circumstances. The company said the internal investigation continued and led to the Blessed Trust account being shut down earlier this year." *Id.*

- "Binance said the probe didn't establish that any of its users transacted directly with a sanctioned entity, instead transmitting funds over several steps. The exchange said its subsequent investigations had found that only $24 million entered wallets associated with the Islamic Revolutionary Guard Corps." *Id.*

The May Article also quoted Binance's denials, starting again from its sub-headline: "Transactions on world's largest crypto exchange took place despite repeated red flags; Binance says it has 'zero-tolerance for illicit activity.'" Bolger Decl. Ex. 4 at 1. It also reported:

- In response to reporting that Babak Zanjani's cryptocurrency network made $850 million in transactions on Binance over two years: "A Binance spokesperson said the information was inaccurate, that Binance didn't permit any transactions with individuals or digital wallets that were sanctioned at the time and that Binance took all appropriate actions once they were." *Id.* at 3.

- The Article then quoted the spokesperson's assertion that "it appears the overwhelming majority of these transactions have nothing to do with the Binance platform." *Id.*

- In response to a discussion of the *Journal*'s prior reporting: "Binance said the investigators weren't fired for raising compliance concerns but instead left 'based on individual circumstances.'" *Id.* at 4.

- In response to reporting about the new DOJ probe: "Binance said it 'categorically did not directly transact with any sanctioned entities,' describing the money flows through it as indirect." *Id.* at 5.

The *Journal*'s publication of Binance's "denials," therefore, undercuts actual malice.

          b.     *Reliance on Confidential Sources Does Not Constitute Actual Malice*

Binance also attempts to plead actual malice by claiming that the *Journal* reported the Articles based on "anonymous" and "unverifiable" sources, which it chose to credit over Binance's "specific and verifiable" denials. *E.g.*, FAC ¶¶ 4, 8, 70, 161, 229. As noted above, Binance's

16

denials were not "specific and verifiable." And even if they were, as is clear from the Articles'

text, the *Journal* did not rely on *anonymous* sources. Rather, it relied on *unnamed* sources,

including sources described as former Binance compliance employees, *see* Bolger Decl. Ex. 4 at

8, and foreign law-enforcement officials, *see* Bolger Decl. Ex. 2 at 3. A source known to the

publisher but not identified by name in the publication is not the same as an anonymous source—

*i.e.*, one whose identity is unknown to the publisher. And relying on such a source is not evidence

of actual malice. *See Biro*, 963 F. Supp. 2d at 286 (failing to name source quoted in article, "does

not make the source 'anonymous'" and has no bearing on "whether a jury could infer that [the

journalist] must have had 'serious doubts about'" the value of the source's information); *Cabello-

Rondon*, 2017 WL 3531551, at *9 ("[F]ailing to name a source is not itself evidence of the source's

unreliability."). For this reason alone, Binance's claim about "anonymous" sources lacks merit.

Similarly, while "[r]eliance on anonymous or unreliable sources without further

investigation may support an inference of actual malice," *Biro*, 807 F.3d at 546 (citing *St. Amant*,

390 U.S. at 732), that is not what occurred here. The Articles make clear that the *Journal* was not

merely relying on the word of its confidential sources but also undertook further investigation. The

Articles rely on "company documents," including "[i]nternal reports submitted by Binance's

financial-crime investigation team" (which were also provided to the DOJ), Bolger Decl. Ex. 2 at

2-3; "company email[s]" and Telegram chats concerning Binance and business entities linked to

Iran, *id.* at 8-9; on-the-record statements from Senator Blumenthal, Bolger Decl. Ex. 3 at 4; "block-

chain data," Bolger Decl. Ex. 4 at 2, 4-5, 7, 12; and public statements, including from the U.S.

Department of Treasury about Iran's use of cryptocurrency and from the Iranian cryptocurrency

exchange, Nobitex, about its use of Binance to purchase cryptocurrency, *id.* at 6-7. The *Journal*

also contacted Blessed Trust, Zanjani, Iranian authorities, the DOJ, and the Treasury Department

17

and attempted to contact Hexa Whale. Bolger Decl. Ex. 2 at 5, 7; *id.* Ex. 3 at 3; *id.* Ex. 4 at 6-7, 12. And the *Journal* engaged extensively with Binance. *See* Section I.A.2.a, *supra*. Thus, far from relying on anonymous sources without further verification, the Articles describe the investigation the *Journal* undertook to report these stories. Binance's conclusory assertion that the *Journal* relied on "anonymous" sources fails to support an inference of actual malice.

c.       *The Articles' Timing Does Not Support a Finding of Actual Malice*

Binance next alleges that the *Journal* acted with actual malice because it "engaged in a clear pattern" of "ambush[ing] Binance with eleventh-hour" requests for comment, which contained "detailed points and queries." FAC ¶¶ 4, 37. As an initial matter, Binance's admission that the *Journal* sought detailed comments undermines its claim that the *Journal* failed to "meaningfully engage or further investigate" prior to publishing the Articles. FAC ¶ 6. In fact, Binance repeatedly complains the *Journal* was asking too many questions and responding to them was too burdensome, *see e.g. id.* ¶¶ 37, 147, 191, 193, 195—hardly the behavior of a newspaper publishing a story without meaningfully engaging.

Regardless, there is no set amount of time a news organization must provide a reporting subject for comment. In fact, *entirely failing* to contact the subject of a story prior to publication does not suffice to plead actual malice. *See Prince*, 2023 WL 4492413, at *10 ("A defendant's failure to verify statements with the plaintiff . . . does not amount to reckless disregard of the truth.") (quoting *Loeb v. News Times Comm'cns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980)); *Sweeney v. Prisoners' Legal Services, Inc.*, 84 N.Y.2d 791, 791-93 (1995) (no showing of actual malice despite defendants conducting "no . . . investigations of [the] allegations" they published).

Nor does asking for comment on a short turnaround time plead actual malice. In *Jacob*, for example, the plaintiffs alleged that the defendant, a *New York Times* reporter, sent an "email containing 27 questions at noon and requested that [the plaintiff] respond by 9 a.m. the next day,"

18

which the plaintiff claimed was proof the *Times* was engaged in a "sham investigation" to "purposeful[ly] avoid[]" the truth. 626 F. Supp. 3d at 679, 692. The court held that the short deadline did not amount to a plausible allegation of actual malice: "If anything, [defendant's] behavior in reaching out to plaintiffs prior to publication evinces appropriate regard for the truthfulness of the publication, even if that outreach was conducted only shortly before publication." *Id.* at 693; *see also Coliniatis*, 965 F. Supp. at 518-19 (no actual malice where newspaper contacted plaintiff one day before publication). Here too, the fact that the *Journal* contacted Binance for comment at all negates, rather than supports, actual malice.

In any event, Binance clearly *did* have enough time to respond to the *Journal*'s requests prior to the publication of each Article. Binance acknowledges that it "provided substantive responses" on 27 different factual contentions before publication of the February Article. FAC ¶ 45. And, in fact, Binance had provided a statement to *Fortune* regarding similar claims one week earlier, *see* Bolger Decl. Ex. 5 at 2 (reporting Binance "appears to be reneging on its promise" to comply with U.S. regulations by facilitating more than $1 billion in Iran-linked transactions and firing investigators), and to the *New York Times* for an article published earlier in the day on February 23, *see* Bolger Decl. Ex. 6 at 1-2 (reporting "about $1.7 billion had flowed from two Binance accounts to Iranian entities with links to terrorist groups, a possible violation of global sanctions," and "[w]ithin weeks, Binance fired or suspended at least four employees involved in the investigation").[7] In addition, *after* receiving the *Journal*'s questions but *before* responding to them, Binance also released a blog post responding to "press reports" regarding the termination of

---

[7] Not only does this show that Binance had enough time to respond to the *Journal*, but the publication of these articles—both from reputable news outlets—underscores that the *Journal* would have no reason to believe that its own article on the same subject was false. *See Church of Scientology Int'l. v. Daniels*, 992 F.2d 1329, 1334 (4th Cir. 1993) (it would be "impossible to conclude that [defendant] entertained serious doubts as to the truth of his statement or spoke with a high degree of probable falsity" given the "volume of published commentary" that aligned with challenged statements).

its compliance investigators. *See* Bolger Decl. Ex. 7 at 5. Binance had more than enough time to respond substantively to the *Journal's* reporting.

As to the March Article, Binance again admits that it emailed its "factual rebuttal" to Berwick prior to the Article's publication. FAC ¶ 151. And before the March Article was published, Binance published yet another blog post about Iran-linked transactions, which it directed Berwick to read before the Article went to print. *Id.*; Bolger Decl. Ex. 8; Ex. 10 at 2.

Similarly, before the May Article was published, Binance "provided a lengthy and detailed response and rebuttal" to a list of 45 points and questions Berwick posed. FAC ¶¶ 191-94, 198-99. And, contrary to Binance's claims that the *Journal* ignored its request for more time to respond, Berwick accommodated Binance's request and continued to engage with Binance for over one week before publishing the Article. *See id.* ¶ 195, 197-98.

Despite this extensive back and forth between Binance and the *Journal*, Binance claims that the *Journal* was not actually interested in its responses and, instead, had a "preconceived narrative" against it. *See id.* ¶¶ 4, 5, 49, 150. But, even if this were true, as the court recognized in *Tah v. Global Witness Publishing, Inc.*, 413 F. Supp. 3d 1 (D.D.C. 2019), it is of "no surprise" when a news organization "arrive[s] at its conclusion, right or wrong, by the time it reache[s] out for comment and shortly before publication," and this is "not enough to show actual malice," *id.* at 13; *see also Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 312 (D.D.C. 2014) ("[A]llegedly having a pre-conceived story line is not sufficient to demonstrate actual malice."), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016). And reviewing the as-published Articles in conjunction with the "points" detailed in the *Journal*'s comment requests demonstrates that the *Journal* refined its reporting as a result of Binance's responses. Most notably, the *Journal* modified its description of the manner in which funds flowed through Binance to Iranian entities to reflect Binance's explanation.

20

*Compare* Bolger Decl. Ex. 11, *with*, Bolger Decl. Ex. 4.

Finally, Binance's remaining speculation about the Articles' timing, including that the *Journal* wanted to get ahead of the *New York Times*, it wanted to drive "page views," and it sought "pure financial gain," FAC ¶¶ 6, 44, fares no better. It is well-established that, "[a] newspaper's motive in publishing a story"—including a desire to "increase its circulation"—"cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Comms. v. Connaughton*, 491 U.S. 657, 665 (1989); *see also Bloom*, 735 F. Supp. 3d at 472-73, 474-75 (allegation that defendant "rushed to publish" articles "purely to obtain benefits from quick publication" was "too conclusory to allege actual malice" and "desire to turn a profit does not in and of itself indicate a defendant acted with actual malice"); *Jacob*, 626 F. Supp. 3d at 693 (allegation that journalist was motivated to publish disparaging information about plaintiffs for economic reasons insufficient to allege actual malice).[8] Binance's claims about the Articles' timing fail to plead actual malice.

### d. *Binance's Post-Publication Denials Are Irrelevant to Actual Malice*

Next, Binance alleges the *Journal* acted with actual malice because it did not take any action following Binance's post-publication communications, which asserted that each Article was false. *See* FAC ¶¶ 140, 146, 184-85, 268-71. But the actual malice inquiry focuses solely on the defendant's state of mind "at the time of publication." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984); *Herbert v. Lando*, 781 F.2d 298, 305-06 (2d Cir. 1986) ("It is self-evident that information acquired after the publication of defamatory material cannot be relevant to the publisher's state of mind of his alleged malice at the time of publication."). Thus, for example, the fact that Binance requested a retraction after the February Article was published has

---

[8] Binance claims the *Journal* "set aside its journalistic standards" to publish the February 23 Article. FAC ¶ 44. But even if this were true, a departure from "accepted newsgathering standards" does not suffice to plead actual malice because it "sounds[s] in no more than journalistic negligence and thus fails to plausibly allege the requisite higher degree of fault." *Brimelow*, 2021 WL 4901969, at *3; *see also Prince*, 634 F. Supp. 3d at 140.

21

no bearing on Binance's state of mind at the time the February Article was published.

e.      *Binance's Allegations of Ill Will Are Irrelevant to Actual Malice*

Throughout the FAC, Binance attempts to conjure the narrative that the *Journal* and Berwick have a longstanding vendetta against Binance, which led them to publish the Articles to harm Binance's reputation. *See* FAC ¶¶ 276-77, 295. Of course, that is not true. Regardless, "[a] complaint that alleges a defamation defendant harbored ill will toward the plaintiff can 'provide no basis for plausibly inferring that the [defendant] had any doubts about the truth' of the challenged statements." *Prince*, 2023 WL 4492413, at *7. Indeed, even "unfair one-sided attacks" cannot establish actual malice. *Biro*, 963 F. Supp. 2d at 276-77 (quoting *Westmoreland v. CBS Inc.*, 601 F. Supp. 66, 68 (S.D.N.Y. 1984)).

Similarly, allegations about "improper political or personal biases do not establish actual malice without additional facts to suggest the speaker acted pursuant to that bias." *McDougal*, 489 F. Supp. 3d at 185; *see also 1st Amend. Praetorian*, 2025 WL 949575, at *9 (same). In *McDougal*, for example, the court held that pleading the defendant was "personally and politically biased" was "pure speculation, supported not by facts but by only conclusory statements." 489 F. Supp. 3d at 185. The same is true here. Binance claims that Berwick has made "expressions of personal hostility toward Binance outside the reporting process" and "seeks to avoid talking to Binance employees because he considers them all to be criminals." FAC ¶ 276. This claim is false, and Binance cites no facts to support it. Indeed, Binance's claim that Berwick "seeks to avoid talking to Binance employees" is belied by the "detailed" comment requests he sent to Binance. *See* Section I.A.2.a, *supra*. Binance's unsupported allegations of ill will and bias fail to plead actual malice.

f.      *Even Collectively, Binance's Allegations Fail to Plead Actual Malice*

Finally, considering Binance's allegations of actual malice collectively does not salvage

Binance's claim. In *Brimelow*, the plaintiff claimed the *New York Times* published an article with actual malice based on a litany of similar factors, including that it ignored the plaintiff's "repeated and persistent denials," departed from accepted newsgathering standards, acted with ill-will, and failed to act impartially, 2021 WL 4901969, at *2-3. The court considered all of these factors together and concluded there was "no combination of allegations from which one could plausibly infer that the Times was purposely avoiding the truth in its reporting." *Id.* at *3.

So too here. Taken alone or together, Binance's claims fail to show that the *Journal* published the Articles knowing them to be false or with a high degree of awareness of their probable falsity. The FAC should, accordingly, be dismissed.

**B.      Binance Does Not and Cannot Plead The Other Elements of Its Defamation Claim**

1.        Binance Has Not Established That The Articles Are False

Next, Binance has not and cannot plead that the Articles are false because it has conceded the truth of and/or has left unchallenged many statements that establish the truth of the Articles' alleged defamatory sting. *See Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 176 (S.D.N.Y. 2021) (defamatory inference not actionable because it flows from undisputed facts); *Aboutaam v. Dow Jones & Co.*, 2019 WL 1359772, at *6 (Sup. Ct. N.Y. Cty. Mar. 26, 2019) (granting dismissal when truth "would not by itself change whether the reader draws an evil opinion of Plaintiff reading the article as a whole"), *aff'd*, 180 A.D.3d 573 (1st Dep't 2020); *Cabello-Rondon*, 2017 WL 3531551, at *6 (dismissing claim where plaintiff seemed to be "carefully avoiding alleging" material falsity).

While "truth provides a complete defense to defamation claims," *Dillon v. City of N.Y.*, 261 A.D.2d 34, 39 (1st Dep't 1999), truth "need not be established to an extreme literal degree." *Love v. William Morrow & Co.*, 193 A.D.2d 586, 587 (2d Dep't 1993). Instead, a challenged statement must only be "substantially true," such that it "could have produced no worse an effect

23

on the mind of the reader than the truth pertinent to the allegation." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 241-42 (2d Cir. 2017). Put differently, a statement is not "false" "so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson*, 501 U.S. at 517. And because falsity is an element of a *prima facie* defamation claim, it is the *plaintiff's* burden to plead and prove the challenged statements are "material[ly] false." *Tannerite*, 864 F.2d at 247. When assessing substantial truth, "[t]he entire publication, as well as the circumstances of its issuance, must be considered." *Id.* at 242-43.

Here, Binance has not adequately alleged that the Articles are materially false because it has either conceded or not challenged factual statements in each of the Articles that have the same effect on the reader as the sentences Binance claims are false. As to the February Article, for example, Binance alleges the Article falsely accuses it of improperly firing employees who investigated allegations that Iran-linked groups used Binance to send $1.7 billion to Iran by nitpicking statements it believes support that accusation. FAC ¶¶ 52-135 (Statements 1-11). But Binance *concedes* that its users had moved significant sums of money to Iran through the platform and it fired employees who had investigated those transactions (and ultimately offboarded those users). *Id.* ¶¶ 54, 69. And Binance does not challenge portions of the Article that, for example, say, "Investigators found Hexa used the account to move about $500 million worth of the stablecoin tether over several months since 2024 to what investigators referred to as 'Entity A.' Entity A was a group of seven digital wallets addresses that Binance investigators concluded were linked to an Iranian network." Bolger Decl. Ex. 2 at 7.

As to the March Article, Binance challenges statements in the Article that it alleges falsely accuse it of continued criminal wrongdoing. FAC ¶¶ 157-79 (Statements 12-14). But Binance does not contest that law enforcement officials have, in fact, launched an investigation into how its

24

platform was being used to transfer funds to Iran. Bolger Decl. Ex. 3 at 1-2.

As to the May Article, Binance alleges that it is defamatory and false to accuse it of knowingly allowing Iran to conduct transactions on the platform. FAC ¶¶ 200-65 (Statements 15-22). While Binance cherry-picks statements that it believes supports this conclusion, Binance concedes that an account controlled by a financier for the Iranian regime made millions in transactions on Binance, that the accounts involved were flagged to Binance months before Binance took action on them, and Binance ultimately took "all appropriate action" on the accounts. Bolger Decl. Ex. 4 at 1-2, 4, 6, 10. And it does not challenge statements in the May Article that say, for example, that "billions in crypto transactions [] have flowed through Binance to networks financing Iran's Islamic Revolutionary Guard Corps in the two years preceding the current U.S.-Iran war." *Id.* at 2.

In short, there is no question that the facts Binance either concedes or leaves unchallenged make it impossible for it to establish the material falsity of the Articles' stings because those conceded facts render the Articles substantially true: Significant funds traveled through the Binance platform to sanctioned Iranian entities; Binance fired the investigators who discovered that a substantial amount of funds were moving through Binance to Iran; Binance internally flagged those accounts but did nothing about them for months; and Binance eventually took appropriate action, including offboarding offending accounts. Taken as a whole, the Articles are true, and Binance has not plausibly alleged that they are materially false.

So too are many of the individual statements Binance challenges:

**Statements 1-3, 7, 11-12, 14, & 20**: Binance fails to plead material falsity as to each of the challenged statements that report on Binance's termination of the investigators looking into Iran-linked transactions. *See* FAC ¶¶ 52, 58, 66, 99, 124, 157, 172, 242. Instead of contesting these

25

facts, the FAC claims these statements are false because Binance did not "unlawfully" or "unethically" fire these investigators in retaliation for their findings, and it did not "improperly" or "wrongly" dismantle their investigation because the offending accounts were later offboarded. *See* FAC ¶¶ 53, 59, 67, 100, 125, 173, 243.[9] The Articles, however, *never state* that Binance fired the investigators in retaliation for their investigation; on the contrary, they report Binance's statement that the investigators were not "suspended or terminated for raising compliance concerns" but instead left "based on individual circumstances." *E.g.*, Bolger Decl. Ex. 2 at 2. The Articles likewise *never state* that Binance improperly dismantled the investigation; on the contrary, they report "the investigation continued . . . and resulted in the entities identified being removed from Binance's platform." *Id.*; *see* Bolger Decl. Ex. 3 at 3 ("Binance said that it didn't terminate any investigators for escalating compliance concerns and that they left on individual circumstances. The company said the internal investigation continued and led to the Blessed Trust account being shut down earlier this year."); Bolger Decl. Ex. 4 at 4 ("In response to the article, Binance said the investigators weren't fired for raising compliance concerns but instead left 'based on individual circumstances.' It said it didn't knowingly permit sanctionable activity, that the identified entities were ultimately removed from Binance's platform and that it managed the risk appropriately."). Binance thus does not plead the falsity of the facts actually reported in the Articles.

**Statement 9**: This statement reports that the Blessed Trust account was "labeled as 'internal' and access was tightly restricted. It required special approval from a Binance department called Internal Audit, whose leader reported to Teng, the CEO." FAC ¶ 109. In the FAC, Binance

---

[9] Binance's pleading that it did not "dismantle any internal investigations," FAC ¶ 158, does not sufficiently allege this statement is materially false because Binance does not deny that it terminated the investigators conducting the investigation.

*admits* that the Blessed Trust account was placed on the Internal Audit restricted list—exactly as the February Article reports—but claims that when the compliance team requested access to the account, it was granted, *see* FAC ¶ 112. But the Article never says anything to the contrary. In fact, by reporting that investigators found that Blessed Trust "had transferred more than $1 billion in tether to the IRGC-run Entity A network," *see* Bolger Decl. Ex. 2 at 8, the February Article indicates that investigators *were* able to investigate the Blessed Trust account even though it was on the restricted list. Binance, therefore, does not plead that Statement 9 is materially false.

**Statements 6, 10, 16, & 19**: Statement 6 reports that Binance's internal investigation team "connected accounts registered to Chinese clients to digital wallets that U.S. and Israeli authorities said were used by Iran to finance its proxies." FAC ¶ 91. It further states, "In total, $1.7 billion flowed over 2024 and 2025 from the accounts, which funded Iran-backed groups including Yemen's Houthi militants." *Id.* Statements 10, 16, and 19 report on internal flags placed on the Blessed Trust and Zanjani accounts prior to Binance taking action on these accounts. *Id.* ¶¶ 116, 233. Binance again does not contest these facts but instead claims these statements are false because Binance did not know *at the time the accounts were onboarded or at the time of the transactions* that they were facilitating the flow of funds to Iran, and did not *knowingly* ignore the alerts on these accounts but, instead, ultimately investigated, offboarded the accounts, and reported them to law enforcement. FAC ¶¶ 92-93; 118-20; 210-11; 234-38. But none of these statements asserts that Binance knew at the time the accounts were created or at the time of the transactions that the accounts would be transferring money to Iran. Nor do they assert that Binance knowingly ignored red flags. Instead, the Articles report that Binance investigated and took all appropriate action concerning suspicious accounts. *See* Bolger Decl. Ex. 2 at 8 (regarding Blessed Trust, "Binance said that appropriate compliance measures were taken and the account was offboarded

27

last month"); Bolger Decl. Ex. 4 at 4 ("[Binance] said it didn't knowingly permit sanctionable activity, that the identified entities were ultimately removed from Binance's platform and that it managed the risk appropriately."). Binance has again not pled falsity.

**Statement 15**: Binance claims that the May 21 Article's headline is false because Binance did not "knowingly" allow Iran to transact on Binance. FAC ¶ 202. But, as Binance itself recognizes, the headline *states* nothing of the sort.

**Statements 17 & 18**: Statement 17 states, "As Iran braced for conflict with the U.S., a key regime financier built a secret payment network to keep money flowing to its military forces. At its core was Binance." FAC ¶ 216. Statement 18 characterizes Binance as a "financial artery for the IRGC." *Id.* ¶ 224. Binance alleges these statements are false because it was "not at the core of any secret payment network used to keep money flowing to Iran's military forces," was not a "central platform" for this activity, *id.* ¶ 217, and "did not facilitate the movement of funds for the IRGC," *id.* ¶ 225.

Initially, in assessing whether a statement is an actionable fact, this Court must look to whether the statement is capable of being proven true or false. *Biro v. Conde Nast,* 883 F. Supp. 2d 441, 460 (S.D.N.Y. 2012). Whether something is at the "core" or is an "artery" is not susceptible of being proven true or false. In fact, this Court rejected a similar claim for defamation in *Kesner*, based on the headline "The Lawyer at the Center of the SEC Pump-and Dump Case." *See* 515 F. Supp. 3d at 176. The Court held that the word center "is not self-defining. A person may be at the center of a case involving improprieties as a perpetrator, but alternatively could be so as a witness, a victim, or unwitting tool." *Id.* at 177. Here, too, describing Binance as at the "core" or "an artery" for a sanctions evasion scheme does not necessarily implicate Binance itself in wrongdoing.

And in any event, Binance has acknowledged that its platform *was* used to transfer money

that ultimately reached the IRGC—it just frames its subsequent removal of suspicious accounts as a success story. This is insufficient to plead falsity.[10] In fact, this is just the sort of allegation rejected in *Cabello-Rondon*. There, the plaintiff challenged as defamatory a statement that he was the "*biggest* target" of an investigation but did not deny that he was "a" target of the investigation. 2017 WL 3531551, at \*7 (emphasis added). The court granted the defendant's motion to dismiss, explaining, "without challenging the accuracy of the statement that he is under investigation, [plaintiff] cannot sufficiently plead falsity by alleging that he is not the 'biggest' target of the investigation." *Id.*; *see also Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 367 (S.D.N.Y. 1998) (same). So too here.  Binance's claim based on Statements 17 and 18 should be dismissed.

In short, Binance has not pled material falsity of each of the statements about which it complains. What Binance is really complaining about is the *Journal's* characterization of undisputed facts.  In other words, Binance would have liked the *Journal* to have reported these events as compliance successes. FAC ¶¶ 32-33. But because Binance does not actually deny the information reported in the Articles, Binance has not pled material falsity.

2.      Binance's Vague References to "Implication" Do Not Salvage Its Claim

To the extent Binance claims that the Articles *imply* that Binance fired the investigators in retaliation for their findings, or *imply* that it was improper for Binance to wait months to remove accounts after they were flagged, such claims also fail for two reasons.

*First*, to allege defamation by implication, Plaintiff "must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference."

---

[10] That is particularly so because Binance does not challenge as defamatory the statement in the May 21 Article that "billions in crypto transactions [] have flowed through Binance to networks financing Iran's Islamic Revolutionary Guard in the two years preceding the current U.S.-Iran war." Bolger Decl. Ex. 4 at 2.

*Stepanov v. Dow Jones & Co., Inc.* 120 A.D.3d 28, 37 (1st Dep't 2014). Other than an insufficient boilerplate allegation, FAC ¶¶ 136, 180, 266, Binance has made no effort to do so here.

*Second*, the alleged implication of wrongdoing is protected as an opinion based on the unchallenged disclosed facts in the Articles. New York courts have long recognized that because "falsity is a *sine qua non* of a libel claim and since only assertions of fact are capable of being proven false . . . a libel action cannot be maintained unless it is premised on published assertions of *fact*." *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995). A defendant cannot be liable "for simply expressing their opinion . . . no matter how unreasonable, extreme, or erroneous those opinions might be." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 380-81 (1977). When an author "fully sets forth the factual basis for a particular view (and that factual basis is not challenged as false), then the author's conclusion constitutes nonactionable opinion." *Biro*, 883 F. Supp. 2d at 468. In such a case, the opinion is protected whether it is stated directly in the article or is merely an "unstated inference that may arise in a reader's mind after reading such facts." *Id.*

That is precisely the case here. Binance does not challenge that significant funds moved through Binance's platform to sanctioned Iranian entities or that the investigators looking into those transactions were fired shortly after discovering them. Nor does Binance challenge that accounts were flagged for moving money to Iran, and Binance only took action on these accounts after several months. Without challenging these facts, Binance cannot challenge the alleged opinion arising from them—that the investigators were terminated based on their findings or that Binance knowingly allowed funds to move into Iran via its platform. *Kesner*, 515 F. Supp. 3d at 179 ("[A] reasonable reader, reading the article in this full context, would understand that [the reporter] was purely opining based on the facts she there disclosed."). This Court need look no further to dismiss any implication claim Binance brings.

30

### 3. Statements 1, 2, 15, and 16 Are Fair Indexes of the Articles

Binance's claims as to Statements 1, 2, 15, and 16—the headlines and sub-headlines of the February and May Articles—should also be dismissed because they are fair indexes of the Articles. "Under New York law, an article's headline is not independently actionable in a defamation case if it is 'a fair index of the substantially accurate material included in the article.'" *BYD Co.*, 531 F. Supp. 3d at 819 (quoting *Test Masters Educ. Servs. v. NYP Holdings, Inc.*, 603 F. Supp. 2d 584, 589 (S.D.N.Y. 2009)); *see also Golan*, 214 A.D.3d at 559 ("[T]he headline and subheadlines were fair indices of the article and, therefore, were not actionable."). Under this standard, "[a] newspaper need not choose the most delicate words available in constructing its headline." *Test Masters*, 603 F. Supp. 2d at 589. This "is a question of law" for the court. *Kesner*, 515 F. Supp. 3d at 172.

Here, the headline of the February Article provides, "Binance Fired Staff Who Flagged $1 Billion Moving to Sanctioned Iran Entities." FAC ¶ 52. The sub-headline similarly states, "Weeks after Trump pardoned Binance's founder, the company dismantled [the] probe and suspended the investigators; Binance denied inquiry ended or staff fired for the concerns." *Id.* ¶ 58. But Binance does not challenge the underlying facts, explained in the Article, that: (1) Binance internal investigators were looking into Iran-linked transactions; (2) these investigators reported over $1 billion flowing through Binance to sanctioned Iranian entities; and (3) Binance subsequently suspended—and ultimately fired—the investigators who raised these concerns. Instead, Binance claims that the investigators were not fired *because of* their findings. FAC ¶ 53. The sub-headline itself and the body of the Article, however, make Binance's position clear. *See* Bolger Decl. Ex. 2 at 1. The Article also makes clear that the investigation was not *permanently* dismantled after Binance fired the investigators, as the offending accounts were nonetheless ultimately removed from Binance's platform. For these reasons, the February 23 Article headline and sub-headline are protected by the fair index privilege.

31

The same is true of the May Article headline and sub-headline. The headline provides, "Iran Moved Billions Through Binance to Fund Regime—Continuing Into This Month." FAC ¶ 201. But Binance does not challenge as defamatory the underlying statements in the May Article that this headline summarizes, including:

- A "network, run by Babak Zanjani . . . made $850 million in transactions over two years" on Binance. Bolger Decl. Ex. 4 at 1.

- "The funds are part of billions in crypto transactions that have flowed through Binance to networks financing Iran's Islamic Revolutionary Guard Corps in the two years preceding the current U.S.-Iran war." *Id.* at 2.

- "The $850 million in Zanjani transactions, which included both deposits and withdrawals, likely means about $425 million moved through Binance to finance Iran's military." *Id.* at 3.

- "Iran's central bank moved $107 million in crypto through a series of transactions into Binance accounts last year." *Id.* at 4.

- "Data compiled by a foreign law-enforcement agency recorded about $260 million in direct transactions during 2024 and 2025 between accounts on Binance and digital wallets associated with Iranian terrorist financiers and sanctioned Iranian entities." *Id.* at 4.

- "Binance investigators flagged that a digital wallet held by an unknown user outside Binance received money through the exchange and sent $218 million to an Iranian-state financing network in 2023, a transfer confirmed by blockchain data." *Id.*

Because the headline fairly summarizes these unchallenged statements, it is not actionable.

Next, the sub-headline provides, "Transactions on world's largest crypto exchange took place despite repeated red flags; Binance says it has 'zero-tolerance for illicit activity." FAC ¶ 209.[11] As explained in Section I.B.1, *supra*, Binance does not contest that the Zanjani account remained on Binance's platform—and continued transacting business—months after internal red flags were raised. Nor does Binance challenge the May Article's statement, "Binance's internal

---

[11] The FAC notably omits this second half of the sub-headline, which includes Binance's position. FAC ¶ 209.

investigators and foreign law-enforcement officials warned last year that Iranian-linked funds were still passing through the platform. In many cases, the accounts remained open for months even after internal alerts flagged their Iranian links." Bolger Decl. Ex. 4 at 6. Binance thus cannot bring a defamation claim stemming from the May Article headlines.

### 4. Statements 4 and 13 Lack a Defamatory Meaning

The Court should also dismiss Statements 4 and 13 on the independent ground that they lack the defamatory meaning that Binance ascribes to them. Under New York law, a statement is defamatory if it "arouse[s] in the mind of the average person in the community an evil or unsavory opinion []or expose[s] plaintiff to public hatred, contempt, or aversion." *Pritchard v. Herald Co.*, 120 A.D.2d 956, 956 (4th Dep't 1986). "[C]ourts will not strain to find [defamation] where none exists." *Cohn v. Nat'l Broad. Co.*, 50 N.Y.2d 885, 887 (1980). Whether a statement is defamatory "should ordinarily be resolved at the pleading stage." *Church of Scientology*, 238 F.3d at 173. For this reason, courts routinely grant motions to dismiss when challenged statements lack a defamatory meaning. *See, e.g.*, *Jacob*, 626 F. Supp. 3d at 689-90; *Lindell v. Mail Media Inc.*, 575 F. Supp. 3d 479, 486-87 (S.D.N.Y. 2021).

Here, Statement 4 reports that "[t]he episode"—*i.e.*, Binance investigators looking into money that moved through Binance to fund Iran-backed terror groups, Binance firing those investigators, and Binance subsequently removing the suspect accounts from Binance's platform—"echoed some of the same concerns that drew U.S. scrutiny in 2023" (when Binance ultimately pled guilty to violating anti-money laundering laws). FAC ¶ 75.[12] Binance alleges this

---

[12] Binance also challenges the latter portion of this sentence, "Binance admitted to breaking sanctions and anti-money-laundering laws—violations that turned it into a money-laundering hub for criminal, terrorists and Iranian-sanction evaders." FAC ¶ 75. But the fact that Binance "admitted to breaking sanctions and anti-money-laundering laws" is a report of a plea deal with the government and thus is absolutely privileged under New York Civil Rights Law § 74. And while Binance claims it "is not a money-laundering hub," FAC ¶ 76, the February Article does not accuse Binance of *currently* being a money-laundering hub, it clearly refers to Binance's status at the time of the plea deal.

accuses it of criminal wrongdoing. *Id.* ¶ 76. But merely stating that this "echoed" earlier concerns does not state that Binance was, in fact, violating anti-money laundering laws again.[13]

Similarly, Statement 13 reports that an inquiry from the DOJ put Binance "back in the legal spotlight" after its guilty plea and the pardon of its founder. FAC ¶ 165. Binance again alleges this accuses it of criminality. *Id.* ¶ 166. But the Article makes clear that Binance is "back in the legal spotlight" because the DOJ was "investigating Iran's use of Binance to evade U.S. sanctions," Bolger Decl. Ex. 3 at 1-2, and that it was unknown whether the DOJ was "investigating Binance itself . . . or solely the customers on its platform." *Id.* at 2. This is not an allegation of criminality.

In fact, the court rejected similar allegations in *1st Amendment Praetorian.* There the court held that the statement that a congressman "promised to explore the connections" between the plaintiff organization and other far right groups did not accuse plaintiff of a crime because it "ma[de] clear that it is [] merely an allegation that will be further investigated." 2025 WL 949575, at *16. And in *Aboutaam*, the court held that statements that the plaintiff and his brother were "entangled in investigations of looted antiquities" and that they were "under scrutiny as authorities in multiple countries look into how Islamic State finances itself by trafficking in ancient objects" lacked a defamatory meaning because they "d[id] not impart any inference of guilt" and "only rais[ed] the question of whether Plaintiff and his brother have been trading in ISIS-looted antiquities."[14] 2019 WL 1359772, at *14-16. Here, as in *1st Amendment Praetorian* and *Aboutaam*,

---

[13] In addition, the term "echo" is not capable of being proven true or false, *Kesner*, 515 F. Supp. 3d at 177, and Binance did not deny the underlying fact that money *was* moving on its platform to Iranian terrorist groups. As such, Binance also cannot plead material falsity as to Statement 4.

[14] Even if—despite its explicit language—the March Article somehow still suggested that Binance itself was being investigated (and it does not), that still would not carry a defamatory meaning. A court "must uphold the constitutional protection that one is presumed innocent until proven guilty in a court of law." *Aboutaam*, 2019 WL 1359772, at *16. The fact that "some readers may believe that one would not be investigated by law enforcement . . . if one were not guilty" therefore does not impart a defamatory meaning into an article that truthfully reports on a government investigation. As such, reporting that Binance is under investigation for money laundering would not state or imply that Binance is, in fact, guilty of this crime. *See id.* (citing *Martin v. Hearst Corp.*, 777 F.3d 546, 553 (2d Cir. 2015)).

Statements 4 and 13 lack the defamatory meaning Binance ascribes to them, and they cannot form the basis of Binance's defamation claim.

## II.    THE *JOURNAL* IS ENTITLED TO ATTORNEYS' FEES AND COSTS

Under New York's anti-SLAPP law, "costs and attorney's fees shall be recovered [by a prevailing defendant] upon a demonstration . . . that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law." N.Y. Civil Rights Law § 70-a(1)(a). A complaint that fails on a Rule 12(b)(6) motion is "a fortiori, 'without a substantial basis in fact and law.'" *Bobulinski*, 758 F. Supp. 3d at 185; *see also Heilbut v. Cassave Sciences, Inc.*, 778 F. Supp. 3d 551, 570 (S.D.N.Y. 2025) ("The Defamation FAC's dismissal for failure to state a claim indicates that the Defamation Action was commenced without a substantial basis."). Because the FAC fails to plausibly plead defamation, it lacks a substantial basis in law,[15] and the Court should find the *Journal* is entitled to collect the attorneys' fees and costs it incurred in defending against this meritless litigation.

## CONCLUSION

For the foregoing reasons, Binance's FAC should be dismissed with prejudice, and this Court should find that the *Journal* is entitled to attorneys' fees and costs under New York's anti-SLAPP law.

Dated: June 29, 2026

---

[15] In *Kesner*, this Court held that § 70-a of the anti-SLAPP law did not apply in federal court because the "substantial basis" standard conflicts with Rule 12(b)(6). *See* 590 F. Supp. 3d at 701. Since that time, however, New York federal courts have recognized that the fee shifting provision of the anti-SLAPP statute, "is a substantive provision that does not conflict with a federal procedural rule." *Bobulinski*, 758 F. Supp. 3d at 177, n.7. This is because, as noted above, a complaint that fails to state a claim under Rule 12(b)(6) lacks a "substantial basis in fact and law" under the anti-SLAPP statute. Accordingly, the anti-SLAPP statute's fee shifting provision should apply in federal court. *Id.*; *see also Grifols, S.A. v. Yu*, 2026 WL 836657, at *5 (S.D.N.Y. Mar. 26, 2026); *Heilbut*, 778 F. Supp. 3d at 569; *Button v. N.Y. Times Co.*, 2025 WL 2643674, at *20-21 (S.D.N.Y. Sept. 15, 2025), *appeal filed*, 25-2634 (2d Cir. Oct. 22, 2025).

Respectfully submitted,
DAVIS WRIGHT TREMAINE LLP

Katherine M. Bolger
Amanda B. Levine
1251 Avenue of the Americas, 42nd Floor
New York, New York 10020
Telephone: (212) 489-8230
katebolger@dwt.com
amandalevine@dwt.com

Azeezat Adeleke (*pro hac vice*)
1301 K Street NW Suite 500 East
Washington, D.C. 20001
Telephone: (202) 973-4237
azeezatadeleke@dwt.com

36