**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BINANCE HOLDINGS LIMITED,      :

           :

        Plaintiff       :

           :

    vs.        :      Case No: 1:26-cv-1980-PAE

           :

DOW JONES & COMPANY, INC. d/b/a THE   :
WALL STREET JOURNAL       :

           :

        Defendant    :

           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

**WITHERS BERGMAN LLP**
Christopher N. LaVigne
Amber Melville-Brown
Alexander C. Haden
430 Park Avenue, 10th Floor
New York, NY, 10022-3505
Telephone: 212.848.9800
Facsimile: 212.848.9888
christopher.lavigne@withersworldwide.com
amber.melville-brown@withersworldwide.com
alex.haden@withersworldwide.com

*Attorneys for Plaintiff Binance Holdings Limited*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY .......................... 3

    A.   Binance and Media Attacks .................................................................................... 3

    B.   The WSJ Rushed to Publish With Inadequate Investigation, Despite Pre-Publication Notice of Falsity ................................................................................ 4

    C.   The WSJ Published a False and Defamatory Article on February 23, 2026 ...................... 5

    D.   The WSJ Refused to Correct or Retract its Defamatory February Statements .................. 6

    E.   The WSJ Published a Second False and Defamatory Article on March 11, 2026 .............. 7

    F.   The WSJ Published a Third False and Defamatory Article on May 21, 2026 ................... 8

ARGUMENT .......................................................................................................................... 9

    A.   Binance Properly Alleges A Defamation Claim .................................................... 9

        1.   Binance Plausibly Pleads Material Falsity (Statements 1-3, 6, 7, 9-12, 14-20) ......... 10

        2.   Binance Properly Pleads Defamation by Implication (False Statements 1-4, 6, 7, 9-16, 19 and 20) .......................................................................... 13

        3.   The "Fair Index" Defense Does Not Apply to Headlines That Repeat Defamatory Statements ........................................................................... 18

        4.   False Statements 4 and 13 Are Defamatory ................................................ 18

        5.   Binance Properly Alleges the WSJ Acted with Actual Malice ...................... 20

            a.   The WSJ Ignored Binance's Doubt-Inducing Denials ............................ 22

            b.   The Articles Portray Binance as Wrongdoer Regardless of Contrary Facts ......... 24

            c.   The WSJ's Defamatory Messages Are Not Reliably Sourced .................... 26

            d.   Berwick's Personal Animosity and WSJ's Profit Motive .......................... 28

            e.   The WSJ's Inadequate, Rushed Investigations and Rush to Publish ............ 30

            f.   The WSJ's Refusal to Correct or Retract ............................................ 33

    B.   The WSJ's Request for Attorney's Fees and Costs Should Be Denied ...................... 34

        1.   Binance Pleaded Actual Malice, Defeating Any Anti-SLAPP Claim ............... 34

        2.   Section 70-a Does Not Apply in Federal Court ........................................... 34

        3.   The WSJ Does Not Satisfy the Anti-SLAPP Statute's Procedural Requirements ................................................................................. 35

CONCLUSION ...................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1st Amendment Praetorian v. N.Y. Times Co.*,
2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) ............................................................................20

*Aberdeen City Council v. Bloomberg L.P.*,
688 F. Supp. 3d 169 (S.D.N.Y. 2023)....................................................................................26

*Aboutaam v. Dow Jones & Co.*,
2019 WL 1359772 (Sup. Ct. N.Y. Cnty. Mar. 26, 2019) .......................................................20

*Alvarado v. Sweetgreen, Inc.*,
712 F. Supp. 3d 393 (S.D.N.Y. 2024)....................................................................................12

*Armstrong v. Simon & Schuster*,
85 N.Y.2d 373 (1995) ...........................................................................................................14

*Babb v. Minder*,
806 F.2d 749 (7th Cir.1986) .................................................................................................27

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013)...............................................................21, 22, 33, 34

*Bobulinski v. Tarlov*,
758 F. Supp. 3d 166 (S.D.N.Y. 2024)....................................................................................35

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) .............................................................................................................17

*Brimelow v. N.Y. Times*,
2021 WL 4901969 (2d Cir. Oct. 21, 2021).............................................................................26

*Button v. N.Y. Times Co.*,
2025 WL 2643674 (S.D.N.Y. Sept. 15, 2025)........................................................................34

*BYD Co. Ltd. v. VICE Media LLC*,
531 F. Supp. 3d 810 (S.D.N.Y. 2021)....................................................................................32

*Celle v. Filipino Rep. Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000)........................................................................... *passim*

*Coritsidis v. Khal Bnei Torah of Mount Ivy*,
2024 WL 37122 (S.D.N.Y. Jan. 3, 2024) ..............................................................................34

*Crane v. Bennett*,
    177 N.Y. 106 (1904) ..........................................................................................21, 33

*Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*,
    551 F. Supp. 3d 320 (S.D.N.Y. 2021)..................................................................35

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)...........................................................................10, 13

*Dongguk Univ. v. Yale Univ.*,
    734 F.3d 113 (2d Cir. 2013)...................................................................................33

*Editor's Pick Luxury LLC v. Red Points Sols. SL*,
    2023 WL 6385993 (S.D.N.Y. Sept. 29, 2023).......................................................34

*Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*,
    194 F. Supp. 3d 263 (S.D.N.Y. 2016)...................................................................10

*Gunduz v. N.Y. Post Co., Inc.*,
    188 A.D.2d 294 (1st Dep't 1992) .........................................................................18

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..............................................................................................31

*Hassig v. FitzRandolph*,
    8 A.D.3d 930 (3d Dep't 2004) ..............................................................................17

*Herbert v. Lando*,
    441 U.S. 153 (1979)..............................................................................................21

*Herbert v. Lando*,
    781 F.2d 298 (2d Cir. 1986)............................................................................14, 15

*Hunt v. Liberty Lobby*,
    720 F.2d 631 (11th Cir. 1983) .........................................................................21, 30

*Jacob v. Lorenz*,
    2023 WL 4106298 (S.D.N.Y. June 21, 2023) ......................................................30

*Karedes v. Ackerley Grp.*,
    423 F.3d 107 (2d Cir. 2005)............................................................................18, 20

*Kavanagh v. Zwilling*,
    997 F. Supp. 2d 241 (S.D.N.Y. 2014)...................................................................14

*Kesner v. Dow Jones & Co., Inc.*,
    515 F. Supp. 3d 149 (S.D.N.Y. 2021)........................................................13, 18, 19

*Khalil v. Fox Corp.*,
  630 F. Supp. 3d 568 (S.D.N.Y. 2022)..................................................................................21

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020)................................................................................................35

*Liberman v. Gelstein*,
  80 N.Y.2d 429 (1992) .......................................................................................................19

*Lively v. Wayfarer Studios LLC*,
  786 F. Supp. 3d 695 (S.D.N.Y. 2025)...............................................................................22

*Lovingood v. Discovery Commc'ns, Inc.*,
  275 F. Supp. 3d 1301 (N.D. Ala. 2017)........................................................................30, 32

*Lynch v. City of New York*,
  952 F.3d 67 (2d Cir. 2020)................................................................................................10

*Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*,
  551 F. Supp. 3d 408 (S.D.N.Y. 2021)...............................................................................35

*Nunes v. NBCUniversal Media, LLC*,
  643 F. Supp. 3d 403 (S.D.N.Y. 2022)........................................................................ *passim*

*Palin v. N.Y. Times Co.*,
  940 F.3d 804 (2d Cir. 2019)........................................................................................ *passim*

*Palin v. N.Y. Times Co.*,
  113 F.4th 245 (2d Cir. 2024) .......................................................................................20, 29

*Partridge v. State of N.Y.*,
  100 N.Y.S.3d 730 (3d Dep't 2019).....................................................................................14

*Pep v. Newsweek, Inc.*,
  553 F. Supp. 1000 (S.D.N.Y. 1983)..........................................................................21, 30, 32

*Perk v. Reader's Digest Ass'n, Inc.*,
  931 F.2d 408 (6th Cir.1991) ..............................................................................................27

*Pillars v. GM LLC (In re Motors Liquidation Co.)*,
  957 F.3d 357 (2020)...........................................................................................................12

*Prince v. The Intercept*,
  2023 WL 4492413 (S.D.N.Y. July 12, 2023) ....................................................................26

*Reeves v. Assoc. Newspapers, Ltd.*,
  232 A.D.3d 10 (1st Dep't 2024) ........................................................................................35

iv

*Restis v. Am. Coal. Against Nuclear Iran, Inc.*,
  53 F. Supp. 3d 705 (S.D.N.Y. 2014)................................................................................19

*Robertson v. McCloskey*,
  666 F. Supp. 241 (D.D.C. 1987).....................................................................................33

*Schermerhorn v. Rosenberg*,
  73 A.D.2d 276 (2d Dep't 1980) ................................................................................18, 25

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
  330 F.3d 1110 (9th Cir. 2003) ..................................................................................28, 31

*Tannerite Sports, LLC v. NBCUniversal New Grp., a division of NBCUniversal*
  *Media, LLC*,
  864 F.3d 236 (2d Cir. 2017)............................................................................................10

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987).........................................................................................21

*Ward v. Klein*,
  10 Misc. 3d 648 (Sup. Ct. N.Y. Cnty. 2005) ..................................................................19

*Westmoreland v. CBS Inc.*,
  596 F. Supp. 1170 (S.D.N.Y. 1984)...........................................................................21, 25

## Statutes

N.Y. Civil Rights Law § 76-a ...............................................................................................10

N.Y. Civil Rights Law § 70-a ......................................................................................3, 34, 35

## Other Authorities

Rodney A. Smolla, 3 SMOLLA & NIMMER ON FREEDOM OF SPEECH § 23:3 (Apr.
  2026) ...........................................................................................................................22, 23

v

Plaintiff Binance Holdings Limited ("Binance") submits this memorandum of law in opposition to Defendant Dow Jones & Company, Inc. d/b/a The Wall Street Journal's (the "WSJ") Motion to Dismiss the Amended Complaint (ECF No. 26, "MTD" or "Motion").

## PRELIMINARY STATEMENT

The WSJ has embarked on a months-long campaign to falsely accuse Binance of engaging in serious sanctions and compliance misconduct. Through three articles published on February 23, March 11, and May 21, 2026 (together, the "Articles"), the WSJ accused Binance—the world's largest cryptocurrency exchange—of obstructing efforts to prevent illegal transactions, retaliating against compliance personnel, dismantling internal investigations, weakening cooperation with law enforcement, and knowingly permitting sanctioned Iranian entities to transact on its platform. Those accusations are false, and the WSJ published them despite repeated notice of their falsity.

The WSJ followed the same playbook for each Article: it contacted Binance at the eleventh hour, posed accusatory questions on compressed, artificial, and unnecessary deadlines, received detailed factual responses that undermined its premise, and ignored those responses and published anyway. The WSJ admitted that it rushed the February 23 Article, and was intent on publishing with or without Binance's responses in order to keep pace with a competing New York Times article, while suggesting that it could revise the Article later with Binance's responses. This supposed safeguard disregarded the impact of publishing false statements in the first place, despite Binance's pre-publication answers, and ultimately proved hollow. Even after Binance provided further detailed explanations post-publication, the WSJ refused to correct or retract the challenged statements and instead repeated and amplified them in the later Articles.

The February 23 Article illustrates the pattern. It falsely accused Binance of firing compliance personnel in retaliation for investigating transactions involving Iranian-linked entities

1

and then "dismantling" the investigation. In reality, no retaliatory firings occurred, and the investigation continued after certain employees were terminated for unrelated reasons. Before publication, Binance gave the WSJ detailed factual refutations explaining those points, describing Binance's compliance practices, and correcting the WSJ's assumptions. The WSJ nevertheless published a sensational headline—"Binance Fired Staff Who Flagged $1 Billion Moving to Sanctioned Iran Entities"—that painted a false picture of law-enforcement obstruction and deficient compliance at Binance. The WSJ then repeated the same pattern in the later Articles.

The WSJ now moves to dismiss, arguing that some challenged statements are not false and defamatory, and that the Articles' headlines are protected by the "fair index" privilege. Those arguments fail. The Articles falsely convey that Binance: (1) fired compliance personnel in retaliation for investigating compliance issues; (2) "dismantled" its compliance investigation without taking further action; (3) diminished its cooperation with law enforcement or otherwise violated the law after 2023; (4) followed deficient internal compliance practices, including knowingly registering and favoring customers with false documentation; and (5) knowingly allowed sanctioned Iranian entities to transact on the platform. (*See* Amended Complaint (ECF No. 20, "AC") ¶ 8(a)–(i).) Not one of those statements is accurate.

And the WSJ's lead argument—that Binance has not alleged "actual malice"— is erroneous and fails to account for the totality of factual circumstances surrounding the Articles. The Amended Complaint alleges the WSJ: repeatedly sent Binance slanted, eleventh-hour requests for comment with arbitrarily short deadlines; received detailed responses that cast serious doubt on its accusations; failed to conduct more than a cursory and inadequate investigation based on those responses; relied on questionable sources; framed facts to imply wrongdoing; and refused to correct or retract its false statements after publication. Moreover, this campaign was driven by

factors unrelated to publication of the truth. Indeed, the WSJ admitted that the February 23 Article was published prematurely, and without regard to Binance's responses, in order to publish quickly on the heels of the New York Times article. And the WSJ's lead reporter has admitted *his unwillingness to consider* Binance's views, and his personal bias towards Binance, which he considers full of "criminals." Taken together, these allegations plausibly demonstrate the WSJ acted with reckless disregard for the truth.

The WSJ separately requests attorney's fees and costs under New York's anti-SLAPP statute, N.Y. Civil Rights Law § 70-a(1). That request should be denied because Binance properly alleges a defamation claim. Additionally, the WSJ cannot recover anti-SLAPP fees and costs because Section 70-a's substantial-basis test conflicts with Federal Rules of Civil Procedure 12 and 56, and a motion to dismiss constitutes an improper vehicle for this request.

## RELEVANT FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Binance and Media Attacks

Binance.com is the world's largest cryptocurrency exchange by trading volume and users, trusted by millions of traders worldwide. (AC ¶ 2.) Consistent with its industry-leading status, Binance has dedicated significant resources to creating "one of the largest and most robust compliance programs in the digital asset industry," especially after its 2023 settlements with governmental agencies. (*Id.* ¶¶ 2, 27.) In 2025 alone, Binance supported authorities in confiscating more than $131 million in funds linked to illicit activity, processing more than 71,000 law-enforcement requests worldwide, and delivering more than 160 law-enforcement training sessions on addressing crypto-related threats. (*Id.* ¶ 32.)

But with success comes detractors. Interest in cryptocurrency—and Binance in particular—means that publishing melodramatic headlines about Binance "increase[s] the likelihood that readers will open and read those articles," serving as clickbait that increases

3

revenue. (*Id.* ¶ 25.) Accordingly, certain media organizations—including the WSJ—publish sensationalist denunciations of Binance to drive up views, with an "an outsized portion of media scrutiny, criticism, and defamation" falling on Binance compared to many competitors. (*Id.* ¶ 33.) In addition to that profit motive, lead author of the Articles, Angus Berwick, bears hostility towards Binance, which impacts his and the WSJ's ability to report responsibly instead of recklessly publishing falsehoods to fit a pre-conceived agenda. (*Id.* ¶¶ 275–76.) Berwick's reporting frequently criticizes Binance, and he has expressed his view that he does not wish to speak with "Binance employees because he considers them all to be criminals." (*Id.* ¶ 276.) His resistance to speaking with Binance is reflected in his approach to publishing the Articles.

**B.**     **The WSJ Rushed to Publish With Inadequate Investigation, Despite Pre-Publication Notice of Falsity**

On Friday, February 20, 2026, Berwick notified Binance the WSJ was "working on a story about internal investigations at Binance into its customers' transactions with a network funding Iran-backed terror groups, and the suspension and firing of employees who took part in the investigations." (AC ¶ 35.) He requested Binance's input on 19 accusations and eight accompanying questions by Monday, February 23, and denied Binance's reasonable request to extend the WSJ's unilateral deadline. (*Id.* ¶¶ 37-40, 45.) On Monday, February 23, he began pressuring Binance to provide responses ahead of his own deadline, and asked Binance if he should treat a recent Binance blog post as its response to his inquiries. (*Id.* ¶ 41.)

That same day, the New York Times published a related article about Binance. (*Id.* ¶ 34.) Because that article overlapped with the subject matter of his inquiry, Berwick immediately told Binance he "saw the NYT piece," and "need[ed Binance's] comments as soon as possible" because the WSJ "now plan[ned] to publish imminently," revealing its profit-motivated rush to compete with the New York Times and its indifference to the true position it appeared to seek from Binance.

4

(*Id.* ¶ 42.) Nonetheless, Binance provided substantive responses to Berwick's 19 points and eight other questions by 2 PM, before the February 23 Article was published. (*Id.* ¶ 45.)

Those responses notified the WSJ that many of the factual assertions or implications it intended to report about Binance were false and defamatory. (*Id.* ¶ 46; *see also id.* ¶¶ 54, 69, 86, 107, 112 (providing substantive, detailed pre-publication responses to the WSJ); *see also infra* at § A.5.a.) Yet Berwick and the WSJ were self-admittedly already "planning to publish imminently," belying any genuine effort to test the accuracy of the Article's accusations or account for Binance's detailed responses. (*Id.* ¶ 42.) Consistent with Berwick's desire not to engage with Binance generally and refusal to investigate his assertions, he ignored these responses. Indeed, the WSJ published the February 23 Article roughly two hours after receiving Binance's in-depth responses, which illustrates the Article was substantially finalized in advance of receiving responses from Binance, with no intent to consider those responses and despite reasons to doubt the truth of its reporting. (*Id.* ¶ 49.) Berwick assured Binance that the WSJ could update the Article later "with any further comment from [Binance]" (*id.* ¶ 42), further reflecting a willingness to publish regardless of accuracy.

## C.    The WSJ Published a False and Defamatory Article on February 23, 2026

Ultimately, the WSJ disregarded Binance's pre-publication responses to the extent they contradicted the WSJ's preconceived narratives that Binance retaliated against compliance personnel for investigating transactions with entities tied to Iran; shut down its investigation; diminished compliance with law enforcement; and knowingly registered customers with false documentation, then provided them preferential treatment. (AC ¶ 8.) Consequently, when the WSJ published the February 23 Article—at the top of its online homepage and the front page of the print edition—it contained at least 11 false and defamatory statements about Binance. (*Id.* ¶ 51.)

Those statements collectively conveyed five overarching false and defamatory accusations.

*First*, the February 23 Article includes false and defamatory accusations that Binance fired compliance personnel in retaliation for investigating compliance issues (False Statements 1, 2, 3, 7, and 11 (AC ¶¶ 52, 58, 66, 99, 123), the "Retaliation Statements"). *Second*, the February 23 Article includes statements denouncing Binance for purportedly diminishing its cooperation with law enforcement requests or otherwise violating the law since 2023 (False Statements 4, 5, and 6 (AC ¶¶ 75, 83, 91), the "Diminished Cooperation Statements"). *Third*, the February 23 Article includes several statements falsely accusing Binance of following poor internal compliance practices, such as knowingly registering and providing preferential treatment to customers with false documentation (False Statements 8-11 (AC ¶¶ 105, 109, 116, 124), the "Poor Compliance Statements"). *Fourth*, False Statements 2, 3, 9, and 11 separately contain false allegations that Binance shut down its compliance investigation without taking any further action (the "Dismantling Statements"). And *fifth*, False Statements 6 and 11 contained false allegations that Binance knowingly assisted the Iranian government (the "Knowing IRGC Assistance" Statements).

**D.      The WSJ Refused to Correct or Retract its Defamatory February Statements**

Binance wrote to Berwick the day after publication of the February 23 Article's false statements and requested corrections. (AC ¶ 137.) Binance reiterated its explanations that "no one was terminated for conducting compliance reviews or raising concerns," (*id.* ¶ 56); compliance personnel continued to work on the underlying investigation, (*id.* ¶ 64); "as soon as Binance became aware of the potential Iran exposure, it investigated, escalated, and offboarded in line with company policies and procedures," (*id.* ¶ 73); "Binance cooperated at all stages with law enforcement," (*id.* ¶ 89); "no accounts associated with Blessed Trust were concealed from Compliance personnel or exempted from Binance's controls" (*id.* ¶ 114); and the accounts associated with Blessed Trust were offboarded (*id.*). Contrary to Berwick's prior offer to publish

first, and clarify later (*supra* at 5), he said he would get back to Binance, yet ultimately ignored Binance and refused to rectify the now published false statements. (*Id.* ¶ 139.)

In addition, Binance sent a retraction letter to the WSJ's Editor-in-Chief and General Counsel the same day, reiterating that the February 23 Article falsely claimed Binance "engaged in illegal conduct by breaching Iranian sanctions, shutting down an investigation into this alleged conduct, and firing employees in retaliation for participating in that investigation in order to suppress the disclosure of wrongdoing." (*Id.* ¶¶ 140, 143.) The WSJ refused to take any corrective action. (*Id.* ¶¶ 145-46.) Binance's reputation was damaged and U.S. Congress members began issuing inquiries and demands for documents, citing the February 23 Article. (*Id.* ¶¶ 280-88.) Binance filed this lawsuit on March 11, 2026, unaware that the WSJ would publish an additional article that same day, reiterating similar false and defamatory messages.

**E.    The WSJ Published a Second False and Defamatory Article on March 11, 2026**

On March 9, Berwick contacted Binance again, purportedly seeking comment for another article. He gave Binance less than one day to respond and framed his questions around similar false accusations consistent with his preconceived agenda, including that Binance ignored Iranian activity on the platform and that Binance dismantled the related investigation. (AC ¶¶ 147-150.)

Binance provided detailed responses the next day, stating it "categorically did not directly transact with any sanctioned entities," it "unequivocally did not terminate any employees for escalating compliance concerns," and it uncovered a "sophisticated, multi-jurisdictional pattern of financial activity" that resulted in some funds "arriv[ing] in wallets with links to IRGC." (*Id.* ¶ 151.) Binance further explained that those "IRGC connections were only identified and sanctioned after Binance began investigating and taking action in lock step with law enforcement to shut down this network," and directed the WSJ to a Binance blog post (on which the WSJ itself sought to rely in order to publish its February 23 Article prematurely) providing additional

information about the true facts. (*Id*. ¶¶ 41, 151) The WSJ refused to meaningfully engage with Binance's response before publication.

On March 10, Binance offered to make a spokesperson immediately available for a detailed, explanatory dialogue. (*Id*. ¶ 153.) Berwick again refused to speak with Binance. Instead, he put that conversation off for the next day (the date of publication) and volunteered that he would not "guarantee the story won't run before then." (*Id*.) The WSJ proceeded to publish the March 11 Article without further investigation, amplifying the February 23 Article's false statements, including False Statement 12 (*id*. ¶ 157, another Dismantling and Retaliation Statement); False Statement 13 (*id*. ¶ 165, another Poor Compliance Statement); and False Statement 14 (*id*. ¶ 172, another Retaliation Statement). Again, Binance wrote to the WSJ immediately after publication, requesting corrections and noting the WSJ had preexisting notice of the falsity of its statements. (*Id*. ¶ 182.) The WSJ took no corrective action. (*Id*. ¶¶ 184-85.)

**F.      The WSJ Published a Third False and Defamatory Article on May 21, 2026**

On May 12, Berwick notified Binance of the WSJ's intention to report on Binance's alleged role "as a vital financial channel for the Iranian Revolutionary Guard Corps in the years preceding the current U.S.-Iran war." (AC ¶ 188.) He included 31 accusatory points and queries (exclusive of subparts) and requested a response in less than two days. (*Id*. ¶ 191.) Binance was forced to request additional time, and ultimately provided a detailed response on May 18, rebutting Berwick's claims. (*Id*. ¶ 194; *see also* ECF No. 27-11 at 9.) Berwick responded the next day with 14 additional questions and demanded a response within 24 hours. (AC ¶ 195.) He also stated that the WSJ would "consider [Binance's] answers to be on the record," and, belying any real desire to convey the true position to its readers, threatened that if Binance wanted the Journal to "consider" the information Binance had provided "on background," Binance had to "put those statements on

the record." (*Id.*) Binance provided detailed responses on May 21, which notified the WSJ that the messages it intended to report about Binance's alleged knowing role in assisting the IRGC were objectively false. (*Id.* ¶ 199.)

In addition to extensive information "on background," Binance's on-the-record response reiterated that the "overwhelming majority of these transactions have nothing to do with the Binance platform" and that the WSJ's reporting "continue[d] to conflate broader blockchain activity on non-Binance platforms with Binance platform flows." (ECF No. 27-11 (Binance and WSJ May Correspondence) at 3.) Binance also reiterated that "[n]one of the transactions [the WSJ] refer[red] to occurred with end receiving wallets [on Binance.com] at the time that they were designated," and that "Binance took all appropriate actions when the relevant authorities designated and attributed these addresses." (*Id.*)

Nevertheless, the WSJ published the May 21 Article, which included numerous false and defamatory statements, including False Statements 15-19 (AC ¶¶ 201, 209, 216, 224, 233), which repeated the false Knowing IRGC Assistance messages. In addition, the May 21 Article repeated the false Retaliation and Diminished Cooperation messages, respectively, in False Statements 20 and 21 (*id.* ¶¶ 242, 250), and False Statement 22 (*id.* ¶ 258) repeated the Poor Compliance Statement. Once again, Binance explained to the WSJ after publication of this Article that its reporting contained false statements, and failed to include the specific "[k]ey corrections" Binance sought. (ECF No. 27-11 at 1; *see also* AC ¶¶ 207, 214, 222, 231, 240, 248, 256.) The WSJ again ignored Binance. The WSJ's false statements in all three Articles remain published and continue to harm Binance. (*Id.* ¶¶ 280–88.)

## ARGUMENT

### A.    Binance Properly Alleges A Defamation Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020). The test is "not whether [liability] is less plausible than an alternative explanation," but rather "whether the complaint is plausible." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) ("*Palin I*") ("[I]t is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory."). The Court accepts "all factual allegations as true" and draws "all reasonable inferences in the plaintiff's favor." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110–11 (2d Cir. 2010).

To plead a defamation claim, New York law requires allegations of "(1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin I*, 940 F.3d at 809. The WSJ principally argues that Binance fails to plead the WSJ acted with "actual malice"—a fault standard for claims involving "public figures" or "public petition and participation" under New York law, N.Y. Civ. Rights Law § 76-a. (*See* MTD at 9-11.)[1] The WSJ also attempts to dispute the sufficiency of Binance's allegations that certain statements are false and defamatory or are otherwise actionable, including because they are protected by the "fair index" privilege. (MTD at 23-33.) The WSJ's arguments fall short, and its motion must be denied.

1.    Binance Plausibly Pleads Material Falsity (Statements 1-3, 6, 7, 9-12, 14-20)

The WSJ contends Binance fails to allege that the "*Articles* are false." (MTD at 23.[2]) That argument misunderstands the law. "A plaintiff in New York courts generally must identify how the defendant's ***statement*** was false to survive a motion to dismiss." *Tannerite Sports, LLC v.*

---

[1] "[U]nder New York law, private-figure plaintiffs must plead only negligence." *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 287 (S.D.N.Y. 2016). The Court need not resolve Binance's public or private figure status here, nor decide the applicable "level of fault that [Binance] must plead," because Binance's allegations satisfy the more rigorous actual malice standard. *See id.*

[2] Unless otherwise noted, emphasis and alterations are added, and internal citations and quotations are omitted.

10

*NBCUniversal New Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 245 (2d Cir. 2017). Binance properly alleges the falsity of each of the 22 challenged statements, setting forth (i) what the statement said; (ii) why it was false; and (iii) why the WSJ knew it was false. (*See generally* AC ¶¶ 52-135 (February 23 Article allegations); ¶¶ 157-79 (March 11 Article allegations); ¶¶ 201-65 (May 21 Article allegations).)

The WSJ does not meaningfully challenge these allegations illustrating falsity, but instead makes the flawed argument that by not challenging every word in the Articles, Binance somehow admits the truth of certain facts underlying the assertions in the Articles. But Binance specifically alleged that the WSJ's entire approach to reporting about Binance was tainted by its (and its lead reporter's) bias against Binance. (*See, e.g.*, *id.* ¶ 3 (the Wall Street Journal's and Angus Berwick's "business of maligning both the cryptocurrency industry generally and Binance specifically, regardless of facts and reality"); ¶ 48 (the WSJ's "hollow offer to later correct or update the February 23 Article" as reflective of the WSJ's "shoot first, ask questions later" approach to Binance); ¶ 276 (Berwick "seeks to avoid talking to Binance employees because he considers them all to be criminals").) And the Amended Complaint makes clear that the Articles as a whole reflect the WSJ's knowing or reckless disregard for the truth generally. (*Id.* ¶¶ 5, 11, 49, 278.)

Binance similarly disputed all of the supposed "admissions" that the WSJ identifies. For example, citing Paragraphs 54 and 69 of the Amended Complaint, the WSJ claims that Binance "*concedes* that its users had moved significant sums of money to Iran through the platform" and "fired employees who had investigated those transactions." (MTD at 24 (emphasis in original).) But Paragraph 54 simply states that the WSJ knew its accusations were false because "the employees departed after Binance uncovered breaches of company data protection and confidentiality policies, rather than because of the investigation." (AC ¶ 54.) And Paragraph 69

11

states that "Binance identified the suspicious activity based on external law enforcement information combined with a thorough investigation. The accounts were offboarded." (*Id.* ¶ 69.) Neither are concessions or support the WSJ's preferred narrative. Worse still, ***citing its own Articles and not the Amended Complaint***, the WSJ claims that Binance admitted that "[i]nvestigators found Hexa used the account to move about $500 million worth of the stablecoin tether over several months since 2024," "law enforcement officials have, in fact, launched an investigation into how [Binance's] platform was being used to transfer funds to Iran," and that "billions in crypto transactions [] have flowed through Binance to networks financing Iran's Islamic Revolutionary Guard Corps." (Mot. at 24-25.) The WSJ cannot attempt to negate falsity by manufacturing supposed admissions outside of the Amended Complaint and from its own Articles. Continuing to repeat its false statements does not make them true.

The WSJ's argument therefore boils down to the idea that by filing its defamation complaint, Binance conceded the truth of all statements it has not specifically identified as actionable. (MTD at 24.) But the WSJ identifies ***no authority*** for the idea that Binance automatically conceded any facts by failing to identify certain sentences in the Articles as an independent basis for defamation liability.[3] Indeed, the WSJ's admission-by-silence theory is irreconcilable with the general principle that statements must "have sufficient formality or conclusiveness" and must be "deliberate, clear, and unambiguous" before they can be treated as binding admissions of fact. *Pillars v. GM LLC (In re Motors Liquidation Co.)*, 957 F.3d 357, 360 (2020). The WSJ's argument is particularly incongruous with the Rule 12 pleading standard,

---

[3] There are, of course, many common sense reasons that a defamation plaintiff may choose to sue on certain statements and not others in a publication. The WSJ's unprecedented theory of admission cannot be reconciled with the maxim "that plaintiffs are the masters of their complaints," *Alvarado v. Sweetgreen, Inc.*, 712 F. Supp. 3d 393, 408 (S.D.N.Y. 2024), and Binance could have decided to sue the WSJ for just one false statement without risking concession of every other accusation.

instructing that plaintiff's allegations receive the benefit of all available favorable inferences. *See, e.g.*, *DiFolco*, 622 F.3d at 110-11.

The WSJ separately attempts to dispute whether the Articles actually contain the false and defamatory accusations that Binance challenges, rather than different (supposedly true) facts. (MTD at 25-29.) But that argument wholly ignores the defamatory ***implications*** that Binance has alleged from False Statements 1-3, 6-7, 9-12, 14-16, and 19-20. (*Infra* at § A.2.) The WSJ argues its Statements 17 and 18, that Binance was at the "core" of or "a financial artery" for Iranian efforts to move funds through Binance, cannot be proven true or false. (MTD at 28.) But that proposition also fails. The WSJ invokes *Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 176 (S.D.N.Y. 2021), which rejected liability for a headline stating an attorney was "at the center" of a case because "[a] person may be at the center of a case involving improprieties as a perpetrator, but alternatively could be so as a witness, a victim, or unwitting tool"—as the "center" was not a "self-defining" accusation. 515 F. Supp. 3d at 176. But here, the May 21 Article more directly accused Binance of facilitating illegal Iranian transactions—especially under a "a fair reading in the context of the *publication as a whole*." *See Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (emphasis in original). The Article does much more than simply state the "platform *was* used to transfer money that ultimately reached the IRGC" (*Contra* MTD at 28-29), and the WSJ cannot now rewrite these false statements accusing Binance of knowingly supporting the IRGC in anodyne terms. (*See, e.g.*, AC ¶ 233 ("Even after multiple internal flags on the activity, the main account [associated with an Iranian anti-sanctions operator] continued to operate.").)

2. <u>Binance Properly Pleads Defamation by Implication (False Statements 1-4, 6, 7, 9-16, 19 and 20)</u>

The WSJ seeks to escape liability from the false statements in the Articles by arguing that the Articles state purportedly independently true statements and never state that, for example,

Binance fired investigators in retaliation for their findings or dismantled its investigation. This argument (1) is false (*see* AC ¶ 52 ("Binance Fired Staff Who Flagged $1 Billion Moving to Sanctioned Iran Entities.")) and (2) seeks to ignore the clear defamatory implications in the Articles. (MTD at 25-30.) These implications are the entire point: it is not newsworthy if Binance fired employees, it is newsworthy if Binance fired employees for investigating potential wrongdoing. Setting separate purportedly true statements next to each other (e.g., Binance "fired the investigators" "investigat[ing] . . . funding Iran-backed terror groups") but deliberately omitting the word "because" does not avoid the clear defamatory implication of these statements.

New York law imposes liability for defamation by implication, which "is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 380-81 (1995). Thus, a claim of defamation by implication is based on a false message "contained not in the statement's literal wording but rather its innuendo." *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 248 (S.D.N.Y. 2014). "While each individual statement alone might be literally accurate, in the aggregate they give rise to a false and defamatory inference." *Herbert v. Lando*, 781 F.2d 298, 307 n.4 (2d Cir. 1986). Defamation-by-implication claims consist of two sub-elements: "(1) that the language of the communication as a whole reasonably conveys a defamatory inference, and (2) that such language affirmatively and contextually suggests that the declarant either intended or endorsed the inference," objectively considering the "substance and context of the communication as a whole." *Partridge v. State of N.Y.*, 100 N.Y.S.3d 730, 735 (3d Dep't 2019).

Even assuming the truth of any statement in the Articles (which Binance does not concede, *see supra* § A.1), the WSJ's myopic view of the challenged statements fails to account for the context of "[t]he entire publication, as well as the circumstances of its issuance." (MTD at 24.)

14

Assessed in context, the challenged statements support a plausible inference that the WSJ intended to imply defamatory messages about Binance:

Each of the Retaliation Statements (False Statements 1-3, 7, 11-12, 14, & 20) impliedly assert Binance fired the relevant investigators *because* they were investigating Iranian transfers. (*See* AC ¶¶ 52, 58, 66, 99, 124, 157, 172, 242.) For example, Statement 11 states that "[o]n Nov. 24, other members of the investigations team told a Binance executive they would continue to investigate Blessed. Two days later, they were locked out of Binance's systems, suspended—and fired soon after." The WSJ's presentation of those facts is exactly the type that intentionally cultivates an implication that those team members were suspended and fired in retaliation for continuing to investigate Blessed Trust. *See Herbert*, 781 F.2d at 307 n.4 ("If, for example, a newspaper account of a rash of neighborhood thefts also reported that a public figure had recently moved into the neighborhood, purchased tools commonly used in burglaries, and had been seen near a number of homes where burglaries had occurred, a reader would be led to believe that the individual described had committed the crimes."). The WSJ's endorsement of this false inference is underscored by the headline of the February 23 Article, which falsely accuses Binance of firing staff for flagging Iranian-related transfers. (AC ¶ 54.)

False Statement 9 asserts that "[u]nlike the majority of accounts held by customers, the suspicious account was labeled as 'internal' and access was tightly restricted. It required special approval from a Binance department called Internal Audit, whose leader reported to Teng, the CEO." (*Id.* ¶ 109.) That is, it falsely implies that Binance intended to restrict access to that account from its internal investigators and to shield that account from any scrutiny from investigators.

Each of False Statements 6, 10, 16 & 19 asserts Binance was aware of funds flowing to Iran via its platform and, therefore, knowingly permitted those transactions or ignored red flags

concerning those transactions. (*Id.* ¶ 91, 116, 209, 233). Indeed, Statement 16 explicitly states that these transactions occurred "***despite repeated red flags***," and Statement 19 explicitly alleges that accounts transacted "[e]ven after ***multiple internal flags*** on the activity." (*Id.* ¶¶ 209, 233; *contra* MTD at 27 ("Nor do [these statements] assert that Binance knowingly ignored red flags.").)

Statement 4 asserts that the termination of investigators "echoed" (in other words, is similar to) "the same concerns that drew U.S. scrutiny in 2023, when prosecutors secured a plea deal with the world's largest crypto exchange and a prison sentence for Zhao." (*Id.* ¶ 75.) Similarly, Statement 13 asserts that the Justice Department's 2026 inquiry "puts the world's largest crypto exchange back in the legal spotlight after its founder . . . received a pardon from President Trump in October. Binance pleaded guilty in 2023 to violating U.S. anti-money-laundering and sanctions laws . . ." (*Id.* ¶ 165.) Again, this is the entire point of the Articles. At the time of publication, it was old news that Binance's founder had received a pardon. The WSJ created new news by implying the impropriety of that pardon while accusing Binance of continuing to engage in the same conduct that it pleaded guilty to years earlier.

The WSJ does not meaningfully dispute these implications or that they were intentional. Instead, the WSJ cursorily argues that Binance has not pleaded a defamatory meaning for some statements in the Articles because the pleading is "boilerplate." (MTD at 29-30.) They do not elaborate on this argument. Regardless, this argument ignores that Binance specifically alleges why each statement is false, why the WSJ knew or had reason to suspect their falsity, and why the false statements are defamatory. (AC ¶¶ 53-56, 59-64, 67-73, 76-81, 84-89, 92-97, 100-03, 106-08, 110-14, 117-22, 125-34, 136, 158-63, 166-70, 173-78, 180, 202-07, 210-14, 217-22, 225-31, 234-40, 243-48, 251-56, 259-64, 266.) It further ignores that Binance specifically alleged the WSJ's reporters intended and endorsed the defamatory statements they made—as is clear from the

16

text of the statements themselves (e.g. *id.* ¶¶ 272-79).

The WSJ also argues that its defamatory Retaliation Statements and Knowing IRGC Assistance Statements are merely protected opinion. The WSJ does not explain how its opinion argument is related to its claim that it made no defamatory statements by implication. In any event, this argument fails because the so-called "opinions" WSJ seeks to emphasize aver facts—i.e., they are falsifiable, or "capable of being proven false." (*See* MTD at 30.) "[T]he inquiry into whether a statement should be viewed as one of fact or one of opinion must be made from the ***perspective of an "ordinary reader"*** of the statement.'" *See Celle*, 209 F.3d at 178 (emphasis in original). "Whether a statement is fact or opinion . . . depends on whether a reasonable reader would consider the assertions to be opinion or fact." *Hassig v. FitzRandolph*, 8 A.D.3d 930, 931 (3d Dep't 2004). "The factors to be considered are: '(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.'" *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995) (quoting *Gross v. N.Y. Times Co.,* 82 N.Y.2d 146, 153 (1993)).

The Retaliation and Knowing IRGC Assistance Statements are clearly not opinion. The Statements contain language with a precise meaning: that Binance fired compliance staff in retaliation for their investigative findings. The Statements can be proven true or false; indeed, the WSJ argues that those statements are materially true. (Mot. at 24-29; *supra* § A.1.) And the clear context of the Articles—published as factual assertions, and not included in the Opinion section—emphasizes that these are not opinions. *See Brian*, 87 N.Y.2d at 53 (noting "the Op Ed page is a forum traditionally reserved for . . . the viewpoints of their authors and, as such, contain

considerable hyperbole, speculation, diversified forms of expression and opinion"). To illustrate: The accusation that "investigators were terminated based on their findings or that Binance knowingly allowed funds to move into Iran via its platform" is a fact under the WSJ's own definition—it is falsifiable (and is indeed false). (MTD at 30.) Readers were invited to accept the defamatory conclusions as factual reporting grounded in undisclosed evidence—not opinion. Far from expressing any personal opinions of the authors, the Articles communicated (false) factual assertions to readers. *Cf. Kesner*, 515 F. Supp. 3d at 179 (author's "use of the terms 'gut feeling' and 'I believe' . . . were particularly clear cues that she was expressing an opinion").

3.    The "Fair Index" Defense Does Not Apply to Headlines That Repeat Defamatory Statements

The WSJ's "fair index" argument also fails. (*See* MTD at 31-33.) A headline is protected only if it is a fair and accurate index "***of the truthful matter*** contained in the related news article." *See Gunduz v. N.Y. Post Co., Inc.*, 188 A.D.2d 294, 294 (1st Dep't 1992); *see also Karedes v. Ackerley Grp.*, 423 F.3d 107, 115 n.1 (2d Cir. 2005) (defamatory headlines are actionable unless they "'are a fair index of the matter contained in a ***truthful report***'"). The privilege does not apply where the headline repeats false and defamatory statements contained in the Article itself. *See Schermerhorn v. Rosenberg*, 73 A.D.2d 276, 284 (2d Dep't 1980). Here, the headlines in False Statements 1, 2, 15, and 16 are actionable because they reflect and repeat the false and defamatory statements and implications contained in the Articles. (AC ¶¶ 52, 58, 66, 99, 124, 201, 209, 216, 224, 233.)

4.    False Statements 4 and 13 Are Defamatory

A statement is defamatory if it tends to expose the plaintiff to "'public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of

. . . confidence and friendly intercourse in society.'" *Celle*, 209 F.3d at 177. Accusations that a business engaged in criminal, illegal, unethical, or professionally improper conduct are defamatory per se. *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992); *see also Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 718-22 (S.D.N.Y. 2014) (allegations of criminal and unethical conduct defamatory). To assess whether a publication imparts a defamatory meaning, "the words must be given a fair reading and must be construed in the context of the entire statement as a whole tested against the understanding of the average [reasonable] reader." *Ward v. Klein*, 10 Misc. 3d 648, 650–51 (Sup. Ct. N.Y. Cnty. 2005); *see also Celle*, 209 F.3d at 178 ("If the contested statements are reasonably susceptible of a defamatory connotation," then its meaning is for the jury to decide).

The false messages conveyed in False Statements 4 and 13 meet that test. False Statement 4 asserted that the "episode"—i.e., the termination of investigators for reasons unrelated to their investigation—"echoed[4] some of the same concerns" that led to Binance's 2023 guilty plea, further describing Binance as a "money-laundering hub for criminals, terrorists and Iranian-sanction evaders." (AC ¶ 75.) In context, a reasonable person would understand the claim that firing investigators "echoed" the "same concerns" that led to prior criminal liability to mean that the firings were conducted to cover up similar illegal conduct. False Statement 13 is defamatory for similar reasons. By claiming a DOJ inquiry into IRGC transactions puts Binance "back in the legal spotlight" after Binance's 2023 plea, a reasonable reader would understand that WSJ was accusing Binance of wrongfully (i.e., knowingly) (1) facilitating transactions with the IRGC and (2) engaging in the same conduct that led to the 2023 criminal plea. Both statements are reasonably

---

[4] The WSJ claims that "echo" cannot be proven true or false, citing *Kesner*. (MTD at 34 n.13.) *Kesner*, at best, concluded that stating someone "at the center" of a case has several definitions. 515 F. Supp. 3d at 177. The WSJ does not say why "echo" cannot be defined and proven true or false, and indeed, a plain reading of Statement 4 shows that the WSJ intended to say that Binance was doing the same thing as before.

read to "impart an inference of guilt"[5] and are therefore defamatory. *Aboutaam v. Dow Jones & Co.*, 2019 WL 1359772, at \*15-16 (Sup. Ct. N.Y. Cnty. Mar. 26, 2019) (quoted in MTD at 34).

> 5.      Binance Properly Alleges the WSJ Acted with Actual Malice

Binance properly alleges that Berwick and the WSJ acted with "actual malice" in publishing the Articles' false and defamatory statements. The WSJ attempts to isolate the factual allegations in the Complaint, citing to caselaw concluding that each factor, standing alone, would not suffice to plead actual malice. But the Court must weigh the totality of facts and circumstances together, rather than in isolation. When considered together, the sum total of Binance's allegations about the WSJ's conduct requires an inference of actual malice.

To survive a motion to dismiss, Binance "must plead 'plausible grounds' to infer actual malice"—i.e., knowingly or recklessly disregarding the truth despite serious doubts—"by alleging enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of actual malice." *Nunes v. NBCUniversal Media, LLC*, 643 F. Supp. 3d 403, 419 (S.D.N.Y. 2022). "The hurdles to plausibly pleading actual malice, though significant . . . , are by no means insurmountable." *Id.* Because the inquiry turns on the "defendant's subjective mental state"—a test "revolv[ing] around facts usually within the defendant's knowledge and control, and rarely . . . admitted"—plaintiffs must generally rely on "inferential and circumstantial evidence." *Palin v. N.Y. Times Co.*, 113 F.4th 245, 263 (2d Cir. 2024) ("*Palin II*"). That analysis "typically requires discovery." *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005).

At the pleading stage, whether "actual malice can plausibly be inferred will depend on the

---

[5] That inference of guilt distinguishes the WSJ's cited authorities, which all involve statements only that plaintiffs were being investigated, not (as here) that their conduct echoes or replicates past unlawful conduct. *See 1st Amendment Praetorian v. N.Y. Times Co.*, 2025 WL 949575, at \*16 (S.D.N.Y. Mar. 28, 2025) (reporting congressman's intention to "explore the connections" between far-right groups and individuals in President Trump's orbit, without reference to prior unlawful conduct); *Aboutaam*, 2019 WL 1359772, at \*15–16 (reporting plaintiff was "being investigated by law enforcement in multiple countries," without referencing prior illegality).

facts and circumstances of each case," i.e., the totality of the circumstances. *Nunes*, 643 F. Supp. 3d at 419. The actual-malice inquiry is "too fact-bound to be resolved on the basis of any single factor or mechanical test," and instead must account for "the cumulation of circumstantial evidence" bearing on defendant's mental state. *Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C. Cir. 1987); *see also Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) ("all the relevant circumstances surrounding the transaction may be shown" to demonstrate actual malice). Accordingly, courts consider the following factors, among others, relevant to an inference of actual malice, even if most would, "in and of [themselves], [be] insufficient," *see, e.g.*, *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281–82 (S.D.N.Y. 2013):

- Defendant's pre-publication receipt of a "denial that carries a doubt-inducing quality," *see Biro*, 963 F. Supp. 2d at 281-82;

- "[C]ircumstances indicating the existence of rivalry, ill will, or hostility between the parties," *Herbert*, 441 U.S. at 164 n.12, or some other bias towards pursuing a "pre-determined" narrative, *Palin I*, 940 F.3d at 813;

- Defendant's "failure to investigate," *Celle*, 209 F.3d at 190, including an unjustifiable rush to publish without adequate investigation, *Pep v. Newsweek, Inc.*, 553 F. Supp. 1000, 1003 (S.D.N.Y. 1983); *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983);

- Defendant's "reliance on anonymous or unreliable sources," *Nunes*, 643 F. Supp. 3d at 419 (S.D.N.Y. 2022), or sources of otherwise "dubious nature," *Celle*, 209 F.3d at 183; *Khalil v. Fox Corp.*, 630 F. Supp. 3d 568, 584 (S.D.N.Y. 2022) (improper reliance on irresponsible source);

- Distorting "evidence to make it seem more convincing or condemnatory than it is," *Westmoreland v. CBS Inc.*, 596 F. Supp. 1170, 1174 (S.D.N.Y. 1984) (e.g., "if in the editing process it distorts statements of witnesses so that they seem to say more than in fact was said"); and

- Post-publication failure to correct or retract a false statement, *Biro*, 963 F. Supp. 2d at 281–82; *Crane v. Bennett*, 177 N.Y. 106, 109 (1904) (multiple refusals to retract defamatory article provided "abundant evidence . . . that the publication of the libels complained of was recklessly and wantonly made and continued").

    *Palin I* illustrates how courts must apply this fact-bound, totality-of-circumstances test. The Second Circuit held that Sarah Palin, a public figure and former governor of Alaska,

sufficiently alleged the New York Times acted with actual malice by publishing an editorial linking her and her political action committee to two political shootings. 940 F.3d at 808. The complaint contained multiple allegations that, taken together, "paint[ed] a plausible picture of . . . actual malice," including: (1) the author's plausible awareness of information rebutting the Palin-shooting link; (2) the author's personal, political bias against Palin; (3) "certain aspects of the drafting and publication process," such as the inclusion of "a hyperlink that contradicted" the Palin-shooting link, and (4) the newspaper's swift subsequent correction. *Palin I*, 940 F.3d at 814-15. The Second Circuit noted that any one of these allegations in isolation might not have sufficed, but concluded that the totality of circumstances permitted a "plausible inference that [the author] published the allegedly defamatory editorial with actual malice." *Id.* at 815.

The same is true here. Binance's allegations, taken together, constitute sufficient circumstantial evidence that the WSJ knowingly or recklessly published statements conveying the false and defamatory Retaliation, Dismantling, Poor Compliance, Diminished Cooperation, and Knowing IRGC Assistance messages about Binance.

### a.    The WSJ Ignored Binance's Doubt-Inducing Denials

The WSJ published the Articles' defamatory statements in the face of "contrary information," *Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 765 (S.D.N.Y. 2025)—specifically, Binance's detailed, credible and doubt-inducing responses to the WSJ's claims. *Biro*, 963 F. Supp. 2d at 281-82 (a "denial that carries a doubt-inducing quality" will "buttress a case for actual malice"); *see* Rodney A. Smolla, 3 SMOLLA & NIMMER ON FREEDOM OF SPEECH § 23:3 (Apr. 2026) (similar). For example, Binance told Berwick and the WSJ prior to the February 23 Article that the Retaliation and Dismantling Statements were demonstrably false (AC ¶¶ 54, 60 (explaining that no employees were "terminated for conducting compliance reviews or raising concerns," and that "certain employees departed after breaches of company data protection and

confidentiality policies were identified").)

These statements are not "mere denials" of wrongdoing from Binance. (*Contra* MTD at 13.) Instead, they are specific rebuttals citing verifiable, unrelated explanations for employee terminations, which "plausibly induce subjective doubt" about any alleged retaliation. SMOLLA & NIMMER, § 23:3. And in response to Berwick's related pre-publication accusations in March and May, Binance reiterated these denials and explained again that "Binance categorically did not dismantle any compliance investigation, and none of the individuals that were separated from the firm were separated for reasons related to that investigation." (ECF No. 21-11 (Bolger Decl. Ex. 11) at 10 (May 18, 2026 email from Ross O'Leary to Angus Berwick); AC ¶ 151 (similar March 10 statement).) These specific and repeated refutations of the Retaliation and Dismantling accusations support a plausible inference that Berwick and the WSJ "in fact entertained serious doubts" about whether the investigation was dismantled and personnel were fired for improper reasons. *See Palin I*, 940 F.3d at 816 & n.1.

If the WSJ were not biased, committed to a preset narrative, and rushing to compete with the New York Times for clicks, it would have been easy and logical (and responsible) for the WSJ to follow up with any questions regarding any of the verifiable facts in these explanations. Instead, the WSJ repeatedly published these and other defamatory statements in the face of similarly specific, doubt-inducing pre-publication responses from Binance:

- Contrary to the WSJ's Retaliation Statements, Binance told the WSJ: "No one was terminated for conducting compliance reviews or raising concerns. Following an internal review, certain employees departed after breaches of company data protection and confidentiality policies were identified," (AC ¶ 54; *see also id.* ¶¶ 56, 106, 163, 174, 178, 245);

- Contrary to the WSJ's Dismantling Statements, Binance told the WSJ: "Binance's investigations continued after the other employees left Binance," (*id.* ¶ 61; *see also id.* ¶¶ 64 ("[C]ompliance personnel continued to work on the underlying investigation to ensure the investigation was completed thoroughly and appropriately."), 69, 73, 112, 114, 134, 163);

- Contrary to the WSJ's Diminished Cooperation Statements, Binance told the WSJ: "Binance

23

identified the suspicious activity based on external law enforcement information combined with a thorough investigation. The accounts were offboarded. We cooperated and continue to cooperate with relevant law enforcement authorities. We took exactly the kind of decisive action that responsible platforms should take," (*id.* ¶ 69; *see also id.* ¶¶ 73, 79, 86, 89, 126, 168, 253);

- Contrary to the WSJ's Poor Compliance Statements, Binance told the WSJ: "[a]ll customers are subject to risk-based KYC and verification controls"; "it does not knowingly onboard customers using incomplete/inaccurate documentation"; and the investigated "account was not blocked from compliance oversight, but rather "placed on an Internal Audit restricted list for reasons unrelated to this investigation – a standard measure to preserve investigative integrity, not to bypass controls [and] [a]t no point was Compliance denied the access necessary to perform its investigative responsibilities and to suggest otherwise is false," (*id.* ¶¶ 107, 112, 119; *see also id.* ¶¶ 128 (specifically addressing false statement "about direct exposure between Binance and Entity A"), 69, 73, 86, 114, 120, 134, 168, 260, 261); and

- Contrary to the WSJ's Knowing IRGC Assistance Statements, Binance explained: "Binance did not directly transact with any sanctioned entities, and that Binance worked with law enforcement to shut down a complex network involving the IRGC once that network was identified," and Binance also "detailed for the Wall Street Journal its recent compliance efforts and work with international law enforcement agencies to combat illicit use of cryptocurrency." (*Id.* ¶ 168; *see also id.* ¶¶ 69, 73, 114, 128, 129, 133; ECF No. 27-11 (Bolger Decl. Ex. 11) at 7-8 (Binance's May responses to Berwick's accusations)).

Binance further bolstered these rebuttals to the WSJ's criticisms of its cooperation and compliance practices with specific contrary evidence, "explaining that in 2025 alone, Binance supported authorities in confiscating more than $131 million in funds linked to illicit activity, processed more than 71,000 law-enforcement requests worldwide, and delivered more than 160 training sessions to strengthen law enforcement's capacity to tackle crypto-related threats." (*Id.* ¶ 86.) Yet the WSJ omitted these facts from the Articles.

      b.     *The Articles Portray Binance as Wrongdoer Regardless of Contrary Facts*

The WSJ attempts to negate this evidence of reckless disregard by pointing out instances where the Articles "acknowledged and quoted" certain statements from Binance. (MTD at 15.) But the authorities cited by the WSJ do not support the notion that merely gesturing to Binance's position immunized the WSJ against an inference of actual malice—instead, the actual-malice inquiry must account for the totality of all circumstances. *See, e.g.*, *Nunes*, 643 F. Supp. 3d at 419.

24

And here the cumulative factual picture shows that, while the WSJ at times "quoted denials from Binance" (MTD at 15), it also manipulated the context around certain denials to blunt their impact, thereby distorting the "evidence to make it seem more convincing or condemnatory than it is." *Westmoreland*, 596 F. Supp. at 1174.

Consider the last paragraph of the February 23 Article: "On Nov. 24, other members of the investigations team told a Binance executive they would continue to investigate Blessed. Two days later, they were locked out of Binance's systems, suspended—and fired soon after." (AC ¶ 124; ECF No. 27-2 (Bolger Decl. Ex. 2) at 11.) The Article's ending implies—by intentionally manipulating the context—that Binance investigators were fired improperly to halt their investigation, despite having been presented with several detailed explanations why that was not the case and choosing to ignore those explanations.

The WSJ did not cure that reckless disregard for the truth by secluding Binance's position elsewhere—mentioning only in passing that "Binance said the investigators weren't suspended or terminated for raising compliance concerns" but instead left "based on individual circumstances." (ECF No. 27-4 (Bolger Decl. Ex. 4) at 4.) Instead, the context supports a plausible inference the WSJ buried this statement in the middle of the Article to magnify the implication of wrongdoing at the beginning (the Article's title, where most "casual reader[s]" will stop, bluntly states that "Binance Fired Staff Who Flagged $1 Billion Moving to Sanctioned Iran Entities") and at the end (where the truth is omitted). *Id.* at 3; *Schermerhorn v. Rosenberg*, 73 A.D.2d 276, 287 (2d Dep't 1980) ("That the defamatory meaning of the headline may be dispelled by a reading of the entire article is of no avail to the publisher," as "[a] headline is often all that is read . . . . ."). The entire structure of the February 23 Article intentionally cultivates an impression of retaliation by Binance, despite the WSJ's awareness of an innocent explanation that it never bothered to

investigate. (*See supra* at 5.) This further supports an inference of actual malice, despite the WSJ's intermittent gestures to Binance's position.

The WSJ further contends that Binance's denials before the May 21 Article were not "meaningful," because "the vast majority of the information provided to the *Journal* was 'on background.'" (MTD at 13.) But the WSJ provides no authority suggesting that newspapers may disregard off-the-record information provided "on background" that casts doubt on the statements in a forthcoming article. On the contrary, off-the-record communications, offered "on background," or "off the record," constitute a "common journalistic practice." *Aberdeen City Council v. Bloomberg L.P.*, 688 F. Supp. 3d 169, 181 (S.D.N.Y. 2023). Further, this is not a justifiable excuse not to investigate the detailed factual rebuttals provided by Binance. [6]

Nor can the WSJ negate the inference of malice from its pre-publication notice of falsity by arguing "denials **without more** do not support a plausible claim of actual malice." *Brimelow v. N.Y. Times*, 2021 WL 4901969, at *3 (2d Cir. Oct. 21, 2021) (as quoted by MTD at 14); *Prince v. The Intercept*, 2023 WL 4492413, at *11 (S.D.N.Y. July 12, 2023) (similar). The Amended Complaint alleges much "more," including that the WSJ's refusal to account for Binance's pre-publication statements is part of a larger pattern supporting an inference of actual malice. (*See infra* at 32.)

c.    *The WSJ's Defamatory Messages Are Not Reliably Sourced*

The WSJ's defamatory statements and implications lack support from reliable sources, further bolstering the inference that the WSJ "knowingly and recklessly ignored the probable

---

[6] The WSJ also argues that one of Binance's denials is "overstated," and confirmed Binance's "reluctance to remove Russian clients," because the denial suggested Binance did not "exit[] the Russian market as promised." (MTD at 13.) That argument ignores Binance's pre-publication explanation that it tightened controls, as evidenced by Binance's decision to "expand Enhanced Due Diligence screening to more users—not reduce anti-money-laundering controls"— and offboard Russian accounts. (AC ¶¶ 259-61.)

falsity" of the accusations it published. *See Celle*, 209 F.3d at 190. A defendant's decision to publish a defamatory statement, despite "a reasonable basis . . . to question the accuracy and reliability of the information" its sources provided, and without further investigation into the sources' information, supports an inference of actual malice. *Id.*; *see also Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir.1991) ("[T]his Court must look at each source to determine whether it was reliable and whether it indicated that more research was required to determine what the truth was" (as cited by *Celle*)). And where a defamatory statement lacks "attribut[ion] . . . to *any* source," that too supports a plausible inference of malice, *Nunes*, 643 F. Supp. 3d 403, 420, especially where the published statements are "peculiarly harmful or damaging to the plaintiff's reputation or good name." *Babb v. Minder*, 806 F.2d 749, 755 (7th Cir.1986) (as cited by *Celle*).

Here, the WSJ's repeated, defamatory implications that Binance retaliated against investigators and "dismantled" their investigation (*see supra* § A.2) lack attribution to any source, much less a reliable one. Put simply, no source—including the "fired Binance investigators" themselves (who apparently "declined to comment" (ECF No. 27-2 at 11))—gave the WSJ an evidentiary basis to accuse Binance of Retaliation and Dismantling. The WSJ's decision to nevertheless publish these "peculiarly damaging" accusations supports a plausible inference of actual malice, especially in light of Binance's express, doubt-inducing contrary statements to the WSJ. *See Minder*, 806 F.2d at 755; *Nunes*, 643 F. Supp. 3d at 420.

The WSJ attempts to defend its source material based on the fact that "*unnamed* sources" were cited to support *other facts* in the Articles. (MTD at 16-17 (drawing distinction from completely "anonymous source[s]").) But the fact that the WSJ (and only the WSJ) may know identities of some sources does not suffice to make them reliable—especially to the extent those unnamed sources contradicted the pre-publication information Binance provided. (*See supra* §

A.5.a.) In any event, citing unidentified "[d]ocuments, foreign law-enforcement officials and the people familiar with Binance's operations" to support *other statements* cannot negate the inference of actual malice from the WSJ's inability to "attribute the [Retaliation and Dismantling] statement[s] to *any source*"—anonymous, confidential, or otherwise. *Nunes*, 643 F. Supp. 3d at 420. At the very least, the WSJ's failure to "investigate the accuracy" of the Retaliation and Dismantling claims further before publishing based on this lack of source material supports a plausible inference that the WSJ "knowingly and recklessly ignored the probable falsity of the story and printed it." *Celle*, 209 F.3d at 190.

### d.     Berwick's Personal Animosity and WSJ's Profit Motive

WSJ contends that its motives and the personal animosity its reporter, Berwick, bears towards Binance are "irrelevant" to the actual-malice inquiry. (MTD at 22-23 (Berwick's hostility); *see also id.* at 21 (WSJ's profit motive).) That is wishful thinking, but not accurate. On the contrary, "ill will and personal animosity between [the parties] at the time of publication" can constitute "circumstantial evidence . . . that [Defendant] entertained serious doubts about the truth." *Celle*, 209 F.3d at 186; *see also Palin I*, 940 F.3d at 814–15 (a "plausible inference of reckless disregard is strengthened" by "allegations that [author] had reason to be personally biased against [plaintiff]"). The same goes for other personal motives to disregard the truth—including a "financial motive"—which represents "a relevant factor bearing on the actual malice inquiry," even if not independently dispositive. *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1136 (9th Cir. 2003).

Here, Binance has properly alleged facts evincing Berwick's personal animus towards Binance, including his penchant for writing articles denouncing Binance (*see supra* at 4) and his statements "that he seeks to avoid talking to Binance employees because he considers them all to

28

be criminals." (AC ¶ 276.)[7] The WSJ tries to dispute what Berwick actually said (MTD at 22), but that evidentiary issue is not resolved at the pleading stage. *See Palin I*, 940 F.3d at 809 (improper to consider author's testimony at motion to dismiss stage).

Binance has also alleged facts supporting a plausible inference that the WSJ acted on a profit motive starting in February 2026, by rushing to publish a pre-determined sensationalist narrative criticizing Binance to compete for revenue-generated pageviews with the New York Times (AC ¶¶ 6, 25, 34, 277). These allegations are not disputed, nor could they be, as a matter of pleading or fact.[8]

Ample facts further support an inference that Berwick and the WSJ "acted pursuant to th[eir] bias." (MTD at 22 (quoting *McDougal*, 489 F. Supp. 3d at 185).) They admitted a desire to publish with or without Binance's responses. (AC ¶¶ 41-42.) Indeed, Berwick repeatedly made good on his desire not to speak with Binance, and refused to speak with a Binance spokesperson prior to publishing the March 11 Article, and then never spoke with them after publication. (*Id.* ¶ 153.) The WSJ repeatedly approached Binance for comment on artificially shortened timelines and after the Articles were fully baked, and presented complex, conclusive accusations. (*Id.* ¶¶ 35, 147, 188-91.) This—coupled with multiple admissions that it was intent on publishing without Binance's response—appears designed specifically to prevent Binance from fully responding or responding at all. The WSJ failed to follow-up at all, except in one instance in connection with the May 21 Article (after Binance filed this lawsuit). There, the WSJ rushed that follow-up, again

---

[7] Berwick's state-of-mind is critical, even if "there are multiple actors involved" in the WSJ's publication decisions, as he appears to be the primary author responsible for all the Articles. *See, e.g.*, *Palin I*, 113 F.4th at 262.

[8] *See* LaVigne Decl. Ex. 1 (*Fake News, Real Money: Ad Tech Platforms, Profit-Driven Hoaxes, and the Business of Journalism*, at 10 ("legitimate visitors are still valuable to fraudulent publishers, making clickbait an appealing choice of content. The more free traffic a site generates, the greater the resulting profit margin.")); Ex. 2 (*All the News That's Fit to Click: The Economics of Clickbait Media*, at 377 ("describ[ing] the economic incentive structures that characterize Clickbait Media"); Ex. 3 (*Clickbait: Research, challenges and opportunities – A systematic literature review*, at 6 (clickbait "has a misleading, exaggerated or malicious nature encouraging increasing advertising revenue, [and] us[es] sensational headlines and informal language")).

assaulting Binance with numerous complex accusations and demanding responses within 24 hours. (*Id.* ¶ 194; *see infra* § A.5.e.) And this pattern resulted in its decision to publish and repeat false and defamatory messages despite being on notice these statements were false. (*See infra* § A.5.e.) At best, the WSJ's Motion appears to concede the WSJ and Berwick engaged in a more reasonable investigative dialogue with various sources **other than Binance**. (MTD at 17-18.) When it came to Binance, however, the WSJ and Berwick were (admittedly) not interested in actually engaging with Binance to understand its position. It proceeded to publish the Articles with, **at least**, reckless disregard for the false statements they contained.[9]

> e.    *The WSJ's Inadequate, Rushed Investigations and Rush to Publish*

The WSJ's failure to adequately investigate Binance's explanations contradicting the pre-conceived WSJ narrative constitutes further evidence of actual malice, *Celle*, 209 F.3d at 190. For example, "actual malice may be inferred when the investigation for a story was grossly inadequate in the circumstances," yet no real urgency justified a rush to publish. *Hunt*, 720 F.2d at 643; *Lovingood v. Discovery Commc'ns, Inc.*, 275 F. Supp. 3d 1301, 1311–12 (N.D. Ala. 2017); *see also Celle*, 209 F.3d at 172 (defendant's failure to "investigate the accuracy of the story" coupled with "evidence indicating ill will and personal animosity between [the parties]" supported actual malice). In other words, "failure to investigate [is] **relevant** to th[e] determination" of actual malice. *Pep v. Newsweek, Inc.*, 553 F. Supp. 1000, 1003 (S.D.N.Y. 1983).

Here, the WSJ's inadequate, rushed investigation supports an inference of actual malice. With respect to the Dismantling Statements in the February 23 and March 11 Articles, the WSJ

---

[9] Again, the facts suggesting Berwick and the WSJ were pursuing a preconceived narrative are **relevant circumstantial evidence** of actual malice, *see, e.g.*, *Palin I*, 940 F.3d at 813 ("allegation of "pre-determined" argument" relevant to actual malice), even if a preconceived narrative "is not enough to show actual malice," **standing alone**. (MTD at 20.) The same point applies to the allegations regarding WSJ's departure from journalistic standards: "circumstantial evidence of departure from accepted journalistic standards **could** constitute some circumstantial evidence of state of mind relevant to an actual malice inquiry." *Jacob v. Lorenz*, 2023 WL 4106298, at *7 (S.D.N.Y. June 21, 2023) (emphasis original); (*contra* MTD at 21 n.8).

never actually investigated whether Binance "dismantled" its internal investigation. And Berwick wholly "*failed to present this accusation to Binance*" and the WSJ "published it without knowing or caring whether it was true or not." (AC ¶ 61.) Likewise, Berwick failed to present to Binance the false Knowing IRGC Assistance accusations that Binance "continued to violate U.S. sanctions and money laundering laws" and acted as a "money-laundering hub for criminals, terrorists and Iranian-sanction evaders." (*Id.* ¶¶ 76-77.) The WSJ's rush to publish these allegations rather than inquire with Binance about them was grossly inadequate and unjustified by any true urgency.

The WSJ failed to actually investigate any of Binance's responses. The WSJ prematurely ended its initial purported investigation, ahead of its own stated deadline, less than one business day after putting its numerous accusations to Binance to compete with the New York Times. (*Id.* ¶¶ 33-36, 42.) But the WSJ decided to publish without spending any time (even a few extra hours, pursuant to its original deadline) considering or following up on Binance's responses. Instead, their motive was profit, not truth, and they offered a disingenuous reassurance to Binance by stating they could consider Binance's responses after publication and subsequently revise the article. *See Suzuki Motor Corp.*, 330 F.3d at 1136. Nor did any objective urgency justify the WSJ's similar rush to publication in March after less than two days' correspondence, while "put[ting] off an interview with a key member of Binance's team" prior to publication. (AC ¶ 153.) The WSJ's investigatory process prior to the May 21 Article likewise plausibly evinces "purposeful avoidance of the truth." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989). Berwick "refus[ed] to consider relevant background information" in Binance's detailed, off-record statements (alongside its on-record position). (AC ¶196; *see also supra* at 8-9.) And the WSJ's only follow-up questions amounted to 14 additional fully baked accusations on yet another arbitrary 24-hour deadline. (AC ¶ 195.) The answers provided to these accusations were very

31

specific and detailed (*Id.* ¶¶ 198-99, 205 ("[A]ny transactions with designated individuals occurred prior to their wallet attribution as sanctioned individuals. Once they were designated or . . . linked to designated individuals, [Binance] investigated, restricted the accounts, offboarded them and reported them."); *see also* ECF No. 27-11 (Bolger Decl. Ex. 4) at 4 (explaining, e.g., that "*Binance would not have known the indirect transactions, that were multiple hops away, were linked to the Central Bank of Iran.*").) Yet the WSJ published without adequately accounting for these answers, and recklessly cultivated the impression that Binance knowingly permitted sanctioned entities to transact on the platform. (AC ¶ 199.)

The WSJ contends that its inadequate investigation is irrelevant because neither "***entirely failing*** to contact the subject of a story prior to publication," nor "asking for comment on a short turnaround time" will "suffice to plead actual malice." (MTD at 18 (emphasis in original).) But "the question is not whether mere failure to investigate a story can, ***standing alone***, constitute malice." *Pep*, 553 F. Supp. at 1003. Here, it is not simply the "timing" and "short turnaround[s]" of the WSJ's investigations that support an inference of malice, but rather the combination and pattern of a rushed investigation and a consistent push to publish, coupled with other traditional markers of actual malice—including personal animus and bias and the decision to disregard and not further investigate the detailed rebuttals Binance provided to the WSJ before it published its false and defamatory statements—which together plausibly support a reckless disregard for the truth.[10]

---

[10] That Binance managed to respond despite unreasonable, manufactured deadlines does not undermine the inference of actual malice from the rushed investigation. (*Contra* MTD at 19-20.) The inference of actual malice arises from the unjustified rush to publish in the face of reasons to doubt the accuracy of the false and defamatory narratives that the WSJ intended to convey. *See, e.g.*, *Lovingood*, 275 F. Supp. 3d at 1311-12 (publishing "without taking the time to examine available resources" without reason for urgency). Nor do articles on similar topics by Fortune and the New York Times undermine Binance's independent allegations against the WSJ (*contra* MTD at 19 n.7), as "merely reporting what another has said obviously does not insulate a reporter from liability for defamation"—especially with other indicia of actual malice. *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 824 (S.D.N.Y. 2021).

####     f.      *The WSJ's Refusal to Correct or Retract*

The WSJ incorrectly contends that its "post-publication" responses to Binance's communications are "irrelevant" to actual malice. (MTD at 21.) Post-publication conduct, including "the failure to retract," "may, under certain circumstances, tend to support a finding of actual malice" (even if not independently sufficient). *Biro*, 963 F. Supp. 2d at 281 (S.D.N.Y. 2013); *see also Crane*, 177 N.Y. at 109 (failure to retract evinces recklessness).[11]

Here, the WSJ's repeated refusal to retract or correct its defamatory messages—even after Binance confronted it with contrary evidence—supports a plausible inference of actual malice at the time of publication. For example, after publication of the February 23 Article, Binance reiterated that "[n]o one was terminated for conducting compliance reviews or raising concerns," (AC ¶¶ 56-57), and detailed how it timely "investigated, escalated and offboarded" potentially offending accounts (*id.* ¶¶ 73-74). Yet, despite excusing its rush to publish by stating it could revise the article post-publication, the WSJ failed to engage with this follow-up and refused to modify or retract the false statements in the article. This "tend[s] to support a finding of actual malice." *Biro*, 963 F. Supp. 2d at 281–82; *see also Crane*, 177 N.Y. at 109 (failure to retract evinces recklessness). (*See also* AC ¶¶ 64-65 (post-publication response to Dismantling Investigation Statements); *id.* ¶¶ 89-90 (same for Diminished Cooperation Statements); *id.* ¶¶ 114–15 (same for Poor Compliance Statements)). That the WSJ doubled down on its false and defamatory February 23 statements, even after a retraction letter "from plaintiff labeling the charges untrue and libelous," only reinforces the inference of actual malice underlying the initial publication. *See Robertson v. McCloskey*, 666 F. Supp. 241, 250 (D.D.C. 1987) (finding actual malice where plaintiff "put [defendant] on notice that he considered the statements libelous, yet defendant pressed on").

---

[11] Post-publication conduct can constitute circumstantial evidence bolstering the inference of intent or recklessness at the time of publication. *See Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 126 (2d Cir. 2013).

Rather than correct the record, the WSJ "repeated and amplified knowingly false and defamatory allegations about Binance" in the March 11 Article, "including by portraying Binance as improperly facilitating sanctions evasion and operating with deficient compliance controls," and "dismantling … an internal investigation" in retaliation for its findings. (AC ¶¶ 155, 157, 171.) Nor did the WSJ retract or correct any of its false statements after Binance informed it that the March 11 and May 21 Articles contained false and defamatory statements. (*Id.* ¶¶ 162-63, 170-71, 178-79, 268-71.) Instead, the WSJ persisted in the same pattern of conduct even after Binance initiated litigation. Considered alongside the other evidence, the WSJ's failure to take corrective action after publication favors an inference of actual malice. *Biro*, 963 F. Supp. 2d 255, 281-82.

**B.      The WSJ's Request for Attorney's Fees and Costs Should Be Denied**

The WSJ tacks on a request for attorney's fees and costs under New York's Anti-SLAPP law, N.Y. Civil Rights Law § 70-a(1)(a). That request should be denied.

1.      Binance Pleaded Actual Malice, Defeating Any Anti-SLAPP Claim

The WSJ's motion to dismiss should be denied because Binance properly alleged defamation claims (*see supra* § A), negating any argument this action lacks "a substantial basis in fact and law" under New York's anti-SLAPP statute, N.Y. Civil Rights Law § 70-a(1)(a).

2.      Section 70-a Does Not Apply in Federal Court

Section 70-a does not apply in federal court under the *Erie* doctrine "because its substantial basis standard . . . conflicts with the standards under Federal Rules of Civil Procedure 12 and 56." *Editor's Pick Luxury LLC v. Red Points Sols. SL*, 2023 WL 6385993, at *6 (S.D.N.Y. Sept. 29, 2023) (collecting cases). "Courts in this District disagree on the question of whether the provision applies in federal court," with recent cases on both sides of the split (*contra* MTD at 19 n.11). *Compare Button v. N.Y. Times Co.*, 2025 WL 2643674, at *20 (S.D.N.Y. Sept. 15, 2025) (permitting anti-SLAPP fees, as cited by the WSJ) *with Coritsidis v. Khal Bnei Torah of Mount*

34

*Ivy*, 2024 WL 37122, at \*6 (S.D.N.Y. Jan. 3, 2024) (denying fees and collecting similar cases).

The cases applying Section 70-a in federal court are wrongly decided, and this Court should reject them. Section 70-a's "substantial basis" standard "requires the plaintiff to make a showing that the Federal Rules do not require" to survive dismissal, and thus it cannot apply in federal court under *Erie*. *See La Liberte v. Reid*, 966 F.3d 79, 87 (2d Cir. 2020); *see also, e.g.*, *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 431 (S.D.N.Y. 2021) ("Applying the Second Circuit's reasoning in *Reid*, the Court concludes that the substantial basis standard articulated in New York's anti-SLAPP law similarly conflicts with the standards under Federal Rules of Civil Procedure 12 and 56.").[12]

3.      <u>The WSJ Does Not Satisfy the Anti-SLAPP Statute's Procedural Requirements</u>

The WSJ's request for attorney's fees and costs in a Rule 12(b)(6) motion is procedurally improper. To recover fees, the WSJ must "maintain an action, claim, cross claim or counterclaim to recover damages." N.Y. Civil Rights Law § 70-a(1). "The statute requires that ***a pleading*** of some sort be filed in order to collect attorney's fees"—that is, a complaint or counterclaim. *Ctr. for Med. Progress v. Planned Parenthood Fed'n of Am.*, 551 F. Supp. 3d 320, 333 (S.D.N.Y. 2021) ("Defendant must file a separate lawsuit in order to recover any attorneys' fees").[13]

<strong><u>CONCLUSION</u></strong>

For all the reasons set forth herein, Defendant's Motion should be denied, and its request for attorney's fees and costs should be rejected.

---

[12] The WSJ's principal authority, *Bobulinski v. Tarlov*, wrongly assumes there is no conflict between Rule 12(b)(6)'s plausibility standard and Section 70-a's "more exacting" substantial basis" requirement. 758 F. Supp. 3d 166 (S.D.N.Y. 2024); *see Reeves v. Assoc. Newspapers, Ltd.*, 232 A.D.3d 10, 24 (1st Dep't 2024).

[13] *Bobulinski* allowed the defendant to request Section 70-a fees in its Rule 12 motion. 758 F. Supp. 3d at 188. That conclusion should be rejected too, as it rests on an untenably broad interpretation of the phrase "'[m]aintaining an action' [to] include[]defendants' ***continuing to litigate*** in an original action filed against them." *Id.*

Dated:    July 13, 2026                    Respectfully submitted,
          New York, New York

_____

**WITHERS BERGMAN LLP**
Christopher N. LaVigne
Amber Melville-Brown
Alexander C. Haden
430 Park Avenue, 10th Floor
New York, NY, 10022-3505
Telephone: 212.848.9800
Facsimile: 212.848.9888
christopher.lavigne@withersworldwide.com
amber.melville-brown@withersworldwide.com
alex.haden@withersworldwide.com

*Attorneys for Plaintiff Binance Holdings Limited*

36